# EXHIBIT #1

# AMERICAN ARBITRATION ASSOCIATION
## CLASS AND COMMERCIAL ARBITRATION TRIBUNAL

*William Spradlin and Shirley Spradlin;*
*Emma Oduca; Sally Kim; Elliot Sprung*
*and David Sprung; TDF Properties,*
*LLC; and Kuniko Ishida; individually*
*and on behalf of all persons*
*similarly situated,*

*Claimants*

v.  Case No.:  11 115 Y 01846 09

*Trump Ruffin Tower I, LLC,*
*a Delaware Limited Liability*
*Company,*
*Respondent*

*AND RELATED COUNTERCLAIMS*

# PARTIAL FINAL AWARD
# ON CLAUSE CONSTRUCTION

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with an Arbitration Agreement set forth in the 2005 Condominium Unit Purchase and Sale Agreement (a specimen of which is attached to Claimants' Demand as Exhibit "2") entered into between the parties, and having been duly sworn and having heard the proofs and allegations of the Parties, do hereby issue the following PARTIAL FINAL AWARD ON CLAUSE CONSTRUCTION:

## I.
## FACTUAL AND PROCEDURAL BACKGROUND

The parties' pleadings[1] generally disclose that Named Claimants are eight purchasers of condominium-hotel room units at the Trump International Hotel and Tower, Las Vegas ("Trump Tower".) In 2005, when the Trump Tower was not yet built, all Claimants executed substantially

---

[1] Claimants' Nevada state court complaint is Exhibit 1 to their Demand in this Arbitration. The presently applicable pleadings are the Complaint in Arbitration, dated March, 2010 and filed as of April 9, 2010 (Scheduling Order #1, Parag. 3). Respondent thereafter filed its Answer and Counterclaims and Claimants answered them.

the same Condominium Unit Purchase and Sale Agreement ("Purchase Agreement") with Respondent and thereafter made cash deposits of 20% of the purchase prices of the units they had contracted to purchase.

In 2008, Respondent sent Claimants notice of the closing date for the units, when the balance of the purchase price for each unit was due under the Purchase Agreement. No Claimant has closed. On September 22, 2008, Claimants filed in Nevada state court their Class Action Complaint seeking to represent a nationwide class[2] of "hundreds" of purchasers of the units (Claimants' Demand, Exh. 1 at Parag. 37). Claimants generally allege that the purchases were actually securities and that Respondent's sales violated numerous Nevada and federal statutes.

Claimants' "Procedural Background" describes the procedural history of the action up to the filing of this arbitration:

> "Respondents removed the action to U.S. Federal District Court, District of Nevada, on October 20, 2008 (Case No. 2:08-cv-01428). The parties agreed to a stay in the case pending the outcome of a similar action which considered the validity of an arbitration clause identical to that contained within the Trump Purchase and Sale Agreement (Attached as Exhibit '2')."

> "On April 22, 2009, the Supreme Court of Nevada decided that the arbitration clause in that action was valid and enforceable (Attached as Exhibit '3'). With the validity of the Trump arbitration clause no longer at issue, Claimants file this Demand for Arbitration." (Procedural Background, Exh. 2 to Claimants' Demand, filed September 3, 2009.)

In the parties' Joint Status Report in preparation for the first status conference in this Arbitration, they disputed whether the requirements of Rule 3 of the AAA Supplementary Rules for Class Arbitrations ("AAA Class Rules") had been met. Having heard the arguments of counsel at the status conference, the Arbitrator was persuaded that the clause construction phase should be decided and set a briefing schedule for that issue. (Scheduling Order #1, Parag. 7) During the briefing, the United States Supreme Court issued its decision in *Stolt-Nielsen S.A. v. Animalfeeds International Corp.* (2010) __ U.S. __, 130 S. Ct.1758 ("*Stolt-Nielsen*"). As a result, the Arbitrator requested further briefing and heard oral argument on May 28, 2010.

## II.
## APPLICABLE DISPUTE RESOLUTION PROVISION, AAA RULES, AND LAW

The Purchase Agreement states that "[t]he laws of the State of Nevada shall apply to this Agreement." (Parag. 25.10; *see also*, Parag. 21) Claimants assert that their claims arise under federal statutes as well.

---

[2] Claimants define the class as: "All individuals who made a deposit to purchase one or more of the securities in the Trump International Hotel & Tower Las Vegas from Defendants, and who have not had their deposit returned to them." (Exh. 1, Parag. 36)

The Purchase Agreement contains an arbitration clause,[3] which provides that the arbitration "shall be conducted under the Dispute Resolution Rules of the American Arbitration Association ('AAA') as modified herein." (Parag. 25.10)  The parties agree that this reference is to the AAA Commercial Arbitration Rules and Mediation Procedures as amended and effective June 1, 2009.  The parties also agree that the AAA Large Complex Case Rules are applicable "to the extent not in conflict with the preceding rules."  (Scheduling Order #1, Parag. 5)

As Scheduling Order #1 provides, the AAA Class Rules, effective October 8, 2003, also apply in this case.  Rule 3 of the AAA Class Rules provides in pertinent part:

"3. Construction of the Arbitration Clause

Upon appointment, the arbitrator shall determine as a threshold matter, in a reasoned, partial final award on the construction of the arbitration clause, whether the applicable arbitration clause permits the arbitration to proceed on behalf of or against a class (the "Clause Construction Award"). ...In construing the applicable arbitration clause, the arbitrator shall not consider the existence of these Supplementary Rules, or any other AAA rules, to be a factor either in favor of or against permitting the arbitration to proceed on a class basis."

## III.
## UNITED STATES SUPREME COURT PRECEDENT

At the time this Arbitration was filed and when the motion under Rule 3 was filed, the most recent teaching of the United States Supreme Court on class arbitration was *Green Tree Financial Corp. v. Bazzle* (2003) 539 U.S. 444, 123 S. Ct. 2402 ("*Bazzle*").  The Court there found that the interpretation of the parties' agreement as to whether class arbitration is permitted is a question for the arbitrator.

The *Bazzle* decision was handed down June 23, 2003, well before any of the Purchase Agreements in issue here was entered into.  The law after *Bazzle* was unsettled; some courts regarded the case as standing for the proposition that a class arbitration was permitted when the arbitration clause was silent as to its availability. *See, e.g., Carlsen v. Freedom Debt Relief* (E.D. Wash. March 26, 2010) 2010 WL 1286616; *Stolt-Nielsen, supra*, at 1768-69 & n. 7.

Respondent claims this case in all respects is covered by the Supreme Court's April 27, 2010, decision in *Stolt-Nielsen*.  The Court there emphasized that a basis must be found for classwide arbitration in the parties' contract in order to allow it.  The Court found that the parties' contract had been entered into long before the 2003 *Bazzle* decision and that the parties had not agreed to classwide arbitration.  Rather, the Court found the salient fact to be the parties' stipulation that there was "no agreement" to arbitrate on a classwide basis. (citing App at 7a)  The Court stated in footnote 10 that it had not considered whether a contractual basis for class

---

[3] The complete text of Parag. 25.10, entitled "Arbitration" is attached to this Partial Final Award as Exhibit A.

arbitration existed since, due to the stipulation in the case before it, that question was "beside the point."

The Court laid down some interpretation ground rules for arbitrators. First, the arbitrator cannot determine that the parties had agreed to classwide arbitration simply because they had decided to arbitrate. After *Stolt-Nielsen*, it is clear that the determination that a dispute is arbitrable is different from a determination that a dispute is arbitrable as a class arbitration. Although arbitrators generally decide procedural issues, they cannot simply decide to impose class arbitration without a contractual basis, because of the changes brought about by the "shift from bilateral arbitration to class-wide arbitration" and the concomitant alteration of many substantive rights. *Id.* at 1776   Class arbitration--which can have high commercial stakes and limited judicial review--is too different from individual arbitration to assume agreement to it, the Court held.

Second, even a broad clause stating in substance "arbitrate any and all disputes" is not sufficient to encompass agreement to classwide arbitration. Third, the cases stating that all doubts as to arbitrability of disputes should be resolved in favor of arbitration are not helpful because that strong presumption in favor of arbitrability is trumped by the FAA provision that all arbitration is bottomed on the parties' agreement. In interpreting the contract, the Court said "We think it is also clear from our precedents and the contractual nature of arbitration that parties may specify *with whom* they choose to arbitrate their disputes." Id at 1774. (emphasis original) (citing *Volt Info. Services v. Leland Stanford Univ.* (1989) 489 U.S. 468, 109 S.Ct. 1248.)

The question the Court's decision left open for arbitrators is how to decide if a contractual basis exists when the agreement is silent and when one of the parties contends that there was an agreement to arbitrate on a classwide basis while the other claims the parties intended only bilateral arbitration. The arbitrator must determine-- from the language of the contract in the first instance--whether the parties specified with whom they chose to arbitrate.

The arbitrator faced with the Rule 3 clause construction decision must look to the applicable federal or state law, rather than to "public policy" as the arbitration panel in *Stolt-Nielsen* had done, or to some other standard. *Id.* at 1775. In *Stolt-Nielsen*, for example, the Court pointed to the following factors in demonstrating that the parties had agreed to bilateral arbitration only: the shipper (Animalfeeds) had chosen the contract form rather than having had the vessel owner (Stolt-Nielsen) foist it on them, the parties were sophisticated business entities, and there was no tradition of class or consolidated arbitration in maritime law. *Id.* at 1775. None of these exact factors exists here but they indicate the types of facts the Arbitrator must look for in deciding whether the parties intended to foreclose classwide arbitration.

# IV.
# ANALYSIS

Since the Purchase Agreement's arbitration provision is silent as to the availability of classwide arbitration, the construction of a contract in the absence of a specific provision is the task now. Under *Stolt-Nielsen,* in order to construe the clause as permitting classwide arbitration

the arbitrator must find evidence of an agreement. The Supreme Court held that state law generally governs, with the proviso that the FAA also must be considered.[4] *Id.* at 1773.

The Arbitrator reviews Nevada's rules of contract construction and what Justice Breyer in another context[5] referred to as the "ordinary background law" in Nevada at the time the contracts were entered into. Then, the Arbitrator examines whether the earlier Nevada state and federal court decisions decide the question of classwide arbitration. Finally, the Arbitrator addresses whether agreement to classwide arbitration may be found on the facts of this case.

### A.   Nevada's Background Law:

The Uniform Arbitration Act, which Nevada has adopted (N.R.S. 38.015 ff), governs arbitration agreements in Nevada. *Kindred v. Dist.Ct.* (2000) 116 Nev. 405, 996 P.2d 903; *Mikohn Gaming Corp. v. McCrea* (2004) 120 Nev. 248, 252, 89 P.3d 36, 39 ("Nevada's version of the Uniform Arbitration Act ...clearly favors arbitration"). Recognizing this "strong policy in favor of arbitration," Nevada courts have construed agreements to arbitrate liberally in favor of arbitration. *Id.* (citing and relying on *Phillips v. Parker* (1990) 106 Nev. 415, 417, 974 P.2d 716, 718). As the Court held in *Stolt-Nielsen*, however, this fact alone is insufficient to permit the arbitrator to find agreement to classwide arbitration.

Under Nevada law, several competing rules of contract construction must be harmonized. The purpose is to give effect to the parties' intention, as far as it can be discerned five years after the fact. As the Nevada Supreme Court held in *Anvui, LLC v. G.L. Dragon* (2007) 123 Nev. 212 "In interpreting a contract, 'the court shall effectuate the intent of the parties, which may be determined in light of the surrounding circumstances if not clear from the contract itself.'"(fn omitted) *Id.* at 215 (ambiguous provision in commercial lease created an issue of material fact, precluding summary eviction of tenant).

### B.   The MGM cases

The Nevada Supreme Court has analyzed the precise arbitration clause at issue here already. Before reviewing the significance of other factors in the parties' contract here, we must review that Court's holding and the holding in a Federal District Court case concerning the same provision to determine whether those decisions control the result here.

In mid-November 2008, the parties in this case agreed to a stay of proceedings to await the decision of the Nevada Supreme Court considering an identical arbitration provision in the MGM Grand Towers hotel condominium unit purchase agreement. The case was *KJH & RDA Investor Group, LLC et al. v. Turnberry/MGM Grand Towers, LLC* (Case No. 51159). In that case, defendant MGM had moved to compel arbitration and plaintiffs resisted. The trial court compelled arbitration and plaintiffs appealed on the ground the arbitration provision was

---

[4] While developments since *Stolt-Nielsen* point to a potential collision between state law and the FAA, *see, e.g.,* *Laster v. AT&T Mobility* (9th Cir. 2009) 584 F.3d 849 (cert granted sub nom *AT&T Mobility v. Concepcion* May 24, 2010 No. 98-893) 130 S.Ct. 3322, no different result would obtain in this case under either state or federal law.
[5] *New Jersey v. New York* (1998) 523 U.S. 767, 812 and, n.6, 118 S.Ct. 1726.

unconscionable. When a party attacks a contract as unconscionable, the burden is on the party claiming unconscionability.

On April 22, 2009, the Nevada Supreme Court ruled in the *KJH* case that the arbitration clause was enforceable.[6] Before the Nevada Supreme Court had ruled in the *KJH* case, a federal magistrate judge in another investor case against the MGM Grand Towers, *Mary Ann Sussex et al. v. Turnberry/MGM Grand Towers, LLC et al.*, U.S.D.C. Dist. Nev., Case No. 2:08-CV-00773-RLH-PAL, had ruled that the identical arbitration clause was unenforceable. However, after the Nevada Supreme Court handed down its decision in the *KJH* case, the Federal District Court overturned the magistrate's decision and followed the Nevada Supreme Court ruling. *Sussex v. Turnberry/MGM Grand Towers* (June 16, 2009) 2009 WL 948652.

In both the *KJH* and *Sussex* cases, the state and federal courts found the entire arbitration provision enforceable and turned aside plaintiffs' claim that the arbitration provision was unconscionable. Neither court considered whether the provision was unconscionable if the provision denied classwide arbitration; that specific issue was not before either court.

The only mention of classwide arbitration in the MGM cases seems to have been made by defendant MGM's counsel, Morris Pickering & Peterson (Mr. Morris), in a brief filed July 17, 2008, in the *Sussex* case, that "The [arbitration] clause does not bar class actions." (*See* Claimants' April 30, 2010, Brief, at n. 4, citing Exhibit 3 to parties' Joint Status Report, 16:5-16) Mr. Morris also argued for MGM: "Nothing in the FAA or UAA prohibits the arbitration of Plaintiffs' putative class action. *Shroyer v. New Cingular Wireless Services, Inc.*, 498 F.3d 976, 990-91 (9th Cir. 2007)(party offered 'no authority or support for …its argument that…the Federal Arbitration Act…disfavor[s] class arbitration…class arbitrations further the FAA's purpose of encouraging alternative dispute resolution')."

Claimants urge that the quoted statements in the brief in the *KJH* case concerning the identical arbitration provision bind Respondent here, and foreclose it from arguing that no classwide arbitration is permitted. Respondent resists, claiming that it was not a party to the case before either court. The problem is that, as their stipulations to stay (Exhibits 1 and 2 to Respondent's May 12, 2010, Brief) show, both parties here relied on the parties in the MGM cases to brief and argue the same arbitration provision they had in this case, and requested the Federal District Court here to stay this case to await the result. Also, the same lawyers representing Claimants here represented the plaintiffs in both of the MGM cases; however, the lawyers representing defendant MGM were not the same as counsel representing Respondent here. It stretches too far to bind Respondent to the statements that a lawyer for a different defendant in a different case made, even when the same arbitration provision is in issue.

However, the Nevada Supreme Court's *KJH* decision does foreclose several of Claimants' arguments. The *KJH* decision analyzed and resolved Claimants' claim that an identical arbitration agreement was unconscionable and unenforceable as well as that it was an adhesion contract. To the extent that the record is the same, and the issues raised were the same there, that decision of Nevada's highest court controls the outcome here.

---

[6] WL 1455992. Though the Supreme Court's decision is unpublished and therefore not precedent (SCR 123), both parties refer to and rely on it, and treat it as controlling. Accordingly, the Arbitrator does as well.

**Unconscionability:**

The Nevada Supreme Court in *KJH* first discussed whether the mandatory arbitration clauses "are unenforceable as unconscionable." (*Id.* at 2) Reviewing them *de novo*, citing *D.R. Horton, Inc. v. Green* (2004)120 Nev. 549, 553, 96 P.3d 1159, 1162, the Court said that arbitration agreements are unconscionable under Nevada law only if they "are both procedurally and substantively unconscionable." The Court in *KJH* emphasized that "both elements must be present to render an arbitration clause invalid." (*Id.* at 3) In *Horton*, the Court had found the arbitration clause in a home purchase agreement to be both procedurally and substantively unconscionable and upheld the trial court's order denying enforcement of it.

What is important in *Horton* is where the Court drew the line and how it upheld the trial court's result while not agreeing completely with the trial court's grounds. For example, it did not find that the homebuyers had no bargaining ability, as the trial court had held. The buyers conceded that it was not an adhesion contract (*Id.* at n. 2), and the Supreme Court stated that the homebuyers could have eliminated the arbitration provision. The Court also held that even a "large disparity between the parties' financial strength does not amount to unequal bargaining power." *Id.* at 555. What supported the trial court's ruling, in the view of the Supreme Court, was that, as in *Burch v. Dist. Ct.* (2002) 118 Nev. 438, 49 P.3d 647, (invalidating a home warranty arbitration provision on unconscionability grounds) the arbitration provision was inconspicuously buried in tiny font on the back page of the purchase document. This fact, plus the sales agent's oral representation that the clause was a "standard provision" and the clause's failure to put the homebuyers on notice that by agreeing to arbitration they were giving up important rights, together established what the Court later summed up as "great procedural unconscionability. *Id.* at 557-58 (relying on *Kindred, supra*).

The Court in *Horton* also found the clause was substantively unconscionable, "[a]lthough the one-sidedness of the provision is not overwhelming." The Court focused on (1) the contract's $10,000 penalty for refusing to arbitrate; and (2) the requirement that each party bear its own attorneys fees and other costs, given the "asymmetrical effects" of the costs provision due to the limited finances of "ordinary consumers" compared to the developer. (*Id.* at 558)

In the *KJH* case, the Court first admonished that, absent procedural unconscionability, an arbitration clause would be upheld "no matter how one-sided the contract terms." Again relying on *Horton* (120 Nev. at 553-4), the Court quoted: "it is not the court's place to rectify these kinds of errors or asymmetries." Procedural unconscionability focuses on oppression and surprise, the Court emphasized, citing *Ferguson v. Countrywide Credit Industries, Inc.* (9th Cir. 2002) 298 F.3d 778, 783. The Court found that neither oppression nor surprise existed in the *KJH* case.

To support that factual finding, the Court in *KJH* pointed out that the arbitration clauses were not inconspicuous and that the plaintiffs must have read and understood them, since they separately initialed each page. These factors led the Court to find that the arbitration provision was not procedurally unconscionable. Citing a recent California Supreme Court decision, *Gentry v. Superior Court* (2007) 42 Cal. 4th 443, 165 P.3d 556, the Nevada Court held that "the total absence of procedural unconscionability is a dispositive consideration." For that reason and

7

despite the lack of the "full-blown evidentiary hearing regarding unconscionability" that plaintiffs had requested (*Id.* at n. 4), the Supreme Court agreed with the trial court that the provisions "are not unenforceable." (*Id.* at 6)

The same factors that the Court found compelling in *KJH* also exist here. The arbitration provision (Parag. 25.10) was not inconspicuous. Claimants' Declarations (discussed below) show that they read the provision, though they claim they thought it provided for classwide arbitration, and they do not deny having separately initialed each page of the Purchase Agreement. Because the *KJH* decision rests on the same factual basis, it is not possible to find the same clause here procedurally unconscionable; therefore, even if the clause is substantively unconscionable, following the Nevada Court's earlier decisions, it must still be enforced.

### Contracts of adhesion:

The *KJH* plaintiffs also argued that the MGM purchase agreement's arbitration provision was adhesive and therefore "oppressive." (*KJH* at 4). Citing *Burch v. Dist. Ct., supra,* 118 Nev. at 442, the Court emphasized that the essential requirement for an adhesion contract is that "the weaker party [in an adhesion contract] has no choice as to its terms." The Court found that the MGM purchase agreement allowed for written amendments and that the buyers "had the chance to consult with an attorney." (*Id.* at 4)

The contract of adhesion doctrine[7] is also limited in Nevada. As the Nevada Supreme Court noted in 2000 in *Kindred, supra,* an employment case in which a stock broker's Title VII and FMLA claims were ordered to arbitration:

> "An adhesion contract is "a standardized contract form offered to consumers of goods and services essentially on a 'take it or leave it' basis, without affording the consumer a realistic opportunity to bargain." *Obstetrics and Gynecologists v. Pepper,* 101 Nev. 105, 107, 693 P.2d 1259, 1260 (1985). We have never applied the adhesion contract doctrine to employment cases." *Kindred v. Dist. Ct., supra,* 116 Nev. 405, 411

In the *KJH* case, the Court distinguished *Horton,* where the arbitration provision was buried inconspicuously after the signature lines, on the back of the home purchase documents. The MGM arbitration clause was not surprising to plaintiffs, the Court held. (*Id.* at 5)

The *KJH* decision also rested significantly on the lack of a "vast disparity" of "bargaining power." (*Id.* at 4) The Supreme Court found that the plaintiff purchasers were "self-described real estate investors who purchased one and, in some case, multiple luxury condominiums—not as personal residences—but as speculative rental properties." (*Id.*) Indeed, one of the reasons that plaintiffs in the *KJH* case argued against arbitration was because they asserted that all class members had damages of over $50,000.

---

[7] Even in jurisdictions with an expansive view of adhesion contracts, finding a contract of adhesion is the beginning, not the end, of the inquiry. Adhesion contracts are found everywhere and are enforced in many situations. The standard of enforcement is whether the provisions are within the reasonable expectations of the weaker party. *See, e.g., Graham v. Scissortail* (1981) 28 Cal. 3d 807, 623 P.2d 165. *See also, Burch, supra,* at 442, and n. 4.

The same statement can be made about Claimants in this case. Their Complaint, filed September 22, 2008 (Exh. 1 to Claimants' Demand), states that they invested in the units to participate in the hotel's rental program, which they were told would generate substantial amounts of revenue to them. (Parag. 4) They claim the following amounts in controversy based only on the amount of the cash deposit each Named Claimant made: William and Shirley Spradlin, $125,000 (Parag. 27); Elliott and David Sprung, $113,000 (Parag. 28); Emma Oduca, $124,000 (Parag. 29); Sally Kim, $156,000 (Parag. 30); TDF Properties, LLC, $127,000 (Parag. 31); and Kuniko Ishida, $120,000 (Parag. 32).

Based "on the record" before it, the Nevada Supreme Court refused to find that the arbitration clauses in *KJH* were adhesive. To support its finding, the Court relied on other language in the MGM purchase agreements that to the Court "imply that the arbitration clauses at issue...were negotiable."

All of the language in the MGM purchase agreement that, in the Nevada Supreme Court's view, implied plaintiffs' ability to negotiate the arbitration provision, is now also part of the record in this Arbitration. (Parties' April 8, 2010 Joint Status Report, Exh. 2.) The Arbitrator notes that the following "Standard Provisions," which appear in the MGM purchase agreement (Parag. 4), appear in this case in the Purchase Agreement at Parag.5:

> "5. **STANDARD PROVISIONS.** It is acknowledged and agreed by the parties hereto that this Agreement is comprised of and does include the content and provisions of the first page, plus "**Standard Provisions**" consisting of **Paragraphs 3** through **48**, inclusive. The Standard Provisions shall bear no addition, deletion or other modifications or, should any appear thereon, they shall be invalid and of no force or effect. Any additions, deletions or other modifications to this Agreement shall be solely made by notation upon the first two (2) pages of this Agreement or by formally executed riders or addenda hereto. Prior receipt, approval, acceptance, inclusion and the binding validity of the Standard Provisions are fully and freely acknowledged by the parties hereto."

The Nevada Court implicitly dismissed this language--disallowing any modification of the bulk of the purchase agreement, including the arbitration provision--and instead cited *Burch, supra* (*Id.* at 4) to demonstrate that unlike the plaintiffs there, the *KJH* plaintiffs had bargaining power and could have negotiated changes to the documents.

Given the Court's earlier refusal to extend the doctrine of adhesion contracts to employment cases in the *Kindred* case, it could have been expected the Court would not extend the doctrine to a hotel-condominium unit purchase in *KJH*. The Nevada law on adhesion contracts seems to be, as Respondent contends, limited to consumers. *See Pepper, supra; cited in Burch, supra*, n. 4. And, even if it were an adhesion contract, it would still be enforceable if its provisions were not oppressive or a surprise. (*Burch, supra* at 442.) The Nevada Court in *KJH* found no surprise or oppression in the provision.

9

Claimants raise a host of related arguments to avoid a finding that the arbitration provision they agreed to does not permit class arbitration. These arguments will be addressed below.

### Claimants' Declarations:

This case also presents one different and relevant factual item not present in *KJH*.[8] Claimants have filed three declarations stating, among other things, that they were not allowed to make changes in the purchase documents (Declarations of William Spradlin "Spradlin Decl.," Elliott Sprung "E Sprung Decl." and David Sprung "D. Sprung Decl.," submitted with Claimants' May 3, 2010 Supplemental Brief.) The Declarations will be evaluated to determine if the facts they relate impact the result here in any way.

Respondent does not deny that it was the drafter of the Purchase Agreement.[9] Respondent does not claim that any purchaser negotiated a change to the arbitration provision. Claimants' three identical Declarations state, among other things, that the Purchase Agreements were presented to them on a "take it or leave it" basis. (Spradlin Decl., E Sprung Decl., D Sprung Decl., Parag. 4)   It is not necessary to resolve any factual dispute here, however.

Paragraph 5 of the Purchase Agreement, cited above, supports Claimants' argument: they were presented with the arbitration agreement (Parag. 25.10) on a "take it or leave it" basis. Though the Supreme Court did not mention this specific paragraph (Parag. 4.10 of the MGM purchase agreement) in the *KJH* case, since the entire purchase agreement was part of the record on which the Court found the arbitration clause nonetheless enforceable, the Arbitrator is bound by that holding.

For the reasons expressed here in detail below, even if Claimants were presented with the arbitration provision on a "take it or leave it" basis as they claim, that fact does not make the agreement unenforceable, even if it is held not to permit classwide arbitration.

### Waiver:

In *KJH*, plaintiffs claimed that they lacked notice of the rights they were waiving in arbitration and specifically argued that the waiver of right to jury trial was unconscionable.   The Court dismissed plaintiffs' argument:

"MGM had no duty to apprise KJH in detail of every right that it was waiving.   See D.R. Horton, 120 Nev. At 556-57, 96 P.3d at 1164. Moreover, by virtue of providing that

---

[8] In *KJH*, the Nevada Supreme Court refused to take judicial notice of declarations the plaintiffs filed in the *Sussex* Federal District Court case to establish procedural unconscionability because the *KJH* plaintiffs had not presented those declarations to the state trial court in the *KJH* case. (n. 2)

[9] Respondent argues that *Parsons Drilling v. Polar Resources Company* (1982) 98 Nev. 374, 377, 649 P.2d 1360, relying on *Gage v. Phillips* (1891) 21 Nev. 150, 153, 26 P. 60, held that if the contract is not ambiguous, parol proof is inadmissible of the writing, which is presumed to be the "whole contract." In this case, the Purchase Agreement contains an integration clause, Parag. 49. It also contains a clause prohibiting construing the language against the drafter, Parag. 41. All of these provisions Claimants agreed to.

arbitration would 'be the exclusive means for resolving disputes which the parties cannot resolve,' and 'shall be conducted under the . . . [r]ules of the [AAA]' before an arbitrator whose award 'shall be final,' the arbitration clauses adequately notified KJH that it was waiving certain important rights, including the right to have its claims tried before a jury. See id." (*Id.* at n.3)

The question here is whether the Supreme Court's finding in the *KJH* case that the arbitration clause adequately notified the plaintiffs of their waiver of rights also determines that they would not be entitled to classwide arbitration. Claimants rely on Nevada precedent stating that a court may not hold that a party intended to waive judicial rights and remedies absent express language. *Lowe Enterprises Residential Partners LP v. Dist. Ct.* (2002) 118 Nev. 92, 40 P.3d 405 (establishing the rules for enforcing a contract waiving the right to jury trial). Relying on their Declarations, Claimants say in substance "we did not intend to give up the right to participate in a class simply by agreeing to arbitration, and it was never mentioned that we were waiving that right."

As shown above, the Nevada Supreme Court in *KJH* already dismissed a similar claim by plaintiffs that they did not intend to waive their rights to a jury trial. (*Id.* at n. 3). The Court did not mention the *Lowe* case, relying instead on *Horton, supra.*

The *Lowe* case is inapplicable here since it dealt with waiver of the right to jury trial, a far more fundamental and significant matter than the type of arbitration, bilateral or classwide, in which the parties would participate. Perhaps in the context of an adhesion contract, Claimants' argument that express waiver language is required before a waiver of class arbitration rights is found might be compelling[10]; however, in *Kindred, supra*, the Nevada Supreme Court already refused to extend the adhesion contract doctrine even to employment cases, much less to the type of real estate investor case presented here. Moreover, the Court said in *Kindred*:

> [W]e have held that "[p]arties to a written arbitration agreement are bound by its conditions regardless of their subjective beliefs at the time the agreement was executed." *Campanelli v. Conservas Altamira, S.A.,* 86 Nev. 838, 841, 477 P.2d 870, 872 (1970)." *Kindred v. Dist. Ct., supra,* 116 Nev. at 411

Based on the Nevada precedent and *Stolt-Nielsen*'s ground rules, the Arbitrator is constrained to find that Nevada law would also uphold an implicit waiver of the class procedural device here. As the Nevada Court has already found, these purchasers were real estate investors involved in a business transaction and had the ability to consult with counsel. *KJH* at 4-5. The Court has also already held that even a large disparity in bargaining power does not equate to unequal bargaining power. *Horton, supra.* The Court has held that the purchasers received adequate notice of the rights they were giving up and were not surprised by the arbitration term. *KJH* at n.3. Based on this precedent and the arbitration provision's language, the Arbitrator concludes that Nevada law would find adequate notice of a waiver of class arbitration.

---

[10] Indeed, many courts have held that even express waiver of class arbitration rights is unenforceable in the adhesion contract context. *See AT&T Mobility v. Concepcion, supra; Fensterstock v. Education Finance Partners* (2nd Cir. July 12, 2010) ___ F.3d ___, 2010 WL 2729759.

### Intent and subjective belief:

Both sides agree that the arbitrator should determine the intent of the parties at the time they entered into the contract. The first step is what the parties' words say—the explicit language in the contract documents. If the words' plain meaning can be determined, that controls since Nevada follows the objective theory of contract.

Claimants' Declarations state that when Claimants read the arbitration provision, they understood that it provided for classwide arbitration under Nevada law if a dispute arose, and that they never agreed that they had not reached an agreement on the availability of classwide arbitration. (Decls. at Parag. 2, 3) In construing a contract, the necessary "intent" is legal intent. As *Kindred, supra,* held, a party's subjective belief is not relevant. For that reason, Claimants' Declarations regarding their subject intent are not helpful to the decision. Their subjective intent is not determinative.

### The effect of silence and other rules of contract construction:

According to Respondent, under ordinary rules of contract construction in Nevada, the primary rule of interpretation is the effect of silence in the arbitration agreement. Respondent urges that, when a contract is silent as to a subject, the contract may not be read to include that term. *Parsons Drilling Inc. v. Polar Resources Co.* (1982) 98 Nev. 374, 377, 649 P. 2d 1360. The *Parsons Drilling* case involved the assignment of a drilling rig. When the lender refused to consent to the assignment, the assignee attempted to return the rig and the assignor claimed it was entitled to be paid rent for the period the assignee had used the rig. The contract was silent as to any obligation to pay rent. The Nevada Supreme Court held that since the contract was silent as to any obligation to pay rent, no rent term could be presumed.

Respondent first claims that here there is no provision for classwide arbitration; therefore, under the rule in *Parsons Drilling,* no court applying Nevada law would supply a provision for classwide arbitration. Respondent then argues that one need only look only to the other terms in the arbitration clause itself, all of which point in the direction of a two-party arbitration only.

Claimants distinguish the *Parsons Drilling* case by arguing that in *Parsons Drilling,* the parties' agreement omitted any reference to a rent term, so a rent term could not be supplied, while here there is not a complete absence of an arbitration term. Here, Claimants argue, the only confusion is whether the term "dispute" includes class action disputes.

Silence, Claimants first say, cannot be held to constitute waiver since, according to their argument, a party cannot waive a right unless it is stated. (Claimants' May 17, 2010 Brief at 11, n. 9) The Court in *KJH* previously treated the waiver argument when it found that rights did not have to be enumerated in order to be waived, relying on *Horton.* (*KJH* at n.3)

Claimants then answer the provision's silence on classwide arbitration with two different arguments—either that, based on other contract language, classwide arbitration is assumed

because it is not specifically excluded,[11] or that the absence of a classwide arbitration term makes the arbitration provision ambiguous. Claimants' two arguments will be considered in turn.

### Meaning of the "any dispute" language:

Claimants rely on the MGM cases to argue that both the federal and state courts implicitly found in construing the identical MGM arbitration provision that the arbitration clause is very broad in scope, covering "any dispute" and that all claims were arbitrable. Claimants' reliance is misplaced; the broad "any dispute" language is not of assistance to them on this point. The only issue before the courts was the arbitrability of the claims themselves.[12] The Nevada Supreme Court found that this broad language adequately notified plaintiffs they would be resolving any disputes in arbitration (*Id.* at n. 3); however, that contract language does not refer to the procedural devices that could be employed in the resolution of the claims.

The available procedural devices were not addressed because the question was not before the courts. In fact, it is by no means clear that either the Nevada Supreme Court or the Federal District Court, in considering the arbitration provision before it, even focused on the classwide arbitration aspect. Neither court mentioned the availability of classwide arbitration as a basis for its decision that the entire arbitration provision was enforceable. Since neither court referred directly to classwide arbitration, it is impossible for this Arbitrator to assume that either court considered whether class proceedings would be available to plaintiffs in arbitration.

*Stolt-Nielsen* supplies the rule of construction. To argue, as Claimants do, that classwide arbitration is assumed if not excluded reverses the appropriate analysis. After *Stolt-Nielsen*, classwide arbitration is excluded unless there is evidence that it was agreed to. On the factual record, there is insufficient evidence that classwide arbitration was agreed to.

The parties can have agreement on a term without it having been expressly stated in the contract. For that reason, the lack of reference to a specific type of claim does not prohibit arbitration of it. But the "any dispute" language is of no assistance to Claimants in this instance. Claimants have not cited any precedent stating that this language means "cases brought as class actions." The Court in *Stolt-Nielsen* noted that this type of broad language refers to substantive claims and can't substitute for the necessary intent to permit the inclusion of non-signatories to the arbitration. *Id.* at 1770. The same result is required here.

Claimants alternatively urge the Arbitrator to find the clause ambiguous. If the clause is ambiguous, then the Arbitrator has access to extrinsic evidence, under the Nevada's law of

---

[11] Claimants also make two additional policy arguments: (1) that class actions are favored in Nevada and therefore should be presumed to be available in arbitration; and (2) that the mention of arbitration under the AAA Rules includes class arbitration, since the AAA Class Rules existed at the time the Purchase Agreement was entered into. However, Nevada favors class actions only in cases in which they are appropriate; in the arbitration context there are competing considerations, most importantly allowing parties to contract as they choose. Moreover, the existence of the AAA Class Rules is not an argument for the existence of a class in any particular case. *See* AAA Class Rule 3 (b), *supra.*

[12] Moreover, as the Court in *Stolt-Nielsen* has already held, the broad "any and all disputes" language does not establish agreement to classwide arbitration.

contract construction. According to Claimants, finding the clause ambiguous allows the arbitrator to look to "parol evidence," including their Declarations (Claimants' May 17, 2010 Brief at 12, n. 10.) Claimants point out that the Court in *Stolt-Nielsen* found ambiguity due to silence of the arbitration clause. While the basis for the Court's ruling there was the parties' stipulation that there was "no agreement to classwide arbitration," the Court did state that in the case of a silent clause, certain types of evidence of intent were relevant, including expert testimony of industry custom and usage, that the arbitration panel had erroneously ignored them.[13]

Looking to other provisions in the contract, Claimants state that silence in the arbitration provision in this case means that classwide arbitration must be allowable. Respondent responds that looking to different provisions in the contract, shows that classwide arbitration was not intended. As the Supreme Court said in *Stolt-Nielsen*, the arbitrator should seek to determine-- from the language of the contract in the first instance--whether the parties in this case specified with whom they chose to arbitrate. Reviewing the text, it appears to point mostly in the direction of bilateral arbitration.

First, by looking at the arbitration clause itself, Respondent argues that one can tell the parties intended only two parties would be involved in an arbitration. Respondent relies on several points in the clause, including confidentiality, having a sole arbitrator and limiting discovery. These aspects uniformly show that the parties intended only two parties to participate.

Claimants counter that the arbitration provision explicitly carves out some types of relief that an arbitrator may not award—notably, punitive damages.[14] For this reason, Claimants urge, the Arbitrator should find that the failure to carve out classwide relief should not be presumed because it could have been explicitly stated and was not. This argument goes back to the "all disputes" language already rejected in *Stolt-Nielsen*. Claimants may not rely on rules of construction the Supreme Court in *Stolt-Nielsen* has now discredited in its new ground rules.

### The "contract documents" and the effect of failure to mention a term:

Under rules of contract construction, if the words used in the arbitration agreement are unclear, then the Arbitrator must consult other sources, for example, what the parties said elsewhere in the "contract documents." The problem in this case is determining which documents constitute the "contract documents."

---

[13] The United States Supreme Court has held that "an agreement's utter silence on an issue [cannot translate] into contractual ambiguity." *New Jersey v. New York* (1998) 523 U.S. 767, 784 n. 6, 118 S. Ct. 1726. Justice Breyer's concurring opinion in the case pointed out "silence means that ordinary background law applies." *Id.* at 813

[14] "The arbitrator shall have the authority to award any remedy or relief that a court of the State of Nevada could grant in conformity to the applicable law except that the arbitrator shall have no authority to award punitive damages." (Parag. 25.10)

Claimants point to a "Trump International Hotel and Tower Las Vegas Condominium Hotel Rental Management Agreement," (Exhibit 1 to Claimants' May 3, 2010, Supplemental Brief)("Rental Agreement") that they argue should be construed as part of the contract documents. The Rental Agreement's arbitration provision (Article 9) contains an explicit class arbitration prohibition (Article 7.9.)[15] Though the Rental Agreement Claimants present is dated in the lower right hand corner of each page "Revised March 2008," Claimants state that it and the Purchase Agreement were part of a single transaction. From that they argue that since the class arbitration prohibition appears in a contemporaneous document and is missing from Paragraph 25.10 of the Purchase Agreement, Paragraph 25.10 must be read to allow class arbitration.

Respondents dispute that these were contemporaneous documents. The issue here is which party has the burden of proof on that point. There has not been any discovery. Claimants say that Respondent must show that the documents were not created at the same time since Respondent has the information in its possession. Its failure to bring forth the evidence should be construed against it. Respondent places the burden on Claimants and the Purchase Agreement has an integration clause (Parag. 49.)

Another contractual construction principle comes into play if the arbitration provision's words are found to be ambiguous. If one party was primarily responsible for drafting the contract, ambiguities in the contract would be construed against that party. Claimants contend that since Respondent drafted the Purchase Agreement it should be construed against Respondent. Respondent relies on Paragraph 41, stating that the parties had "equal bargaining power" and that the documents are not to be construed against either party.

I do not find that the contract is ambiguous in failing to provide for classwide arbitration. Since I do not find ambiguity, it is not necessary to refer to other contract construction principles. The *Stolt-Nielsen* decision requires that the arbitrator find evidence of agreement in order to impose classwide arbitration. Here, contends Respondent, there is no evidence that Respondent agreed. Given the lack of proof that the contract documents include the Rental Agreement, and considering the many aspects of the Purchase Agreement's arbitration clause itself that point in the direction of bilateral arbitration only, no agreement for classwide arbitration can be found.

**Looking beyond the Contract Documents:**

Claimants state that the "background law" of Nevada favors the consolidation of arbitrations. To establish the Nevada "default rule" they rely on N.R.S. 38.224, the Nevada statute that allows consolidation of separate construction arbitrations. (Claimants' May 17, 2010, Brief at 10.) Claimants rely on *Exber Inc. v. Sletten Construction Company* (1976) 92 Nev.

---

[15] Article 9.7 provides: "<u>Class Actions Prohibited.</u> **IN ANY ARBITRATION CONDUCTED UNDER THIS AGREEMENT, NO CLASS ACTION SHALL BE PERMITTED, NOTWITHSTANDING OTHERWISE APPLICABLE LAW. AN ARBITRATOR ACTING UNDER THIS AGREEMENT IS NOT EMPOWERED BY THIS AGREEMENT TO CONDUCT A CLASS ARBITRATION. ONLY CLAIMS OF HOTEL MANAGER AND THE OWNER SHALL BE DETERMINED IN ANY ARBITRATION UNDER THIS AGREEMENT. THE ARBITRATOR SHALL NOT ALLOW EITHER HOTEL MANAGER OR OWNER TO SERVE IN ANY REPRESENTATIVE CAPACITY FOR OTHERS OR AS A PRIVATE ATTORNEY GENERAL."**

721, 732, 558 P.2d 517 and 31 ALR 6th 433 §8 (2008), listing Nevada among the states that follow a default rule allowing consolidation where the agreement is silent. Respondent states consolidation is also inappropriate, since "the parties did not contemplate" it. (Respondent's May 12, 2010, Brief at 10.)

Here, Claimants argue, since the Arbitrator is entitled to consolidate arbitrations, a silent arbitration clause should also be held to apply to permit class arbitrations. Claimants' argument goes too far. While consolidation and class proceedings share some elements, they are procedurally significantly different. Class proceedings have the effect of binding absent class members, while consolidated proceedings simply allow joint proceedings.

Consolidation of arbitrations might be an appropriate procedural device for handling Claimants' claims. Consolidation is permitted where there are separate arbitrations between the same parties or where one party is a party to two or more arbitrations if the dispute arises from a series of related transactions creating the possibility of conflicting rulings. However, the record here at present is undeveloped and it would be premature to make any determination about consolidation at this stage, particularly in light of Respondent's opposition to it.

Moreover, the Nevada statute on which Claimants rely gives the power to consolidate separate arbitrations to the court under specifically enumerated circumstances. While Claimants invite the Arbitrator to play the role of the court here, the Arbitrator does not find in the Nevada statutory scheme the power to do so.

## V.
## WHO DECIDES UNCONSCIONABILITY?

In their final brief, Claimants urge that if the Arbitrator construes the arbitration clause to prohibit classwide arbitration, the entire arbitration clause should be held unconscionable. However, the decision as to unconscionability, the Claimants urge, is for the court, rather than the Arbitrator, since that is a "gateway" issue. Accordingly, Claimants argue that the Arbitrator should "remand" the case to the Federal District Court for this purpose. (Claimants' May 17, 2010, Brief at 17-18). Claimants are mistaken.

*Jackson v. Rent-A-Center West, Inc.* (9th Cir. Nev. 2009) 581 F.3d 912, the Ninth Circuit decision on which Claimants rely for this proposition, is no longer good law. The *Rent-A-Center* case (which the plaintiff, Jackson, filed in the Nevada Federal District Court) construed the following language from an employment agreement between Jackson and Rent-A-Center West: "[t]he Arbitrator ... shall have exclusive authority to resolve any dispute relating to the ... enforceability ... of this Agreement including, but not limited to any claim that all or any part of this Agreement is void or voidable." *Id.,* at 32, 34

The Nevada Federal District Court held that this language delegated to the arbitrator the decision whether the arbitration provision was unconscionable. The court therefore dismissed the case and ordered the matter to arbitration. A divided panel of the Court of Appeals for the Ninth Circuit reversed the District Court, finding that unconscionability is a matter for the court, rather than the arbitrator, to decide.

16

The United States Supreme Court reversed the Ninth Circuit decision, holding that the parties' agreement controlled because under the FAA the parties' agreement was the basis for arbitration. The parties could agree to arbitrate even a "gateway" issue.

As a result of *Rent-A-Center*, the Arbitrator must determine the enforceability of the arbitration agreement here, because the parties' contract delegates the decision to the arbitrator:

> "The parties agree to submit to arbitration any dispute related to this Agreement (including, but not limited to, any dispute related to the interpretation or enforceability of this Agreement) and agree that the arbitration process shall be the exclusive means for resolving disputes which the parties cannot resolve."

Although the Nevada Supreme Court has already decided that the overall arbitration clause is not unenforceable, it did not have before it the question whether the arbitration agreement is nonetheless enforceable if the clause is interpreted to prohibit classwide arbitration. Claimants point out that it cannot be assumed that the Nevada Supreme Court would find the clause enforceable if it were interpreted to prohibit classwide arbitration. *See, e.g., Discover Bank v. Superior Court* (2005) 36 Cal. 4th 148, 113 P.3d 1100; *Shroyer v. New Cingular Wireless Services, Inc.* (9th Cir. 2007) 498 F.3d 976; *Laster v. AT&T Mobility* ("Concepcion") *supra.*

However, following the Nevada high court's most recent statement of Nevada law in the *KJH* case, the Arbitrator finds that Claimants have not met their burden of showing the arbitration clause is unconscionable in prohibiting classwide arbitration. This is not a case involving consumers, as the Court has already found. It described the purchasers as "self-avowed real estate investors" (*KJH* at 5) who had reason to expect an arbitration clause. This case also does not present a situation of an ongoing injustice perpetrated by a party with superior bargaining power that will not be addressed in the absence of a class arbitration because the amounts at issue are too small. In light of the sophistication of the parties, the significant dollar amount of each Claimant's claims, and the Nevada Supreme Court's earlier pronouncement on the overall arbitration clause, the Arbitrator finds that Claimants have failed to sustain their burden of showing that the clause, even if construed to forbid class arbitration, is unconscionable.

This result conforms to other pronouncements since the *Stolt-Nielsen* decision. From those cases, it appears that even waivers of classwide arbitration will be upheld, at least in commercial cases. For example, in the term just concluded, the United States Supreme Court granted certiorari in a case from the Court of Appeals for the Second Circuit, *In re American Express Merchants Litigation* (2nd Cir. 2009) 554 F.3d 300 (cert. granted). In that antitrust case, the Second Circuit had held unenforceable a class action waiver in a commercial contract. On May 3, 2010, after its decision in *Stolt-Nielsen*, the Court vacated the court's decision and remanded the case to the Second Circuit "for further consideration in light of *Stolt-Nielsen*." (sub nom *American Express Company v. Italian Colors Restaurant* (May 3, 2010) 130 S.Ct. 2401).

17

# VI.
## CONCLUSION AND FURTHER PROCEEDINGS

No determination is being made now in this case as to the merits of the dispute. That determination is for another day. This ruling affects only the ability of the Named Claimants to proceed on behalf of a class; it does not affect the individual claims of the Named Claimants.

Pursuant to Rule 3 of the AAA Class Rules, this Arbitration is hereby stayed for thirty (30) days to allow either party to seek to confirm or vacate this Partial Final Award. If the Arbitrator is advised in writing within the stay period that a request for judicial review has been filed, either party may apply to the Arbitrator for a further stay of the proceedings.

All issues and/or arguments raised by the parties have been considered, though not all have been addressed in this Partial Final Award on Clause Construction. Any arguments not addressed are hereby rejected and denied.

Dated: August **10** 2010

Louise A. LaMothe, APC
Arbitrator

I, Louise A. LaMothe, APC, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Partial Final Award on Clause Construction.

Dated: August **10** 2010

Louise A. LaMothe, APC
Arbitrator

25.10 Arbitration.   The parties agree to submit to arbitration any dispute related to this Agreement (including, but not limited to, any dispute related to the interpretation or enforceability of this Agreement) and agree that the arbitration process shall be the exclusive means for resolving disputes which the parties cannot resolve. The laws of the State of Nevada shall apply to this Agreement. Any arbitration hereunder shall be conducted under the Dispute Resolution Rules of the American Arbitration Association ("AAA") as modified herein. Arbitration proceedings shall take place in Las Vegas, Nevada before a single arbitration who shall be a lawyer. The prevailing party shall be reimbursed for all expenses of arbitration, including arbitration fees and attorney's fees and costs. All arbitration proceedings shall be confidential. Neither party shall disclose any information about the evidence produced by the other party in the arbitration proceedings, except in the course of judicial, regulatory, or arbitration proceeding, or as may be demanded by government authority. Before making any disclosure permitted by the preceding sentence, a party shall give the other party reasonable advance written notice of the intended disclosure and an opportunity to prevent disclosure. In connection with any arbitration provision hereunder, each party shall have the right to take the deposition of two (2) individuals and any expert witness retained by the other party. Additional discovery may be had only where the arbitrator so orders, upon a showing of substantial need. Only evidence that is directly relevant to the issues may be obtained in discovery. Each party bears the burden of persuasion of any claim or counterclaim raised by that party. The arbitration provision of this Agreement shall not prevent any party from obtaining injunctive relief from a court of competent jurisdiction to enforce the obligations for which such party may obtain provision relief pending a decision on the merits by the arbitrator. Each of the parties hereby consents to the jurisdiction of Nevada courts for such purpose. The arbitration shall have authority to award any remedy or relief that a court of the State of Nevada could grant in conformity to applicable law except that the arbitrator shall have no authority to award punitive damages. Any arbitration award shall be accompanied by a written statement containing a summary of the issues in controversy, a description of the award and an explanation of the reasons for the award. The arbitrator's award shall be final and judgment may be entered upon such award by any court.

**EXHIBIT #2**

1   Robert B. Gerard, Esq. (Nevada State Bar #005323)
    Ricardo R. Ehmann, Esq. (Nevada State Bar #010576)
2   GERARD & ASSOCIATES
    2840 South Jones Boulevard
3   Building D, Suite #4
    Las Vegas, Nevada 89146
4   Telephone:    (702) 251-0093
    Facsimile:    (702) 251-0094
5
    Kyle Nordrehaug, Esq. (California State Bar #205975)
6   BLUMENTHAL, NORDREHAUG & BHOWMIK
    2255 Calle Clara
7   La Jolla, California 92037
    Telephone:    (858) 551-1223
8   Facsimile:    (858) 551-1232

9   *Attorneys for Plaintiffs*

10

11                    AMERICAN ARBITRATION ASSOCIATION

12

13

14  WILLIAM SPRADLIN and SHIRLEY      )   CASE NO.: 11 115 1846 09
    SPRADLIN; EMMA ODUCA; SALLY KIM;  )
15  ELLIOT SPRUNG and DAVID SPRUNG;   )
    TDF PROPERTIES, LLC; and KUNIKO   )   (U.S. District Case No.: 2:08-cv-01428-KJD-
16  ISHIDA; individually and on behalf of all )   RJJ)
    persons similarly situated;       )
17                                    )
18          Claimants,               )   DECLARATION OF WILLIAM
                                      )   SPRADLIN
19          vs.                       )
                                      )
20                                    )
                                      )
21  TRUMP RUFFIN TOWER I LLC, a Delaware)
    Limited Liability Company; and DOES 1 )
22  through 100, inclusive,           )
                                      )
23          Respondents.             )
                                      )
24                                    )
                                      )
25                                    )
                                      )
26                                    )
                                      )
27                                    )
                                      )
28                                    )

1  I, **William Spradlin**, declare as follows:

2      1.    I am a claimant in the above entitled action and have personal knowledge as to the

3  facts stated in this declaration. If called as a witness, I could and would competently testify to

4  the truth of the facts stated in this declaration.

5      2.    After reviewing the provisions of Section 25.10 of the Trump Las Vegas

6  Purchase Agreement regarding arbitration which states in relevant part that "The parties agree to

7  submit to arbitration any dispute related to the agreement"; "The laws of the State of Nevada

8  shall apply to this Agreement"; and "The arbitrator shall have authority to award any remedy or

9  relief that a court of the State of Nevada could grant in conformity with applicable law",

10  I understood the aforementioned provisions to mean that any dispute regarding the Purchase

11  Agreement could be brought as a class arbitration under the laws of the State of Nevada such that

12  a class wide remedy and relief could be awarded by the arbitrator and executed the Purchase

13  Agreement based upon this belief.

14      3.    I never stipulated that the Purchase Agreement's direct silence on the issue of

15  class arbitration meant that no agreement had been reached on that issue, rather, my intent was

16  that Nevada law would control, thus allowing for class arbitration of the dispute and class wide

17  relief.

18      4.    The Purchase Agreement including the arbitration provision was presented to me

19  on a take it or leave it basis.

20      I declare under penalty of perjury under the laws of the State of *Nevada* that the

21  foregoing is true and correct.

22

23  Executed on this _1_ th day of *May*, 2010, at *Henderson*, *Nevada*

                                   (city)     (state)

24

25

26

27                     William Spradlin

28

**EXHIBIT #3**

1  Robert B. Gerard, Esq. (Nevada State Bar #005323)
   Ricardo R. Ehmann, Esq. (Nevada State Bar #010576)
2  GERARD & ASSOCIATES
   2840 South Jones Boulevard
3  Building D, Suite #4
   Las Vegas, Nevada 89146
4  Telephone:    (702) 251-0093
   Facsimile:    (702) 251-0094
5
6  Kyle Nordrehaug, Esq. (California State Bar #205975)
   BLUMENTHAL NORDREHAUG & BHOWMIK
7  2255 Calle Clara
   La Jolla, California 92037
8  Telephone:    (858) 551-1223
   Facsimile:    (858) 551-1232
9  *Attorneys for Plaintiffs*

10

11                    AMERICAN ARBITRATION ASSOCIATION

12

13

14  WILLIAM SPRADLIN and SHIRLEY          )    CASE NO.: 11 115 1846 09
    SPRADLIN; EMMA ODUCA; SALLY KIM;      )
15  ELLIOT SPRUNG and DAVID SPRUNG;       )
    TDF PROPERTIES, LLC; and KUNIKO       )
16  ISHIDA; individually and on behalf of all  )    (U.S. District Case No.: 2:08-cv-01428-KJD-
    persons similarly situated;           )    RJJ)
17                                        )
                                          )
18            Claimants,                  )    **DECLARATION OF ELLIOT SPRUNG**
                                          )
19       vs.                              )
                                          )
20                                        )
                                          )
21  TRUMP RUFFIN TOWER I LLC, a Delaware  )
    Limited Liability Company; and DOES 1 )
22  through 100, inclusive,               )
                                          )
23            Respondents.                )
                                          )
24                                        )
                                          )
25                                        )
                                          )
26                                        )
                                          )
27                                        )
                                          )
28  _____)

1    I, Elliot Sprung, declare as follows:

2        1.    I am a claimant in the above entitled action and have personal knowledge as to the

3    facts stated in this declaration. If called as a witness, I could and would competently testify to

4    the truth of the facts stated in this declaration.

5        2.    After reviewing the provisions of Section 25.10 of the Trump Las Vegas

6    Purchase Agreement regarding arbitration which states in relevant part that "The parties agree to

7    submit to arbitration any dispute related to the agreement"; "The laws of the State of Nevada

8    shall apply to this Agreement"; and "The arbitrator shall have authority to award any remedy or

9    relief that a court of the State of Nevada could grant in conformity with applicable law",

10    I understood the aforementioned provisions to mean that any dispute regarding the Purchase

11    Agreement could be brought as a class arbitration under the laws of the State of Nevada such that

12    a class wide remedy and relief could be awarded by the arbitrator and executed the Purchase

13    Agreement based upon this belief.

14        3.    I never stipulated that the Purchase Agreement's direct silence on the issue of

15    class arbitration meant that no agreement had been reached on that issue, rather, my intent was

16    that Nevada law would control, thus allowing for class arbitration of the dispute and class wide

17    relief.

18        4.    The Purchase Agreement including the arbitration provision was presented to me

19    on a take it or leave it basis.

20

21        I declare under penalty of perjury under the laws of the State of _____ that the

22    foregoing is true and correct.

23        Executed on this ___ th day of _____, 2010, at _____, _____

24                                                                    (city)            (state)

25

26

27                                                        Elliot Sprung

28

-2-

**EXHIBIT #4**

1  Robert B. Gerard, Esq. (Nevada State Bar #005323)
   Ricardo R. Ehmann, Esq. (Nevada State Bar #010576)
2  GERARD & ASSOCIATES
   2840 South Jones Boulevard
3  Building D, Suite #4
   Las Vegas, Nevada 89146
4  Telephone:    (702) 251-0093
   Facsimile:    (702) 251-0094
5
6  Kyle Nordrehaug, Esq. (California State Bar #205975)
   BLUMENTHAL NORDREHAUG & BHOWMIK
7  2255 Calle Clara
   La Jolla, California 92037
8  Telephone:    (858) 551-1223
   Facsimile:    (858) 551-1232
9  *Attorneys for Plaintiffs*

10

11                 **AMERICAN ARBITRATION ASSOCIATION**

12

13

14  WILLIAM SPRADLIN and SHIRLEY          )   CASE NO.: 11 115 1846 09
    SPRADLIN; EMMA ODUCA; SALLY KIM;     )
15  ELLIOT SPRUNG and DAVID SPRUNG;      )
    TDF PROPERTIES, LLC; and KUNIKO      )   (U.S. District Case No.: 2:08-cv-01428-KJD-
16  ISHIDA; individually and on behalf of all )   RJJ)
    persons similarly situated;          )
17                                        )
18          Claimants,                    )   **DECLARATION OF DAVID SPRUNG**
                                          )
19      vs.                               )
                                          )
20                                        )
                                          )
21  TRUMP RUFFIN TOWER I LLC, a Delaware )
    Limited Liability Company; and DOES 1 )
22  through 100, inclusive,               )
                                          )
23          Respondents.                  )
                                          )
24                                        )
                                          )
25                                        )
                                          )
26                                        )
                                          )
27                                        )
                                          )
28                                        )

1   I, David Sprung, declare as follows:

2       1.      I am a claimant in the above entitled action and have personal knowledge as to the

3   facts stated in this declaration. If called as a witness, I could and would competently testify to

4   the truth of the facts stated in this declaration.

5       2.      After reviewing the provisions of Section 25.10 of the Trump Las Vegas

6   Purchase Agreement regarding arbitration which states in relevant part that "The parties agree to

7   submit to arbitration any dispute related to the agreement"; "The laws of the State of Nevada

8   shall apply to this Agreement"; and "The arbitrator shall have authority to award any remedy or

9   relief that a court of the State of Nevada could grant in conformity with applicable law",

10  I understood the aforementioned provisions to mean that any dispute regarding the Purchase

11  Agreement could be brought as a class arbitration under the laws of the State of Nevada such that

12  a class wide remedy and relief could be awarded by the arbitrator and executed the Purchase

13  Agreement based upon this belief.

14      3.      I never stipulated that the Purchase Agreement's direct silence on the issue of

15  class arbitration meant that no agreement had been reached on that issue, rather, my intent was

16  that Nevada law would control, thus allowing for class arbitration of the dispute and class wide

17  relief.

18      4.      The Purchase Agreement including the arbitration provision was presented to me

19  on a take it or leave it basis.

20

21      I declare under penalty of perjury under the laws of the State of _____ that the

22  foregoing is true and correct.

23      Executed on this ____ th day of ____, 2010, at _____ , _____

24                                                  (city)              (state)

25

26

27                                          David Sprung

28

**EXHIBIT #5**

# THE TRUMP INTERNATIONAL HOTEL & TOWER – LAS VEGAS

## CONDOMINIUM UNIT PURCHASE AND SALE AGREEMENT

**WARNING:   THE CALIFORNIA DEPARTMENT OF REAL ESTATE HAS NOT INSPECTED, EXAMINED, OR QUALIFIED THIS OFFERING.**

**PLEASE NOTE:   ORAL REPRESENTATIONS CANNOT BE RELIED UPON AS CORRECTLY STATING THE REPRESENTATIONS OF THE SELLER.   FOR CORRECT REPRESENTATIONS, REFERENCE SHOULD BE MADE TO THIS AGREEMENT AND THE DOCUMENTS REQUIRED BY NEVADA REVISED STATUTES ("NRS") CHAPTER 116 (THE "ACT"), TO BE FURNISHED BY SELLER TO BUYER.**

   In consideration of the terms and conditions hereinafter set forth in this Condominium Unit Purchase and Sale Agreement (this "Agreement"), Trump Ruffin Tower I, LLC, a Delaware limited liability company ("Seller"), whose address is 3128 Las Vegas Boulevard South, Las Vegas, Nevada 89109, agrees to sell and the buyer or buyers named below ("Buyer") agrees to purchase unit number **4219** (the "Unit") in The Trump International Hotel & Tower – Las Vegas (the "Condominium"), located generally on North Fashion Show Drive near the Fashion Show Mall in Las Vegas, Nevada. The Unit and Condominium are described in greater detail in the proposed Declaration of Covenants, Conditions and Restrictions and Reservation of Easements for the Condominium (the "Declaration") included in the Public Offering Statement for the Condominium (the "Public Offering Statement") and documents attached thereto (collectively, the "Governing Documents"). All capitalized terms used herein but not otherwise defined shall have the meaning ascribed to them in the Declaration.

| | |
|---|---|
| Buyer(s): **Kuniko Ishida**<br>~~Yoshio Yajima~~<br><br>Address: 8716 Raindrop Canyon Ave.<br>City:    Las Vegas<br>State:   NV<br>Zip:     89129<br>Country:<br><br>Home Telephone<br>Office Telephone:  702-368-1292<br>Cellular Telephone: 310-592-7638<br>Facsimile Number: 702-368-1292<br>~~E-Mail Address k_ishida@kdd.net~~ | NAME, ADDRESS AND TELEPHONE NUMBER WHERE ALL BUYER'S NOTICES ARE TO BE MAILED OR FAXED, IF DIFFERENT:<br><br>Name: _____<br>Address: _____<br><br>City: _____<br>State: _____<br>Zip: _____<br>Country: _____<br><br>Home Telephone: _____<br>Office Telephone: _____<br>Cellular Telephone: _____<br>Facsimile Number: _____<br>E-Mail Address: _____ |

ESTIMATED CLOSING DATE:  3rd Quarter / 2008

Buyer's Initials
A##339827 v13 –
TRUMP INTERNATIONAL - CONDOMINIUM UNIT PURCHASE AGREEMENT.doc


Seller's Initials

1. **PURCHASE AND SALE.** Buyer agrees to buy, and Seller agrees to sell, the Unit on the terms and conditions contained in this Agreement. The purchase price (the "Purchase Price") for the Unit is $**600,000.00**

2. , payable in funds of the United States of America as follows:

| PAYMENT | DUE DATE | AMOUNT |
|---|---|---|
| First Deposit | Upon reservation of a Unit, if any | $10,000.00 |
| Second Deposit | Upon execution of this Agreement | $50,000.00 |
| Third Deposit | Within one (1) year following execution of this Agreement | $60,000.00 |
| Balance | At Closing (as defined below) | $480,000.00 |
| Total Purchase Price | | $600,000.00 |

3. **BROKERAGE.** Other than real estate brokers that Seller has acknowledged in writing, Buyer represents that there are no other real estate brokers involved in this transaction, except the following:

Broker

Broker: American Realty & Investments
Tatsuyoshi Sato
Address: 6390 W. Cheyenne Ave, #E
Las Vegas, NV 89108
Phone: 866-641-3590
Fax: 702-932-1687
Cell : 702-528-4817

Buyer covenants to defend, indemnify and hold Seller and Seller's broker harmless against all claims of real estate brokers or salesmen due to acts of Buyer or Buyer's representatives, and Buyer shall be liable for Seller's costs, including attorneys' fees and damages, which arise by virtue of such claims as set forth in this paragraph. This paragraph shall survive closing of the transaction contemplated hereby (the "Closing").

4. **EXHIBITS AND ADDENDA.** Any exhibits, attachments and/or addenda identified in Exhibit "A" (collectively "Addenda") attached hereto shall constitute a part of this Agreement and are incorporated herein by reference.

5. **STANDARD PROVISIONS.** It is acknowledged and agreed by the parties hereto that this Agreement is comprised of and does include the content and provisions of the first page, plus "Standard Provisions" consisting of **Paragraphs 3 through 48**, inclusive. The Standard Provisions shall bear no addition, deletion or other modifications or, should any appear thereon, they shall be invalid and of no force or effect. Any additions, deletions or other modifications to this Agreement shall be solely made by notation upon the first two (2) pages of this Agreement or by formally executed riders or addenda hereto. Prior receipt, approval, acceptance, inclusion and the binding validity of the Standard Provisions are fully and freely acknowledged by the parties hereto.

6. **SALE CONTINGENT ON ACQUISITION OF LAND.** Seller's obligation hereunder to sell the Unit to Buyer is contingent upon Seller's acquisition of the real property on which the Condominium will be constructed from Hyde Park, LLC, a Nevada limited liability company. In the event Seller is unable to purchase the land prior to the recordation of the final subdivision map for the Condominium, Buyer and Seller shall be released from their

Buyer's Initials
A:\#339827 v13 --
TRUMP INTERNATIONAL - CONDOMINIUM UNIT PURCHASE AGREEMENT.doc

2

Seller's Initials

obligations hereunder, and Seller shall return all deposits made to Buyer, together with interest earned thereon, if any.

7.   DEPOSITS.  The deposits required by **Paragraph 1** above may be made by personal check (subject to clearance), cashier's check (subject to clearance) or wire transfer of federal funds.  All payments must be made in funds of the United States of America and all checks must be payable on a bank located in the United States of America.  Seller is not obligated to accept any deposit which Buyer fails to pay on time, and if Seller agrees to accept such deposit on a later date, Buyer will pay a late funding charge equal to the greater of eighteen percent (18%) or the applicable highest lawful rate per annum of all funds due Seller from the date due until the date received and cleared by Seller.  Failure to pay any deposit as and when required hereunder is a default under this Agreement which shall enable Seller, at its option, to terminate this Agreement or take such other actions available to Seller under this Agreement, at law or in equity.

8.   TERMS OF CLOSING.  The balance due at Closing must be paid by cashier's check (subject to clearance), or wire transfer of federal funds.  Said payment must be made in funds of the United States of America and all cashier's checks must be payable on a bank located in the United States of America.

Buyer understands that Buyer will be obligated to pay all cash at Closing under this Agreement, and that Buyer's obligations under this Agreement to purchase the Unit will not depend on or be conditioned upon Buyer obtaining a loan secured by deed of trust from any lender or any conditions imposed by such lender.  Buyer will be solely responsible for making Buyer's own financial arrangements to enable Buyer to pay Seller for the Unit.  The fact that Seller may arrange for the availability of loans secured by deeds of trust for purchasers of units will not in any way affect this obligation.  Seller agrees, however, to reasonably cooperate with any lender and to coordinate Closing with it, but only if the lender meets Seller's Closing schedule and pays the proceeds of its loan secured by deed of trust at Closing.  In the event that the lender does not pay Seller these proceeds at Closing, Buyer will not be allowed to take possession of the Unit until Seller actually receives cleared funds.

Although Seller does not have to do so, if Seller agrees to delay Closing upon Buyer's request, or until the lender is ready to close, or to wait for full or partial funding from lender until after Closing, Buyer agrees to pay Seller a late funding charge equal to interest at eighteen percent (18%) of all sums due Seller which have not been paid to Seller (and which have not then cleared) from the date Seller originally scheduled Closing to the date of actual payment (and clearance).  This late funding charge may be estimated and charged by Seller at Closing.  Seller's estimate will be adjusted after Closing based on actual funding and clearance dates upon either Seller or Buyer's written request.  Without limiting the generality of **Paragraph 29** of this Agreement, the foregoing sentence will continue to be effective after Closing.

9.   SELLER'S FINANCING.  Seller may borrow money from lenders for the acquisition, development and/or construction of the Condominium.  Buyer agrees that any lender advancing funds to Seller for Seller's use in connection with the Condominium will have a prior deed of trust on the Unit and the Condominium until Closing.  At that time, Seller may use all the proceeds of Buyer's purchase which are necessary to release the Unit from the then applicable encumbrances for the purpose of obtaining those releases.  Neither this Agreement, nor Buyer's payment of the deposits, will give Buyer any lien or claim against the Unit or the Condominium.  Without limiting the generality of the foregoing, until the Closing, Buyer's rights under this Agreement are subordinate to all deeds of trust and other encumbrances (and all modifications made to those deeds of trust and other encumbrances) that secure the advancement of acquisition, development and/or construction funds, whether made or recorded before or after the Effective Date (as defined in **Paragraph 47** of this Agreement).

10.   CONSTRUCTION.  Buyer acknowledges that Seller shall be obligated only to provide or complete those systems, services or amenities, including roads, sewers, water, gas or electric service or recreational amenities that are set forth, and by this reference hereby incorporated, in the Property Report for the Condominium (the "Property Report").  The effective date of the Property Report is June 16, 2005.  The following provisions will apply if in accordance with this Agreement the construction, furnishing and landscaping of the Unit and of the Condominium in which the Unit is located are not substantially complete on the Effective Date (if the Unit is substantially completed on the Effective Date, Buyer hereby acknowledges having inspected and approved it, and Buyer is buying the Unit "AS IS" except as indicated on any Addenda).

3

**Buyer's Initials**

A.M.315837 v13 --

TRUMP INTERNATIONAL - CONDOMINIUM UNIT PURCHASE AGREEMENT.doc

**Seller's Initials**

10.1    Construction.  Seller agrees to construct the Unit in substantial conformance with the plans and specifications on file in Seller's office ("Seller's Plans and Specifications"), which Buyer can inspect upon reasonable notice, and, where applicable, similar to an existing model of the Unit.  Buyer acknowledges and agrees that Seller's Plans and Specifications for the Unit and Condominium are available for inspection at the sales office.  Buyer understands that the Unit may be the reverse or mirror image of the floor plan of any model or that shown on Seller's Plans and Specifications, Seller's sales brochures or other materials.  Buyer understands and agrees any existing model may contain items or special features which are not included in Buyer's purchase, such as furnishing and decorations, accessories, window treatments, carpeting and flooring, wall treatments and paint, fixtures and special lighting effects, and extra appliances.  Buyer understands and agrees that the Purchase Price only includes the construction of the Unit pursuant to Seller's Plans and Specifications and the standard items specified in Seller's sales brochures and those items or additions in any Addenda.  Buyer acknowledges and agrees that there are various methods for calculating the square footage of a Unit and that, depending on the method of calculation, the quoted square footage of the Unit may vary by more than a nominal amount.  Seller reserves the right, without liability to Buyer, (i) to make any modifications, changes or omissions to the Unit, Shared Components (as defined in the Declaration) or the Common Elements (as defined in the Declaration) (x) as long as they do not substantially and adversely affect Buyer, or (y) if they are recommended or required by any governmental authority, and (ii) to substitute materials, equipment, cabinets, fixtures, appliance, and/or bathroom floor coverings with items of similar or greater quality.  Buyer understands materials used in the construction such as wood, paint, tile, marble, and the like, are subject to shading, the gradation of which may vary from samples, models or color charts, and from piece to piece, and Seller will not be liable for such variation.  Furthermore, Seller hereby disclaims any liability for chips and scuffs in kitchen cabinets, vanities and tubs occurring after Closing.  Seller will have complete discretion in "finishing details" of the Condominium including, but not limited to, the exterior of the buildings, landscaping, amenities, and beautification of the Condominium.  Buyer further agrees and understands that trees and landscaping which are located on portions of the Condominium may be removed to permit construction.  Seller does not guarantee the survival of any trees or landscaping which are left or planted on any portion of the Condominium.

Buyer acknowledges and agrees that it is a widely observed construction industry practice for pre-construction plans and specifications for any unit or building to be changed and adjusted from time to time in order to accommodate ongoing "in the field" construction needs.  These changes and adjustments are essential in order to permit all components of the units and the building to be integrated into a well functioning and aesthetically pleasing product in an expeditious manner.  Because of the foregoing, Buyer understands and agrees that changes in the dimensions of rooms and in the location of telephones, electric, cable television and other utility outlets, windows, doors, walls, partitions, lighting fixtures, electric panel boxes and the general layout of the Unit are subject to changes made by Seller in its sole discretion.  Buyer acknowledges and agrees that it is to Buyer's benefit to allow Seller to make such changes to the Unit and the Condominium.

10.2    Deviations from Plans and Specifications.  Buyer fully understands and agrees that the Seller's Plans and Specifications for the Condominium and the Unit describe "proposed improvements" to be "constructed," and that the realities of construction are such that the final building and improvements will, in all likelihood, contain variations and deviations from the Seller's Plans and Specifications.

10.3    Deviations from Seller's Sales Materials/Models.  Buyer acknowledges and agrees that the Unit may differ from the models and floor plans shown to Buyer, as well as Seller's sales brochures or other materials ("Seller's Sales Materials").  Buyer understands that changes to the Unit rendering the Unit different from the models, floor plans, and Seller's Sales Materials may be made for a variety of reasons, including, but not limited to: (i) requirements or recommendations by governmental authorities; (ii) availability of materials, appliances, fixtures, floor coverings, decorations or other items originally included in the models or Seller's Sales Materials; (iii) subsequent quality enhancements or improvements to the Unit; and (iv) "in the field" and "on site" changes and adjustments necessary to permit all components of the units and the building to be integrated into a well functioning and aesthetically pleasing product.  Seller reserves the right to make such changes, modifications or omissions to the Unit, provided that such changes do not substantially and adversely affect Buyer.  All substituted materials, appliances, fixtures, floor coverings, decorations or other items will be of similar or greater quality to the items shown in the models, floor plan and Seller's Sales Materials.

Buyer's Initials
A:\339837 v13 –
TRUMP INTERNATIONAL - CONDOMINIUM UNIT PURCHASE AGREEMENT.doc

Seller's Initials

10.4    No Extras and Options.  Buyer recognizes that Seller is not obligated to agree to provide extras or options.

10.5    Completion Date.  Seller anticipates the Unit will be substantially completed by the Estimated Closing Date set forth on Page 1 of this Agreement, but Buyer understands and agrees that Seller cannot guarantee completion by such Estimated Closing Date.  Seller will not be liable for any delays and Seller will not have to make, provide or compensate Buyer for any accommodations or costs as a result of any delays, and any delays will not permit Buyer to cancel, amend, or diminish any of Buyer's obligations.  In the event Seller is unable to obtain executed purchase and sale agreements for fifty percent (50%) of the units in the Condominium on or before (December 31, 2005), Seller may terminate this Agreement and refund all of Buyer's Deposits, in which case both parties shall be relieved of all obligations hereunder.  The ability of Seller to terminate this Agreement for inability to obtain a sufficient number of executed purchase and sale agreements is a condition for the benefit of Seller only, which condition Seller may waive in its sole and absolute discretion.

10.6    Interference with Construction.  Prior to the Closing, Buyer will not enter into or upon the Unit or the Condominium or interfere with the progress of construction or with workmen, and Buyer will not cause such entry or interference by others.  Seller shall not be liable for any injury resulting from Buyer's breach of this Paragraph 9.6.  Notwithstanding anything herein to the contrary, Buyer may enter the Unit with Seller's representative for the purpose of making one pre-Closing inspection and preparation of a "punchlist" of items of workmanship or materials (only within the boundaries of the Unit itself) which Seller may agree to correct within a reasonable time subsequent to Closing.  Said pre-Closing inspection shall be made by appointment with Seller's representative prior to Closing, and shall be scheduled on the date and at the time set by Seller.  Both Buyer and Seller's representative shall sign the punchlist which is prepared at said pre-Closing inspection.  Seller shall only be required to correct those items of workmanship and materials which should be corrected in order to conform construction of the Unit to the Seller's Plans and Specifications within a reasonable time after Closing.  Notwithstanding the preparation of a punchlist, Seller's obligation to correct any items will not be grounds for deferring the Closing, nor imposing any condition on Closing, and there shall be no postponement of Closing, holdbacks of Closing funds, or escrow of sums due to punchlist items.

10.7    Completion.  The issuance of a temporary, partial or permanent certificate of occupancy for the Condominium, the floor where the Unit is located or the Unit, whichever occurs first, will conclusively establish completion of the Unit.  If some minor items are not finished at Closing, Buyer will not hold back any funds or object to a final non-escrow Closing.  The Shared Components and other portions of the Condominium need not then have certificates of occupancy, nor be so completed.

10.8    Insulation.  Seller has advised Buyer, as required by the rules of the Federal Trade Commission, that it intends, currently, to install in connection with the Units, the following insulation:

| Type | R-Value/STC Rating | Location |
|---|---|---|
| 6" Batt Insulation | R-19 | Outside Wall Insulation |
| Glass | R-8 | Curtain Wall Glass |
| 4" EPS Board Topping Slab | R-11 | Ceilings below air conditioned mechanical space above |
| 2-½" Batt Insulation | R-11; STC 60 db | Demising Walls between Units |
| 3-½" Batt Insulation | STC 50 db | Corridor Walls |
| Sound Isolation | STC 50 db | Floor |

This R-Value and STC information is based solely on the information given by the appropriate manufacturers (based on the thicknesses or system listed) and Buyer agrees that Seller is not responsible for the manufacturers' errors.  All insulation information is subject to Seller's general right to make changes in Seller's Plans and Specifications.

K.I
Buyer's Initials
AW239827 v13 –
TRUMP INTERNATIONAL - CONDOMINIUM UNIT PURCHASE AGREEMENT.doc

5

Seller's Initials

10.9   Impact Noise Insulation; Noise Disclaimer. In the event Buyer desires to install tile or hard surface flooring finishes in the Unit, Buyer must obtain the approval of the Hotel Unit Owner (as defined in the Declaration) and make such improvements in accordance with the Declaration and any rules or regulations adopted by the Hotel Unit Owner. Buyer must install noise insulation along with the installation of any internal hard surface flooring finishes. Buyer acknowledges and agrees that sound transmission in a high-rise building is very difficult to control and that noise from adjoining Units and/or mechanical equipment can often be heard in other Units. Seller makes no representation or warranty as to the level of sound transmission between Units, and Buyer waives and expressly releases any such warranty and claims for loss or damages resulting from sound transmission.

11.   CLOSING.   The Closing shall take place only upon the completion of the Unit as defined in Paragraph 9.7 of this Agreement, the recordation of a final subdivision map for the Condominium, and the recordation of the Declaration. Seller shall provide notice to Buyer, which notice shall set forth the time, date and place of Closing (the "Closing Date"). The Closing Date specified in the aforementioned notice shall be set by Seller and shall not be less than five (5) business days from the date of such notice. In the event Buyer requests an extension of the Closing Date, no such extension shall be effective unless given in writing by Seller, which extension Seller has no obligation to give. The Closing Date shall be the date utilized for calculation of all prorations and adjustments required by this Agreement.

Notwithstanding the foregoing, Seller may and is authorized to postpone the Closing for any reason and Buyer agrees to close on the date Seller specifies in its notice of postponement. A change of time or place of Closing only (one not involving a change of date) shall not require any additional notice period. Any notice of Closing, postponement or rescheduling requested or desired by Seller may be given orally, by telephone, facsimile, mail or other means of communication at Seller's option. All of these notices will be sent or directed to the address, or given by use of the telephone or facsimile number specified on Page 1 of this Agreement, unless Seller has received written notice from Buyer of any change prior to the date the notice is given. These notices will be deemed effective on the date given or mailed. An affidavit of one of Seller's employees or agents that notice was given to Buyer will be conclusive for purposes of proving that notice was in fact given.

If Buyer fails to receive any notice because Buyer failed to advise Seller of any change of address or telephone or facsimile number, or because Buyer failed to pick up a letter when Buyer had been advised of an attempted delivery, Buyer will not be relieved of Buyer's obligation to proceed with Closing on the Closing Date unless Seller agrees in writing to postpone the Closing Date. Buyer understands that Seller is not required to reschedule or to permit a delay in Closing.

In the event Buyer fails to close this transaction on the Closing Date for any reason other than for a delay desired, requested or caused by Seller (including Buyer's failure to obtain or procure any document or instrument required at Closing), Buyer shall further be required to pay to Seller, at the time of Closing, a sum equal to the greater of eighteen percent (18%) or the applicable highest lawful rate per annum calculated on a daily basis on the outstanding balance of the Purchase Price, from the Closing Date through and including the date of the actual Closing; provided, however, that at the sole option of Seller, the provisions of Paragraph 17 of this Agreement relating to default shall be considered paramount and shall prevail over the provisions of this Paragraph 10. The acceptance by Buyer of the deed of conveyance shall be conclusive evidence that Seller has performed all its obligations under this Agreement.

12.   DEED; TITLE TO UNIT.   Seller and Buyer agree that Buyer is purchasing the Unit subject to those items more particularly set forth in this Paragraph 11, and that title to the Unit which Buyer will acquire according to the terms and conditions of this Agreement will be subject to the following "Permitted Exceptions." Seller will convey title to the Unit by grant, bargain and sale deed subject only to (i) real estate taxes, and any other taxes and assessments imposed by other taxing authorities for the year of the Closing and subsequent years; (ii) conditions, covenants, restrictions, agreements, limitations, reservations, declarations, dedications, and easements of record; (iii) existing zoning ordinances, publicly dedicated rights-of-way, easements and other matters of public record, including, but not limited to, utility agreements of record, and any other restrictions upon the use of the property or other requirements by governmental authorities having jurisdiction; (iv) any state of facts which an accurate survey of the Unit and the Condominium would disclose; (v) any loan secured by deed of trust executed by Buyer encumbering the Unit or such other title exceptions created by or on behalf of Buyer; (vi) the Governing Documents,

Buyer's Initials
A:\9330827 v13 −
TRUMP INTERNATIONAL - CONDOMINIUM UNIT PURCHASE AGREEMENT.doc

6

Seller's Initials

including, but not limited to, the Declaration, Bylaws and Articles of Incorporation and Rules and Regulations of The Trump International Hotel & Tower – Las Vegas and any amendments to the foregoing; (vii) the standard printed exceptions contained in an ALTA owner's residential policy of title insurance; (viii) all other laws, ordinances and rules and regulations of all governmental agencies; (ix) pending governmental liens for public improvements as of Closing (Seller will be responsible for certified governmental liens for public improvements as of Closing; provided, however, that to the extent that such certified liens are payable in installments, Seller shall only be responsible for those installments due prior to Closing, and Buyer hereby assumes all installments coming due after Closing); and (x) any other matters not listed above which are of record with the Office of the County Recorder, Clark County, Nevada, concerning or relating to the Unit as of the date title the Unit is conveyed as provided herein. Seller hereby reserves the right to grant any and all easements over, upon, under and across the Condominium and the Condominium Property (as defined in the Declaration) (including the Unit) which may be necessary or desirable in order to furnish utility services or other services to the Units or the Annexable Area, or any portion thereof and Buyer's title shall be subject to any such easements. The foregoing exceptions set forth in this Paragraph 11 shall hereinafter be referred to as the "Permitted Exceptions."

If Seller cannot provide the quality of title described above, Seller will have a reasonable period of time (not to exceed ninety (90) days) to correct any defects in title. If Seller cannot, after making reasonable efforts (which shall not require the bringing of lawsuits or the payment or satisfaction of involuntary liens or judgments), or elects not to, correct the title defects, Buyer will have two (2) options:

a)   Buyer can accept title in the condition Seller offers it (with defects) and pay the Purchase Price for the Unit, waiving any right Buyer may have against Seller because of the defects in title; or

b)   Buyer can cancel this Agreement and receive a full refund of Buyer's deposit, whereupon both Seller and Buyer shall be relieved of all obligations under this Agreement.

Notwithstanding the foregoing, Seller agrees that if Seller conveys title to the Unit to Buyer, any deed of trust, mortgage, judgment, option or contract to sell or a trust agreement not created by or on behalf of Buyer, affecting the Condominium or affecting more than one unit offered for sale in the Condominium, except for any lien or other encumbrance arising as the result of the imposition of any tax assessment by any public authority, will be released upon Closing.

13.   CLOSING DOCUMENTS AND COSTS; PRORATIONS. At Closing, Buyer will be responsible for paying the real property transfer tax on the grant, bargain and sale deed, any taxes or assessments levied against the purchase price of appliances, furnishings, personal property and/or equipment in the Unit and the premium for issuance of an ALTA owner's residential policy of title insurance for the Unit in the amount of the Purchase Price, which policy shall be subject to the Permitted Exceptions. Buyer shall also pay the cost of endorsements to the policy of title insurance which are not part of the Purchase Price. Escrow fees will be divided evenly between Seller and Buyer. The Purchase Price shall be subject to adjustment by Closing costs, charged to Buyer, if any, prorations, Hotel Shared Costs and maintenance assessments for the Condominium Association (as defined in Paragraph 22 herein) required at Closing. Buyer shall also pay to the Seller or the Hotel Unit Owner a capital contribution in accordance with Paragraph 22 of this Agreement. In addition to the capital contribution, at Closing, Buyer shall be obligated to prepay the next month's charge for the Hotel Shared Cost (as defined in the Declaration) and the maintenance assessment of the Condominium Association. Buyer shall reimburse Seller for any utility deposits or hook-up fees which Seller may have advanced prior to Closing for the Unit. Seller's acknowledgment that it is prepared to deliver title to the Unit subject only to the Permitted Exceptions set forth in Paragraph 11 of this Agreement shall be conclusive evidence that title is good, marketable and/or insurable. Taxes, insurance premiums, Hotel Shared Costs, Condominium Association maintenance assessments, government assessments and other proratable items shall be prorated as of Closing. If Closing occurs in a year in which taxes on the Condominium are assessed in a single tax bill on the Condominium as a whole rather than on a unit-by-unit basis, Buyer will pay to Seller Buyer's prorata share of taxes and Seller will pay the taxes for that year. If Closing occurs in a year in which taxes are assessed on an individual unit basis, Buyer will, upon presentation of the tax bill to Seller, be reimbursed for Seller's prorata share of taxes, based upon the maximum discount available. Any costs incurred in connection

7

Seller's Initials

with Buyer obtaining a loan (secured by a mortgage or deed of trust on the Unit) and the fees, points, prepayments, expenses and title costs relating to such loan shall be paid by Buyer. Each party shall bear the costs of its own attorney's fees, if any.

14. BILL OF SALE. Buyer shall receive at Closing a bill of sale for any appliances, furnishings, personal property and equipment in the Unit.

15. PARKING. Parking will be by valet only and parking spaces will not be assigned to a particular Unit. All spaces will be available on a "first-come" basis.

16. WARRANTY AND DISCLAIMER. Specimen copies of all manufacturers' warranties which will be delivered to Buyer at Closing and which are not expressly warranted by Seller have been made readily available for Buyer's review in the "Warranties Binder" located in the sales office and Buyer acknowledges disclosure of such warranties and the location thereof by Seller. Buyer, to the extent permitted by law, is purchasing the Unit "AS IS" and should undertake whatever inspections of the Unit, Common Elements and Shared Components Buyer so desires in order to assure Buyer as to the quality and condition of the buildings and improvements.

**EXCEPT FOR THE WARRANTIES CONTAINED IN THE DEED OF CONVEYANCE AND ANY WRITTEN WARRANTIES DELIVERED AT CLOSING, NO WARRANTIES, EXPRESS OR IMPLIED, REPRESENTATIONS, UNDERSTANDINGS, GUARANTIES OR PROMISES INCLUDING THE WARRANTIES SET FORTH IN THE ACT HAVE BEEN MADE TO OR RELIED UPON BY BUYER IN MAKING THE DETERMINATION TO EXECUTE AND CLOSE PURSUANT TO THIS AGREEMENT AND, TO THE MAXIMUM EXTENT PERMITTED BY LAW, ALL WARRANTIES, INCLUDING IMPLIED WARRANTIES OF FITNESS FOR A PARTICULAR PURPOSE, MERCHANTABILITY AND HABITABILITY, AND ALL WARRANTIES IMPOSED BY STATUTE (EXCEPT TO THE EXTENT THEY CANNOT BE DISCLAIMED) ARE DISCLAIMED.**

**AS TO IMPLIED WARRANTIES WHICH CANNOT BE DISCLAIMED EITHER IN WHOLE OR IN PART, INCIDENTAL AND CONSEQUENTIAL DAMAGES ARE DISCLAIMED AND SELLER SHALL HAVE NO RESPONSIBILITY FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES, INCLUDING, BUT NOT LIMITED TO, ANY CLAIMS FOR PERSONAL INJURY, PROPERTY DAMAGE OR EMOTIONAL DISTRESS. NO WARRANTIES OR GUARANTIES ARE GIVEN AS TO CONSUMER PRODUCTS AS DEFINED IN 15 U.S.C. SECTION 2301, ET SEQ. (MAGNUSON-MOSS WARRANTY ACT). SELLER HAS NOT GIVEN AND BUYER HAS NOT RELIED ON OR BARGAINED FOR ANY SUCH WARRANTIES. BUYER HEREBY AGREES TO EXECUTE AN ADDENDUM TO THIS AGREEMENT LIMITING THE STATUTE OF LIMITATIONS FOR CERTAIN WARRANTIES CONTAINED IN THE ACT. THIS PARAGRAPH 15 SHALL SURVIVE CLOSING.**

BUYER'S INITIALS

17. ESCROW OF DEPOSITS.

17.1    Escrow of Deposits. Seller has established an escrow account with First American Title Company (the "Escrow Agent"), with offices located at 2490 Paseo Verde Parkway, Henderson, Nevada 89074 and all escrowed deposits shall be held and disbursed pursuant to and in accordance with the terms of this Agreement, the Act, and the escrow instructions (the "Escrow Instructions"). In the absence of Escrow Instructions, this Agreement shall act as the escrow instructions for the Escrow Agent. Seller and Buyer hereby agree to be bound by the terms, conditions, provisions and agreements of said Escrow Instructions, *provided, however*, that in the event this Agreement conflicts with the Escrow Instructions the terms and provisions of this Agreement shall supersede and control. Buyer may obtain a receipt for any and all escrow deposits from the Escrow Agent upon request. Seller may change escrow agents. In this Agreement, reference to deposits will be considered to automatically include all interest actually earned, if any, on the deposits so that the party who/which becomes entitled to receive the deposits will also receive any interest earned thereon; *provided, however*, that in the event the Closing occurs, Seller shall be entitled to all interest, if any, earned on the deposits and that Buyer will not be entitled to a credit

8

Buyer's Initials
A:\#339827 v13 –
TRUMP INTERNATIONAL - CONDOMINIUM UNIT PURCHASE AGREEMENT.doc

Seller's Initials

against the Purchase Price for any interest earned. Interest on deposits will be governed by the following: (i) no interest will be deemed earned on deposits unless it actually accrues and is paid by the applicable bank or other institution; and (ii) Seller is not required to place (or cause to be placed) deposits in an account which bears interest at all or any particular rate. Buyer recognizes that if Seller uses all or any portion of the deposits, or if all or any portion of the deposits are retained in non-interest bearing accounts, no interest will be earned or deemed to be earned (even if Seller indirectly benefits from any such use or retention). If Seller does place the deposits in an interest bearing account, Seller may select the kind of account (low-yielding or otherwise) in its sole discretion.

17.2   Bonding of Deposits. Notwithstanding Paragraph 16.1 of this Agreement, in lieu of placing the deposits in escrow, Seller may furnish a bond executed by Seller as principal and by a corporation qualified under the laws of Nevada as surety, payable to the State of Nevada, and conditioned upon the performance of Seller's duties concerning the purchase of the Unit. Such bond shall be in a principal sum equal to the amount of the deposits.

17.3   Refund of Deposits. In the event Buyer elects to terminate this Agreement in accordance with Paragraphs 17.2 or 42 of this Agreement, as applicable, all deposits or other amounts paid by the Buyer shall be refunded without penalty or obligation within twenty (20) days of the receipt of the notice of termination by the Seller.

18.  DEFAULT.

18.1   Buyer's Default. Should Buyer fail to do any and all acts and execute any and all instruments necessary on the designated Closing Date or should Buyer fail to perform any covenant, promise or obligation required to be performed hereunder, Seller, at its option, may terminate this Agreement and retain, or if not then paid by Buyer, Buyer will pay to Seller, all of Buyer's deposits then made or which would have been made or required had Buyer not defaulted, and all interest which was, or would have been, earned on such deposits, as liquidated and agreed upon damages (the "**Liquidated Damages Amount**"); the parties hereto agree and acknowledge that actual damages resulting from a default or breach by Buyer are extremely difficult to estimate and that the Liquidated Damages Amount is a reasonable, good faith estimate of the actual damages incurred by Seller in connection with the removal of the Unit from the market and shall not constitute a penalty. Upon payment or retention of the Liquidated Damages Amount, all parties hereto shall be released from obligations hereunder. Notwithstanding the foregoing and with the exception of Buyer's failure to timely pay a deposit or close on the Closing Date, Seller shall give Buyer written notice of Buyer's default or breach of this Agreement and give Buyer the opportunity to correct the default or breach within twenty (20) days from the receipt of such notice. The Escrow Agent, upon being notified of Buyer's failure to correct the default or breach, shall pay Buyer's deposits and interest thereon to Seller and the Escrow Agent shall be under no obligation to make any independent investigation or confirmation of the alleged default. In the event that Buyer fails to timely pay a deposit or close on the Closing Date, Seller shall have the option of terminating this Agreement without prior notice to Buyer.

Notwithstanding the foregoing, if Buyer loses the right to purchase the Unit because of Buyer's default or breach of contract after fifteen percent (15%) of the Purchase Price, exclusive of interest, has been paid, then Seller shall refund to Buyer any amount which remains from the payments made after subtracting fifteen percent (15%) of the Purchase Price, exclusive of interest, or the amount of the Seller's actual damages, whichever is the greater.

K.I
**BUYER'S INITIALS**                                              **SELLER'S INITIALS**

18.2   Seller's Default. In the event Seller shall fail to materially perform any of its obligations hereunder, Buyer shall give Seller written notice specifying such default and if Seller, within thirty (30) days subsequent to receipt of said notice, fails to take such action which would cure the default within a reasonable time after notice, and if Buyer has performed all of Buyer's obligations under this Agreement, Buyer may terminate this Agreement and request the return of Buyer's deposits, together with all interest earned thereon, by providing Seller with written notice of such termination, whereupon all parties hereto shall be released from their obligations hereunder.

K.I
Buyer's Initials                                   9                    Seller's Initials
AJW330#327 v13 –
TRUMP INTERNATIONAL - CONDOMINIUM UNIT PURCHASE AGREEMENT.doc

18.3    Subdivision Map. Notwithstanding the foregoing, Buyer acknowledges that (i) Seller has disclosed to Buyer that a final subdivision map for the Condominium has not yet been approved and recorded, and (ii) Buyer has reviewed the most recent version of the subdivision map prepared by Seller (the "Provisional Subdivision Map"). In the event that the approved and recorded final subdivision map for the Condominium differs materially and adversely from the Provisional Subdivision Map, Buyer may terminate this Agreement and request the return of Buyer's deposits, together with all interest earned thereon, by providing Seller with written notice of such termination within ten (10) days of the recordation of the final subdivision map for the Condominium, whereupon all parties hereto shall be released from their obligations hereunder.

19.   GOVERNING DOCUMENTS.   Buyer hereby acknowledges receipt of copies of those instruments and documents listed on Exhibit "A" attached hereto and Buyer shall execute a receipt in the form of Exhibit "A" hereto. Buyer agrees to comply with the Governing Documents and that occupancy of the Unit shall at all times be subject to the provisions of the Governing Documents. Seller has delivered to Buyer a full set of the Governing Documents. Seller reserves the right, in its sole discretion, to amend any of the Governing Documents, provided that a copy of such amendment is transmitted to the Buyer. Notwithstanding anything to the contrary contained herein, upon recordation of the Governing Documents, Seller shall only have the right to amend the Governing Documents in accordance with Nevada law. Buyer may rescind this Agreement if an amendment is so substantial in nature as to render title to the Unit unmarketable. If this Agreement is cancelled for any reason, Buyer will return to Seller all of the Governing Documents delivered to Buyer in the same condition received, reasonable wear and tear excepted, or Buyer shall pay to Seller $100.00 if Buyer fails to return same to Seller, which amount may, in the sole discretion of Seller, be deducted from Buyer's deposit.

20.   NON-ASSIGNABILITY.  Buyer shall not, and has no right to, assign, sell or transfer Buyer's interest in this Agreement without Seller's prior written consent, which consent may be arbitrarily or unreasonably withheld, in Seller's sole discretion. If Buyer is a corporation, other business entity, trustee or nominee, a transfer of any equitable, beneficial, legal or principal interest in or to Buyer will constitute an assignment of the Agreement requiring Seller's consent. Seller's consent may be conditioned in any manner it desires, in its sole discretion. The fact that the Seller refuses its consent to an assignment shall not give rise to any claim for any damages against Seller. Seller may freely assign, transfer or sell any or all of its rights and obligations under this Agreement, Notwithstanding anything to the contrary contained herein, Buyer, without Seller's consent, shall be entitled to assign Buyer's right, title and interest in this Agreement to a corporation, partnership or trust, of which Buyer owns and controls a majority of the voting and controlling interests. Notwithstanding the assignment set forth herein, nothing shall relieve Buyer of its obligations hereunder. In the event of such an assignment by Buyer, Buyer may not transfer any equity, beneficial or principal interest in the corporation, partnership or trust to which Buyer has assigned this Agreement without Seller's prior written consent, which consent may be withheld or conditioned by Seller in any manner Seller desires in Seller's sole discretion.

This Agreement is binding upon the Buyer's heirs and legal representatives. If Buyer has received Seller's consent to assign, transfer or sell Buyer's interest in this Agreement, this Agreement shall be binding upon such assignee, transferee or purchaser. If Buyer is a corporation or other business entity, this Agreement shall be binding upon Buyer's successors in interest.

21.   GOVERNING LAW.  The Agreement shall be governed by and construed in accordance with the laws of the State of Nevada. Venue for any action, litigation or proceeding arising out of or concerning this Agreement shall be in Clark County, Nevada, and the parties expressly waive their right to venue elsewhere. **THE FOLLOWING SENTENCE WILL SUPERSEDE AND TAKE PRECEDENCE OVER ANYTHING ELSE IN THIS AGREEMENT WHICH IS IN CONFLICT WITH IT: IF ANY PROVISIONS SERVE TO LIMIT OR QUALIFY SELLER'S SUBSTANTIAL COMPLETION OBLIGATION AS STATED IN THIS AGREEMENT, OR BUYER'S REMEDIES IN THE EVENT THAT SUCH OBLIGATION IS BREACHED, AND SUCH LIMITATIONS OR QUALIFICATIONS ARE NOT PERMITTED IF THE EXEMPTION OF THIS SALE FROM THE INTERSTATE LAND SALES FULL DISCLOSURE ACT PURSUANT TO 15 U.S.C., SECTION 1702(A)(2) IS TO APPLY, OR THIS AGREEMENT IS TO OTHERWISE BE FULLY ENFORCEABLE, THAN ALL THOSE PROVISIONS ARE HEREBY STRICKEN AND MADE NULL AND VOID AS IF NEVER A PART OF THIS AGREEMENT. FOR PURPOSES OF THIS PARAGRAPH**

10

Buyer's Initials
A:\0339827 v13 –
TRUMP INTERNATIONAL - CONDOMINIUM UNIT PURCHASE AGREEMENT.doc

Seller's Initials

ONLY, THE WORDS "THIS AGREEMENT" INCLUDE IN THEIR MEANING THE GOVERNING DOCUMENTS.

22. NOTICES. Notices to either party shall be given by certified mail, postage prepaid and return receipt requested, hand delivery or a nationally recognized overnight courier. All notices shall be sent to the addresses of the parties set forth on the first page of this Agreement. Either party may change its address for notice by giving notice to the other as provided herein. All notices shall be deemed and considered given upon mailing. Notwithstanding the foregoing, any notice by Seller of Closing, Closing extension, postponement or rescheduling pursuant to Paragraph 10 of this Agreement may be given orally, by telephone, facsimile or other means of communication and an affidavit from Seller, its agents or employees, shall be conclusive of the fact that such notice was given to Buyer. Such form of notice shall be deemed effective when given. Notwithstanding anything herein to the contrary, the notice requirements contained in this Paragraph 21 shall not apply to the cancellation provisions contained in Paragraph 42 or those provided on the signature page hereof.

23. MAINTENANCE AND OPERATION COSTS.   AS THOSE AREAS TYPICALLY DESIGNATED AS COMMON ELEMENTS IN A CONDOMINIUM ARE DESIGNATED AS SHARED COMPONENTS TO BE OWNED AND MAINTAINED BY THE HOTEL UNIT OWNER, BUYER UNDERSTANDS AND AGREES THAT BUYER MUST PAY ITS ALLOCATED SHARE OF THE HOTEL SHARED COSTS FOR MAINTENANCE AND OPERATION OF THE SHARED COMPONENTS, AS WELL AS RELATED EXPENSES, FROM AND AFTER THE CLOSING DATE. THOUGH A LARGE PORTION OF THE EXPENSES PAID BY BUYER WILL BE ATTRIBUTABLE TO THE MAINTENANCE AND OPERATION OF THE SHARED COMPONENTS, BUYER UNDERSTANDS AND AGREES THAT BUYER MUST ALSO PAY AN ASSESSMENT TO THE TRUMP INTERNATIONAL HOTEL & TOWER – LAS VEGAS CONDOMINIUM ASSOCIATION (THE "CONDOMINIUM ASSOCIATION"), FOR MAINTENANCE OF COMMON ELEMENTS, AND ANY OTHER EXPENSES INCIDENT TO THE OPERATION OF THE CONDOMINIUM ASSOCIATION FROM AND AFTER THE CLOSING DATE. A CAPITAL CONTRIBUTION EQUAL TO THREE (3) MONTHS OF HOTEL SHARED COSTS SHALL BE PAID BY BUYER AT CLOSING AS DESIGNATED BY SELLER. IN ADDITION, A CAPITAL CONTRIBUTION EQUAL TO THREE (3) MONTHS OF CONDOMINIUM ASSOCIATION ASSESSMENTS AND SHALL BE PAID BY BUYER AT CLOSING, AS DESIGNATED BY SELLER, TO SELLER OR TO THE CONDOMINIUM ASSOCIATION. THESE CONTRIBUTIONS SHALL BE DETERMINED AT THE TIME OF CLOSING, WILL NOT BE CREDITED AGAINST REGULAR CONDOMINIUM ASSOCIATION ASSESSMENTS OR HOTEL SHARED COSTS, AND MAY BE USED FOR ANY EXPENSES THAT SELLER OR THE HOTEL UNIT OWNER INCURS IN MAINTAINING THE SHARED COMPONENTS OR COMMON ELEMENTS, OR PROVIDING SERVICES AND SUBSIDIES IN RELATION TO THE SHARED COMPONENTS OR COMMON ELEMENTS. SUCH EXPENSES MAY ALSO BE USED TO PAY ANY DEFICITS OR OTHER SUMS SELLER MAY BE REQUIRED TO ADVANCE TO THE CONDOMINIUM ASSOCIATION AND/OR THE HOTEL UNIT OWNER. BUYER AGREES TO BE BOUND BY ALL THE GOVERNING DOCUMENTS, INCLUDING, BUT NOT LIMITED TO, THE DECLARATION, AS THEY MAY BE AMENDED FROM TIME TO TIME.

24. ADDITIONAL DISCLOSURES AND ACKNOWLEDGEMENTS.

24.1   NO REPRESENTATIONS REGARDING CERTAIN ECONOMIC BENEFITS. BUYER ACKNOWLEDGES THAT NEITHER SELLER NOR ANY OF ITS EMPLOYEES, AGENTS, BROKERS OR SALES AGENTS HAVE REPRESENTED OR OFFERED THE UNIT AS AN INVESTMENT OPPORTUNITY FOR APPRECIATION OF VALUE OR AS A MEANS OF OBTAINING INCOME FROM THE RENTAL THEREOF. BUYER FURTHER ACKNOWLEDGES THAT NEITHER SELLER NOR ANY OF ITS EMPLOYEES, AGENTS, BROKERS OR SALES AGENTS HAVE MADE ANY REPRESENTATIONS AS TO RENTAL OR OTHER INCOME FROM THE UNIT OR AS TO ANY OTHER ECONOMIC BENEFIT, INCLUDING POSSIBLE ADVANTAGES FROM THE OWNERSHIP OF THE UNIT UNDER FEDERAL OR STATE TAX LAWS, TO BE DERIVED FROM THE PURCHASE OF THE UNIT. BUYER FURTHER ACKNOWLEDGES THAT NEITHER SELLER NOR ANY OF ITS EMPLOYEES, AGENTS, BROKERS OR SALES AGENTS HAVE MADE ANY ORAL

Buyer's Initials
A#339827 v13 –
TRUMP INTERNATIONAL - CONDOMINIUM UNIT PURCHASE AGREEMENT.doc

Seller's Initials

REPRESENTATIONS THAT CONFLICT WITH THE GOVERNING DOCUMENTS AND THE GOVERNING DOCUMENTS AND WRITTEN DISCLOSURES DELIVERED TO BUYER SHALL CONTROL.

<u>K. I</u>
**BUYER'S INITIALS**

24.2    <u>DISCLAIMER OF EXPRESS OR IMPLIED WARRANTIES</u>. SELLER HEREBY DISCLAIMS ANY AND ALL AND EACH AND EVERY EXPRESS OR IMPLIED WARRANTIES, WHETHER ESTABLISHED BY STATUTORY, COMMON, CASE LAW OR OTHERWISE, AS TO THE DESIGN, CONSTRUCTION, CONTINUATION OF ANY PARTICULAR VIEW (IT BEING UNDERSTOOD AND AGREED THAT CONSTRUCTION ON ANY ADJACENT PROPERTIES MAY OBSTRUCT SUCH VIEW), SOUND AND/OR ODOR TRANSMISSION, AND THE EXISTENCE AND/OR DEVELOPMENT OF MOLDS, MILDEW, TOXINS OR FUNGI, FURNISHING AND EQUIPPING OF THE CONDOMINIUM.

25.  MISCELLANEOUS.

25.1    <u>Time is of the Essence</u>.  Time is of the essence in this Agreement with respect to Buyer's obligations hereunder.

25.2    <u>No Rights in Unit</u>.  Buyer acknowledges that Buyer acquires no right, title, interest or lien rights in the Unit prior to the conveyance of the title and Buyer agrees not to file in the public records this Agreement, any claim, memorandum or notice (including a lis pendens) concerning any dispute with Seller relative to the subject matter of this Agreement.  Any such recording shall be a default hereunder.

25.3    <u>No Recordation</u>.  This Agreement shall not be recorded in any public records without the prior written consent of Seller, which consent may be arbitrarily or unreasonably withheld, in Seller's sole discretion.  The recording of this Agreement, without Seller's prior written consent, shall be a default hereunder.

25.4    <u>Liens</u>.  If, at the time of Closing, any deed of trust or lien encumbers the Unit, Seller may use Buyer's Closing funds to obtain a release of same at Closing.

25.5    <u>Right to Litigate Taxes</u>.  Seller shall have the right to litigate ad valorem tax matters, impact charges, service fees and interim and/or special assessments concerning the Unit or underlying lands for prior years and the year of conveyance.

25.6    <u>Construction</u>.  It is Seller's and Buyer's mutual desire and intention that all provisions of the Agreement be given full effect and be enforceable strictly in accordance with their terms.  If, however, any part of this Agreement is not enforceable in accordance with its terms or would render other parts of this Agreement or this Agreement in its entirety unenforceable, the unenforceable part or parts are to be judicially modified, if at all possible, to come as close as possible to the expressed intent of such part or parts and still be enforceable without jeopardy to other parts of this Agreement, or this Agreement in its entirety, and then are to be enforced as so modified.  If the unenforceable part or parts cannot be so modified, such part or parts shall be unenforceable and considered null and void in order that the mutual paramount goal that this Agreement is to be enforced to the maximum extent possible strictly in accordance with its terms can be achieved.

Without limiting the generality of the foregoing, if the mere inclusion in this Agreement of language granting to Seller certain rights, remedies and powers, or waiving or limiting any of Buyer's rights, remedies or powers or Seller's obligations, results in a final determination (after giving effect to the above judicial modification, if possible) that Buyer has the right to cancel this Agreement and receive a refund of Buyer's deposit, such offending rights, powers, limitations and/or waivers shall be struck, cancelled and rendered unenforceable, ineffective and null and void.  Under no circumstances shall either Buyer or Seller have the right to cancel this Agreement solely by reason of the inclusion of certain language in this Agreement, unless the specific purpose of that language is to grant a right of cancellation.

12

<u>K. I</u>
**Buyer's Initials**
A08338827 v13 –
TRUMP INTERNATIONAL - CONDOMINIUM UNIT PURCHASE AGREEMENT.doc

<u>Seller's Initials</u>

25.7   Counterparts.   This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, and said counterparts shall constitute but one and the same instrument which may be sufficiently evidenced by one such counterpart.

25.8   Pronouns.   All pronouns and variations thereof shall be construed so as to refer to the masculine, feminine, neuter, singular or plural form thereof, as the identity of the person or persons or the situation may require.

25.9   Headings.   The titles of paragraphs, sections and subsections contained in this Agreement are inserted for convenience of reference only, and are not to be given any legal effect and should not affect the construction or the interpretation of this Agreement.

25.10   Arbitration.   The parties agree to submit to arbitration any dispute related to this Agreement (including, but not limited to, any dispute related to the interpretation or enforceability of this Agreement) and agree that the arbitration process shall be the exclusive means for resolving disputes which the parties cannot resolve. The laws of the State of Nevada shall apply to this Agreement. Any arbitration hereunder shall be conducted under the Dispute Resolution Rules of the American Arbitration Association ("AAA") as modified herein. Arbitration proceedings shall take place in Las Vegas, Nevada before a single arbitrator who shall be a lawyer. The prevailing party shall be reimbursed for all expenses of arbitration, including arbitration fees and attorneys' fees and costs. All arbitration proceedings shall be confidential. Neither party shall disclose any information about the evidence produced by the other party in the arbitration proceedings, except in the course of judicial, regulatory, or arbitration proceeding, or as may be demanded by government authority. Before making any disclosure permitted by the preceding sentence, a party shall give the other party reasonable advance written notice of the intended disclosure and an opportunity to prevent disclosure. In connection with any arbitration provisions hereunder, each party shall have the right to take the deposition of two (2) individuals and any expert witness retained by the other party. Additional discovery may be had only where the arbitrator so orders, upon a showing of substantial need. Only evidence that is directly relevant to the issues may be obtained in discovery. Each party bears the burden of persuasion of any claim or counterclaim raised by that party. The arbitration provisions of this Agreement shall not prevent any party from obtaining injunctive relief from a court of competent jurisdiction to enforce the obligations for which such party may obtain provisional relief pending a decision on the merits by the arbitrator. Each of the parties hereby consents to the jurisdiction of Nevada courts for such purpose. The arbitrator shall have authority to award any remedy or relief that a court of the State of Nevada could grant in conformity to applicable law except that the arbitrator shall have no authority to award punitive damages. Any arbitration award shall be accompanied by a written statement containing a summary of the issues in controversy, a description of the award and an explanation of the reasons for the award. The arbitrator's award shall be final and judgment may be entered upon such award by any court.

26.   ADJUSTMENTS WITH THE CONDOMINIUM ASSOCIATION.   Buyer understands that Seller may have to advance money to the Condominium Association to permit it to pay for certain of its initial expenses. Seller is entitled to be reimbursed by the Condominium Association for all of its sums advanced by Seller. The Condominium Association may reimburse Seller out of assessments paid by Buyer and other unit owners as those assessments are collected at a later date, or by way of a credit against any obligations Seller may have to pay the Condominium Association, at Seller's election.

27.   BUDGETS.   Buyer understands that the estimated operating budget as to the costs associated with the operation and maintenance of the Shared Components and Condominium Association (collectively, the "Budgets") contained in the Governing Documents provide only an estimate of what it will cost to operate and maintain the Shared Components and the Condominium Association during the period of time stated in the Budgets. The Budgets, themselves, however, are not guaranteed. Seller may make changes in the Budgets at any time to cover increases or decreases in actual expenses or in estimates. Reserves are expected to be collected annually with respect to the Shared Components, however, it is intended that the Seller, as the sole Owner upon the formation of the Condominium, will elect not to provide reserves for the initial year of the Condominium. Thereafter, on an annual basis, a majority of the Condominium Association's members may vote to continue not to provide any reserves for the Condominium.

Buyer's Initials
A#839937 v13 –
TRUMP INTERNATIONAL - CONDOMINIUM UNIT PURCHASE AGREEMENT.doc

13

Seller's Initials

28. LIABILITY FOR CASUALTY LOSS. If the Unit is damaged by fire or other casualty after the Effective Date, but prior to the Closing of the Unit, then Seller shall be financially responsible for the loss. If, however, such damage occurs after the Closing of the sale of any unit in the Condominium, then the Hotel Unit Owner or the Condominium Association, as applicable, shall have the right to decide whether or not to repair the unit. After the Closing, neither the Hotel Unit Owner, Condominium Association nor the Seller shall be financially responsible to Buyer for the loss of any property lying within the boundaries of the Unit, including, but not limited to, personal property of Buyer.

In the event Seller, the Hotel Unit Owner or the Condominium Association decides to repair damage occurring prior to Closing, then the Seller, the Hotel Unit Owner and/or the Condominium Association shall have a reasonable time to complete repairs. Any such repair work will be judged by the same standards used to evaluate new construction. In the event of the foregoing, the Buyer shall not have any right to reduction in the Purchase Price nor have any claim against the Seller, the Hotel Unit Owner nor the Condominium Association, and Buyer agrees to accept the Unit on the Closing Date (provided the repairs are finished by the Closing Date). Any monies that Seller, the Hotel Unit Owner or Condominium Association receive in settlement for any damages (insurance, etc.) will belong to the Seller, the Hotel Unit Owner or Condominium Association, as the case may be. If Seller, the Hotel Unit Owner or the Condominium Association decides not to repair the damage, then, and in that event, this Agreement shall be cancelled and all deposits shall be returned to the Buyer, and the parties shall be relieved of all further obligations hereunder. Notwithstanding anything to the contrary contained hereinabove, in the event that the Unit is damaged by casualty prior to Closing, Seller may elect not to repair, and to terminate this Agreement.

29. SELLER'S USE OF THE CONDOMINIUM. As long as Seller or an affiliate of Seller owns a unit or units in the Condominium or has any ownership in the Hotel Unit, it and its agents can keep offices and model units within the Condominium. Sales people employed by Seller or outside brokers of Seller can show these units, erect advertising signs and do whatever else is necessary in Seller's opinion to help sell or lease units or develop and manage the Condominium, but Seller's use of the Condominium shall be appropriate in Seller's opinion and cannot unreasonably interfere, in Seller's opinion, with Buyer's use and enjoyment of the Unit. This Paragraph 28 shall survive and continue to be effective after Closing.

30. SURVIVAL. The provisions and disclaimers in this Agreement which are intended to have effect after Closing shall survive (continue to be effective after) Closing and delivery of the grant bargain sale deed to Buyer.

31. JOINT AND SEVERAL OBLIGATIONS. If more than one person signs this Agreement as Buyer, each person shall be liable for full performance of all Buyer's duties and obligations hereunder. Seller may enforce this Agreement against each of the Buyers as individuals or together.

32. WAIVER. Seller's waiver of any of its rights or remedies shall not operate to waive any other of Seller's rights or remedies or to prevent Seller from enforcing the waived right or remedy in another instance.

33. NO REPRESENTATIONS. No broker, salesperson, or other person has been authorized to give any information or make any representations other than those contained in writing within the offering materials provided by Seller, and if given or made, such information or representations must not be relied upon as having been authorized by Seller. By executing this Agreement, Buyer acknowledges that no representations have been or are made concerning the economic benefits to be derived from the rental or resale of the Unit.

34. RADON GAS. Buyer is advised that radon gas is a naturally occurring radioactive gas that, when it has accumulated in a building in sufficient quantities, may present health risks to persons who are exposed to it over time. Additional information regarding radon and radon testing may be obtained from your county public health unit. Nothing contained herein shall be deemed to be a representation or warranty by Seller as to the existence or non-existence of radon gas in or about the Unit or Condominium.

35. SOIL TEST REPORTS. Seller has advised Buyer that the following soil test report has been prepared: Geotechnical Evaluation for Proposed Trump Tower in Las Vegas, Nevada, Project No. 4124JS097, dated February 9, 2005, prepared by Western Technologies Inc., as amended and supplemented. Within five (5) days after signing this Agreement, Buyer may make a written request for a copy of soil report conducted on the property on which the

14

Buyer's Initials
A\\0330927 v13 -
TRUMP INTERNATIONAL - CONDOMINIUM UNIT PURCHASE AGREEMENT.doc

Seller's Initials

Condominium is located. Seller shall provide, without cost, a copy of each report requested not later than five (5) days after the request is received by Seller. In accordance with NRS Section 113.135, Buyer hereby waives Buyer's right to rescind this Agreement for the Unit within twenty (20) days after the receipt of all soil test reports as provided in NRS Section 113.135(3).

36. RECORDING OF GOVERNING DOCUMENTS. Buyer herein specifically grants authority to the Seller to file and place among the Office of the Recorder of Clark County, Nevada, all documents and papers required to be filed by the NRS in order to legally create and maintain existence of the Condominium.

37. INDUCEMENT. Buyer acknowledges that the primary inducements for Buyer to purchase under this Agreement are the Unit itself, and not the recreational amenities and other Shared Components and Common Elements.

38. LOCAL AGENT. Buyer shall deliver to Seller, within thirty (30) days of the Effective Date, an executed designation of an individual qualified to accept service of process in the State of Nevada, which designation shall be irrevocable during the period this Agreement remains in effect and for such time thereafter as is necessary to effectuate service of process upon Buyer or such designated local agent concerning any action, litigation or proceeding arising out of or concerning this Agreement. Buyer may appoint a substitute or successor local agent by notifying Seller of same in accordance with the notice provisions hereunder. If Buyer fails to deliver such designation, Buyer shall be deemed to have appointed the Secretary of State, State of Nevada, as Buyer's agent for such purposes.

39. CERTIFICATION. Buyer hereby certifies, under penalties of perjury, that the taxpayer's identification number (social security number or federal employer identification number) as set forth on Page 1 of this Agreement is correct, and understands that failure to provide the correct taxpayer's identification number, as required by law, may subject Buyer to civil or criminal penalties.

40. ATTORNEY'S FEES. In any action, litigation or proceeding arising out of or concerning a default of this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party its costs and reasonable attorneys' fees, through the appellate level.

41. INTERPRETATION. Notwithstanding that this Agreement was prepared by one party hereto, it shall not be construed more strongly against or more favorably for either party; it being known that both parties have had equal bargaining power, have been represented (or have had the opportunity to be represented) by their own independent counsel and have equal business acumen such that any rule of construction that a document is to be construed against the drafting party shall not be applicable.

42. BUYER'S INSPECTION. Buyer acknowledges that, prior to Closing, Buyer will have an opportunity to inspect the Unit, subject to the restrictions and limitations set forth in Paragraph 9.6. Buyer further acknowledges that, prior to the execution of this Agreement, Buyer has had ample opportunity to inspect the Governing Documents.

43. CANCELLATION RIGHT OF BUYER. BUYER MAY, BY WRITTEN NOTICE TO SELLER, CANCEL THIS AGREEMENT UNTIL MIDNIGHT OF THE SEVENTH (7TH) CALENDAR DAY FOLLOWING THE EFFECTIVE DATE.

44. CONSTRUCTION BY BUYER'S AGENTS. Buyer agrees not to hire or employ any contractors, subcontractors or any other persons, firms or corporations, to do any work in or on the Unit while said Unit is under construction, until after Closing and title and possession of the Unit has been transferred to the Buyer. Buyer agrees that it, its contractors, subcontractors or any other persons hired to work on the Unit shall abide by the Governing Documents, Buyer shall be responsible for any damage to the Condominium caused by Buyer, its contractors, subcontractors or any other persons hired to work on the Unit.

45. SELLER'S CONTROL OF CONDOMINIUM ASSOCIATION. Buyer acknowledges that the Seller will appoint officers and directors of the Condominium Association, and of necessity will be acting on behalf of the

15

Buyer's Initials
A:\W330827 v13 –
TRUMP INTERNATIONAL - CONDOMINIUM UNIT PURCHASE AGREEMENT.doc

Seller's Initials

Condominium Association in dealings and transactions with Seller. Buyer expressly waives all objections to such dealings and transactions and hereby ratifies, approves and confirms the same. Buyer further understands and acknowledges that the Condominium Association's role in the governance of the Condominium will be minimal, as those items typically considered common elements in other condominium projects are designated as Shared Components and owned entirely by the Hotel Unit Owner.

### 46.  ADDITIONAL DISCLOSURES; DISCLAIMERS AND RELEASES.

46.1    ADDITIONAL DISCLOSURES. WITHOUT LIMITING ANY OTHER PROVISION IN THE DECLARATION, BUYER FOR ITSELF AND FOR THE BUYER'S TENANTS, EMPLOYEES, FAMILY MEMBERS, GUESTS AND OTHER INVITEES, SHALL CONCLUSIVELY BE DEEMED TO UNDERSTAND, AND TO HAVE ACKNOWLEDGED AND AGREED TO, ALL OF THE FOLLOWING:

(a)    BUYER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT THE HOTEL UNIT OWNER SHALL HAVE THE RIGHT, IN ITS SOLE DISCRETION, TO (1) SELECT A HOTEL OPERATOR TO MANAGE AND/OR OPERATE THE HOTEL UNIT; (2) TO CHANGE SUCH HOTEL OPERATOR FROM TIME TO TIME. BUYER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT NEITHER THE SELLER, THE HOTEL UNIT OWNER NOR ANY OF THEIR RESPECTIVE AGENTS OR REPRESENTATIVES HAS MADE ANY REPRESENTATIONS, WARRANTIES, GUARANTIES OR OTHER CLAIMS OF ANY KIND REGARDING THE IDENTITY OF AN HOTEL OPERATOR FOR THE HOTEL UNIT OR IF A HOTEL OPERATOR WILL BE HIRED TO OPERATE OR MANAGE THE HOTEL UNIT. SELLER AND HOTEL UNIT OWNER EXPRESSLY DISCLAIM ANY REPRESENTATIONS, WARRANTIES, GUARANTIES OR OTHER CLAIMS OF ANY KIND REGARDING THE SAME.

(b)    BUYER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT NEITHER THE SELLER, THE HOTEL UNIT OWNER NOR ANY OF THEIR RESPECTIVE AGENTS OR REPRESENTATIVES HAS MADE ANY REPRESENTATIONS, WARRANTIES, GUARANTIES OR OTHER CLAIMS OF ANY KIND REGARDING (1) ANY RENTAL INCOME, IF ANY, THAT MAY BE OBTAINED BY BUYER FROM RENTING A UNIT; OR (2) ANY RENTAL PROGRAMS THAT MAY BE CURRENTLY AVAILABLE, OR IN THE FUTURE MADE AVAILABLE, FOR PARTICIPATION BY BUYER. SELLER AND HOTEL UNIT OWNER EXPRESSLY DISCLAIM ANY REPRESENTATIONS, WARRANTIES, GUARANTIES OR OTHER CLAIMS OF ANY KIND REGARDING ANY RENTAL PROGRAMS AND HEREBY NOTIFY ANY PURCHASER OF A UNIT THAT ANY RENTAL PROGRAM THAT MAY BECOME AVAILABLE IN WHICH A BUYER MIGHT DESIRE TO PARTICIPATE WILL MOST LIKELY PLACE SEVERE RESTRICTIONS ON BUYER'S RIGHTS TO USE ITS UNIT, INCLUDING IMPOSING BLACKOUT PERIODS OR OTHER DATE RESTRICTIONS ON USE OF THE UNIT THAT ARE IN ADDITION TO RESTRICTIONS AND REQUIREMENTS IMPOSED BY THE DECLARATION.

(c)    Living in a multi-story condominium building entails living in very close proximity to other persons and business, and hotels, with attendant limitations on solitude and privacy. Walls, floors and ceilings have been designed to meet applicable building codes. However, Buyer will hear noise from adjacent Units within the Condominium, including, but not limited to, noise from showers, bathtubs, sinks, toilets or other sources of running water and/or plumbing fixtures. Also, Buyer may hear noise from items such as the pool, vacuum cleaners, stereos or televisions, or from people running, walking, exercising and socializing. Finally, Buyer can expect to hear substantial levels of sound, music, noise, odors, vibrations, and other nuisances from retail, commercial and hotel and casino developments in the vicinity of the Condominium. Buyer may also experience light entering the Unit from commercial lighting in the vicinity and from street lights located in close proximity to the windows and doors of the Unit.

16

(d)    The Condominium Association and Seller have no control over the transmission of noise, light or odors within the Condominium and/or from the adjacent retail/entertainment, commercial and hotel and casino developments, and the potential effect of such noise, light or odors on the Unit.

(e)    Any spa, health club or fitness center and related facilities that are intended to be part of the Hotel Unit may be subject to separate use fees and charges in addition to the other fees, charges and assessments provided in the Declaration.

(f)    Buyer acknowledges that (i) there are no protected views in the Condominium, and the Unit is not assured the existence or unobstructed continuation of any particular view, and (ii) any construction, landscaping or other installation of improvements by Seller (including, without limitation, the construction of another hotel tower in the vicinity of the Condominium), other owners or owners of other property in the vicinity of the Condominium, including, without limitation, owners of the Frontier Hotel and Casino and the Fashion Show Mall, may impair the view from the Unit, and Buyer consents to such view impairment.

(g)    Buyer acknowledges that Seller or any of Seller's affiliates or related parties may, in its sole discretion, construct an additional hotel/condominium tower in the vicinity of the Condominium and that the construction of such improvements may result in high levels of traffic, noise, maintenance, repair, dust, and other nuisances from such construction and operation of such additional hotel/condominium and Buyer hereby releases Seller and any of Seller's affiliates or related parties or any other third party involved in such construction and operation of a second hotel/condominium tower from any and all claims arising from or relating to such construction and operation and/or noise, dust, and other nuisance related thereto.

(h)    Certain portions of land (the "Neighboring Developments") outside, abutting and/or near the Condominium have not yet been developed or may be subject to redevelopment, and in the future may or will be developed by Seller, or third parties over whom Seller has no control.   The Condominium Association and Seller have no jurisdiction over the future Neighboring Developments, and accordingly, there is no representation as to the nature, use or architecture of any future development or improvements on Neighboring Developments; and such use, development and/or construction on Neighboring Developments may result in noise, dust, or other "nuisance" to the Condominium or Buyer.

(i)    Nevada Power Company may maintain a high energy electrical transmission line facility within North Fashion Show Drive or other streets in the vicinity of the Condominium, and there may in the future be other major electrical power system components (high voltage transmission or distribution lines, transformers, etc.) from time to time located nearby the Project, which generate certain electric and magnetic fields ("EMF") around them; Buyer hereby releases the Seller from any and all claims arising from or relating to EMF.

(j)    The Unit and other portions of the Condominium from time to time are or may be located within or nearby certain airplane flight patterns, and/or subject to significant levels of airplane traffic and noise; and Buyer hereby releases Seller from any and all claims arising from or relating to airplane flight patterns, and/or airplane noise.

(k)    The Unit and other portions of the Condominium are located near hotels and casinos.   The hotels, casinos and retail projects have or may in the future have large LED signs which may be modified or added to from time to time.  Buyer hereby releases the Seller from any and all claims arising from or relating to the appearance of the hotels and casinos and the signage that from time to time is erected in connection therewith.

(l)    The Unit and the Condominium are located near multi-lane freeways known as Interstate 15, and the Condominium is located adjacent to nearby major roads, including, but not

17

Buyer's Initials
A:\0330827 v13 –
TRUMP INTERNATIONAL - CONDOMINIUM UNIT PURCHASE AGREEMENT.doc

Seller's Initials

limited to, Las Vegas Boulevard, all of which may, but need not necessarily, be constructed, reconstructed, or expanded in the future (all collectively, "roadways"), and subject to high levels of traffic, noise, construction, maintenance, repair, dust, and other nuisance from such roadways; and Buyer hereby releases Seller from any and all claims arising from or relating to roadways and/or noise, dust, and other nuisance related thereto.

(m)     The Units and other portions of the Condominium are now or hereafter may be located adjacent to or nearby power generators, major water facilities and major water and drainage channel(s) and/or washes (all, collectively, "Facilities"), the ownership, use, regulation, operation, maintenance, improvement and repair of which are not within Seller's control, and over which Seller does not necessarily have jurisdiction or authority, and, in connection therewith, Buyer acknowledges by acceptance of a deed to the Unit: (1) the Facilities may be an attractive nuisance to children; (2) maintenance and use of the Facilities may involve various operations and applications, including (but not necessarily limited to) noisy electric, gasoline or other power driven vehicles and/or equipment used by Facilities maintenance and repair personnel during various times of the day, including, without limitation, early morning and/or late evening hours; and (3) the possibility of damage to improvements and property on the Condominium property, particularly in the event of overflow of water or other substances from or related to the Facilities, as the result of nonfunction, malfunction, or overtaxing of the Facilities or any other reason; and (4) any or all of the foregoing may cause inconvenience and disturbance to Buyer and other persons in or near Common Elements and/or Shared Components, and possible injury to person and/or damage to property.

(n)     Residential construction is an industry inherently subject to variations and imperfections, and items which do not materially affect safety or structural integrity shall be deemed "expected minor flaws" (including, but not limited to: reasonable wear, tear or deterioration; shrinkage, swelling, expansion or settlement; squeaking, peeling, chipping, cracking, or fading; touch-up painting; minor flaws or corrective work; and like items) and not constructional defects. Buyer hereby releases Seller from any and all claims arising from or relating to such expected minor flaws.

(o)     The finished construction of each Unit, the Shared Components and any Association Property, while within the standards of the industry in Clark County, Nevada, and while in substantial compliance with the Sellers' Plans and Specifications, will be subject to variations and imperfections and expected minor flaws; and Buyer hereby releases Seller from any and all claims arising from or relating to such variations, imperfections and flaws.

(p)     Indoor air quality of the Unit may be affected in a manner and to a degree found in new construction within industry standards, including, without limitation, by particulates or volatiles emanating or evaporating from new carpeting or other building materials, fresh paint or other sealants or finishes, and similar products.

(q)     Installation and maintenance of any security or traffic access device, operation, or method, shall not create any presumption or duty whatsoever of the Seller or the Condominium Association (or their respective officers, directors, managers, employees, agents, and/or contractors) with regard to security or protection of persons or property within or adjacent to the Project; and Buyer, by acceptance of a deed to a Unit, whether or not so stated in the deed, shall be deemed to have agreed to take any and all protective and security measures and precautions which Buyer would have taken if the Condominium had been located within public areas and not gated.

(r)     The Las Vegas Valley contains a number of earthquake faults, and the Condominium property or portions thereof may be located on or nearby an identified or yet to be identified seismic fault line; and Buyer hereby releases Seller from any and all claims arising from or relating to earthquakes or seismic activities.

18

(s)    The Unit and other portions of the Project from time to time may, but need not necessarily, experience problems with scorpions, bees, ants, spiders, termites, pigeons, snakes, rats, and/or other insect, rodent or pest problems (collectively, "pests"); and Seller hereby specifically disclaims any and all representations or warranties, express and implied, with regard to or pertaining to any pest, and Buyer must make its own independent determination regarding the existence or non-existence of any pest(s) which may be associated with the Unit or other portions of the Condominium.

(t)    The Las Vegas Valley currently is undergoing severe drought conditions, and relevant water districts and authorities have announced certain water conservation measures and restrictions on outdoor watering and/or outdoor water features. It is possible that these drought conditions may continue or worsen, and/or that the relevant water districts and authorities may announce further water conservation measures and restrictions, including restrictions on indoor water use, which may affect the Unit, the Shared Components, and the Association Property (as defined in the Declaration) (if any) landscaping and features, and the appearance and/or use of same. Buyer must make its own independent determination regarding such matters, and hereby releases Seller and/or Condominium Association from any and all claims arising from or relating to drought or water conservation measures or restrictions, and/or the effects respectively thereof.

(u)    Even with a "slip sheet" underneath, certain hard surface flooring may still be subject to hairline cracks, and grout may crack and/or deteriorate, and furthermore, cracks in the walls may result from normal settlement and shifting around doors, windows, walls and ceilings; and Buyer shall be solely responsible for any such cracking or deterioration.

(v)    Other matters, limitations, and restrictions, uniquely applicable to this Condominium, are set forth in the Declaration, and may be supplemented from time to time by the Rules (as defined in the Declaration).

(w)    Buyer agrees and acknowledges that it is not a person, entity, or organization (i) listed in the Annex to, or otherwise subject to the provisions of, the Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001, and relating to Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit or Support Terrorism, (ii) that is named as a "specifically designated national (SDN)" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control at its official website (http://www.treas.gov.ofac/t1sdn.pdf) or at any replacement website or other replacement official publication of such list or that it is named on any other U.S. or foreign government or regulatory list issued post 9/11/01, (iii) acting, directly or indirectly, in contravention of any anti-money laundering or anti-terrorist laws, rules, regulations, policies or executive orders of the United States or any applicable foreign jurisdiction, or in concert with any terrorist organizations or narcotics traffickers, including those persons that are included on any relevant lists maintained by the United Nations, North Atlantic Treaty Organization, Financial Action Task Force on Money Laundering, U.S. Office of Foreign Assets Control, U.S. Securities and Exchange Commission, U.S. Federal Bureau of Investigation, U.S. Central Intelligence Agency, or U.S. Internal Revenue Service, all as may be amended from time to time, or (iv) that is owned or controlled by, or acting for or on behalf of, any person described in clause (i), (ii) or (iii) above.

_____
BUYER'S INITIALS

46.2    **RELEASES. BUYER, FOR ITSELF AND ALL PERSONS CLAIMING UNDER SUCH OWNER, SHALL CONCLUSIVELY BE DEEMED TO HAVE ACKNOWLEDGED AND AGREED, TO RELEASE SELLER AND ITS AFFILIATES, AND ALL OF THEIR RESPECTIVE OFFICERS, MANAGERS, AGENTS, EMPLOYEES, SUPPLIERS, AND CONTRACTORS, FROM ANY AND ALL CLAIMS, CAUSES OF ACTION, LOSS, DAMAGE OR LIABILITY (INCLUDING, BUT NOT LIMITED TO, ANY CLAIM FOR NUISANCE OR HEALTH HAZARD, PROPERTY DAMAGE, BODILY INJURY,**

19

Buyer's Initials
A\W339827 v13 –
TRUMP INTERNATIONAL · CONDOMINIUM UNIT PURCHASE AGREEMENT.doc

Seller's Initials

AND/OR DEATH) ARISING FROM OR RELATED TO ALL AND/OR ANY ONE OR MORE OF THE CONDITIONS, ACTIVITIES, OCCURRENCES, OR OTHER MATTERS DESCRIBED IN THE FOREGOING PARAGRAPH 45.1.

     46.3   HOTEL UNIT OWNER RELEASE. BUYER (BY VIRTUE OF HIS ACCEPTANCE OF TITLE TO HIS UNIT) AND EACH OTHER PERSON HAVING AN INTEREST IN OR LIEN UPON, OR MAKING USE OF, ANY PORTION OF THE PROPERTIES (BY VIRTUE OF ACCEPTING SUCH INTEREST OR LIEN OR MAKING SUCH USE) SHALL BE BOUND BY THIS PROVISION AND SHALL BE DEEMED TO HAVE AUTOMATICALLY WAIVED ANY AND ALL RIGHTS, CLAIMS, DEMANDS AND CAUSES OF ACTION AGAINST THE HOTEL UNIT OWNER ARISING FROM OR CONNECTED WITH ANY MATTER FOR WHICH THE LIABILITY OF THE HOTEL UNIT OWNER HAS BEEN DISCLAIMED HEREBY.

    47. LEGAL DOCUMENTS. This Agreement and other Governing Documents, purchase documents, all disclosure materials and brochure materials are important legal documents and if not understood, Buyers should seek legal advice.

    48. EFFECTIVE DATE. The "Effective Date" of this Agreement shall be the latest date as indicated below on which a party has executed this Agreement. Notwithstanding the foregoing, this Agreement shall not be binding upon Seller until executed by an authorized representative of Seller.

    49. ENTIRE AGREEMENT. This Agreement is wholly integrated and shall supersede any and all previous and current understandings and agreements between the Buyer and Seller, and this Agreement represents the entire agreement between the Buyer and Seller. No modification of this Agreement shall be valid unless in writing and signed by both Buyer and Seller. Any modification not in compliance herewith shall be null and void and of no force or effect. Brochures and advertising representations and illustrations constitute general concepts only, and are subject to change and modification at Seller's sole discretion.

### [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

K |
Buyer's Initials
A:\W339827 v13 –
TRUMP INTERNATIONAL - CONDOMINIUM UNIT PURCHASE AGREEMENT.doc


Seller's Initials

YOU HAVE THE OPTION TO CANCEL THIS AGREEMENT BY NOTICE TO THE SELLER UNTIL MIDNIGHT ON THE SEVENTH (7th) CALENDAR DAY FOLLOWING THE EFFECTIVE DATE OF THIS AGREEMENT.

IF YOU DID NOT RECEIVE A PROPERTY REPORT PREPARED PURSUANT TO THE RULES AND REGULATIONS OF THE OFFICE OF INTERSTATE LAND SALES REGISTRATION, U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, IN ADVANCE OF YOUR SIGNING THE CONTRACT OR AGREEMENT, THE CONTRACT OR AGREEMENT OF SALE MAY BE CANCELLED AT YOUR OPTION FOR TWO YEARS FROM THE DATE OF SIGNING.

IN WITNESS WHEREOF, the parties have executed this Agreement on the day and year set forth below.

SELLER:

WITNESS:
_____
(as to Seller)

TRUMP RUFFIN TOWER I LLC, a Delaware limited liability company

By: _____
Name: Jason D. Greenblatt
Title: Vice President

Date: July 21, 2005

WITNESSES:
_____
(As to Buyer)

BUYER:
X _____
Printed Name: **Kuniko Ishida**
Date: _____

X _____
Printed Name: ~~Yoshio Yajima~~ K.I.
Date: _____

_____
(As to Buyer)

X _____
Printed Name: _____
Date: _____

_____
(As to Buyer)

X _____
Printed Name: _____
Date: _____

_____
(As to Buyer)

**Buyer's Initials**
A1603/0927 v13 –
TRUMP INTERNATIONAL - CONDOMINIUM UNIT PURCHASE AGREEMENT.doc

21

Seller's Initials

## EXHIBIT "A"
### RECEIPT FOR GOVERNING DOCUMENTS

The undersigned acknowledges that the documents initialed below have been received.

Place a check in the column by each document received.

| ITEM | RECEIVED |
|---|---|
| 1. Public Offering Statement, including the following exhibits: | ✓ |
|    (a) Declaration of Covenants, Conditions and Restrictions and Reservation of Easements for the Trump International Hotel & Tower – Las Vegas and any amendments thereto | ✓ |
|    (b) Articles of Incorporation of The Trump International Hotel & Tower – Las Vegas Condominium Association | ✓ |
|    (c) Bylaws of The Trump International Hotel & Tower – Las Vegas Condominium Association | ✓ |
|    (d) Estimated Operating Budget for The Trump International Hotel & Tower – Las Vegas Condominium Association | ✓ |
|    (e) Estimated Operating Budget for Hotel Shared Costs | ✓ |
|    (f) Information Statement Regarding Your Purchase of Property in a Common Interest Community | ✓ |
|    (g) Nevada Revised Statutes Sections 11.202 through 11.206 and 40.600 through 40.695 | ✓ |
| 2. Condominium Unit Purchase and Sale Agreement | |
| 3. Addendum to Condominium Unit Purchase and Sale Agreement: Limited Waiver of Statute of Limitations for Warranties | ✓ |
| 4. Zoning Designation Disclosure Statement | ✓ |
| 5. Gaming Enterprise District Disclosure Statement | ✓ |
| 6. Addendum to Gaming Enterprise District Disclosure Statement: Waiver of 24-Hour Disclosure Period | ✓ |
| 7. Copies of Site Plan, Floor Plans and Building and Unit Features and Specifications | ✓ |
| 8. Information Statement Regarding Your Purchase of Property in a Common-Interest Community (to be initialed separately) | ✓ |

Executed this _20_ day of ____July____, 200_5_.

X _____
Buyer Kuniko Ishida

X _____
Buyer ~~Yoshio Yujima~~

X _____
Buyer

X _____
Buyer

The following two (2) pages **HAVE NOT BEEN** duplicated in error.

Your **signature and initials** are required on each form

**[REMAINDER OF PAGE INTENTIONALY LEFT BLANK]**

Buyer's Initials
A:\633D927 v13 -
TRUMP INTERNATIONAL - CONDOMINIUM UNIT PURCHASE AGREEMENT.doc


Seller's Initials

## RECEIPT, AGENT CERTIFICATION AND CANCELLATION PAGE

### PURCHASER RECEIPT
*Important: Read Carefully*

Name of Condominium:   The Trump International Hotel & Tower – Las Vegas
OILSR Number: 31322                               Date of Report: June 16, 2005

We must give you a copy of this Property Report and give you an opportunity to read it before you sign any contract or agreement.  By signing this receipt, you acknowledge that you have received a copy of our Property Report.

Received by X _____          Date: _7 - 30 - 2005_
                       Kuniko Ishida

Street Address  8716 Raindrop Canyon Ave.
City      Las Vegas                      State NV                         Zip 89129

If any representations are made to you which are contrary to these in this Report, please notify the:

Office of Interstate Land Sales Registration
HUD Building , 451 Seventh Street, S.W.
Washington, DC  20410

### AGENT CERTIFICATION

I certify that I have made no representations to the person(s) receiving this Property Report which are contrary to the information contained in this Property Report.

Unit No.: 4219

Name of Salesperson: Mike Eckel

Signature: X _____          Date  July 10 '05

### PURCHASER CANCELLATION

If you are entitled to cancel your purchase contract, and wish to do so, you may cancel by personal notice, or in writing.  If you cancel in person or by telephone, it is recommended that you immediately confirm the cancellation by certified mail.  You may use the form below:

Name of Condominium:           The Trump International Hotel & Tower – Las Vegas

Date of Contract: _____

This will confirm that I/we wish to cancel our purchase contract.

Purchaser(s) signature_____Date_____

_____
Buyer's Initials
A:W330827 V13 --
TRUMP INTERNATIONAL • CONDOMINIUM UNIT PURCHASE AGREEMENT.doc

24

_____
Seller's Initials

**RECEIPT, AGENT CERTIFICATION AND CANCELLATION PAGE**

**PURCHASER RECEIPT**
*Important: Read Carefully*

Name of Condominium:   The Trump International Hotel & Tower – Las Vegas
OILSR Number: 31322                                         Date of Report: June 16, 2005

We must give you a copy of this Property Report and give you an opportunity to read it before you sign any contract or agreement.  By signing this receipt, you acknowledge that you have received a copy of our Property Report.

Received by X _____     .  Date: __7 - 20 - 2005__
                     Kuniko Ishida

Street Address  8716 Raindrop Canyon Ave.
City      Las Vegas                     State NV                     Zip 89129

If any representations are made to you which are contrary to these in this Report, please notify the:

Office of Interstate Land Sales Registration
HUD Building , 451 Seventh Street, S.W.
Washington, DC  20410

**AGENT CERTIFICATION**

I certify that I have made no representations to the person(s) receiving this Property Report which are contrary to the information contained in this Property Report.

Unit No.: 4219

Name of Salesperson: Mike Eckel

Signature: X _____ Date _July 10 '05_

**PURCHASER CANCELLATION**

If you are entitled to cancel your purchase contract, and wish to do so, you may cancel by personal notice, or in writing.  If you cancel in person or by telephone, it is recommended that you immediately confirm the cancellation by certified mail.  You may use the form below:

Name of Condominium:          The Trump International Hotel & Tower – Las Vegas

Date of Contract:_____

This will confirm that I/we wish to cancel our purchase contract.

Purchaser(s) signature_____Date_____

25

Buyer's Initials
A:\939827 v13 –
TRUMP INTERNATIONAL - CONDOMINIUM UNIT PURCHASE AGREEMENT.doc

Seller's Initials

# ADDENDUM TO CONDOMINIUM UNIT PURCHASE AND SALE AGREEMENT

## LIMITED WAIVER OF STATUTE OF LIMITATIONS FOR WARRANTIES

The undersigned Buyer(s) ("*Buyer*") and Trump Ruffin Tower I, LLC, a Delaware limited liability company ("*Seller*") are parties to that certain Condominium Unit Purchase and Sale Agreement dated as of _____ (the "*Purchase Agreement*") for Unit 4219 in The Trump International Hotel & Tower – Las Vegas (the "*Unit*"). All capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.

Buyer and Seller hereby acknowledge that Nevada Revised Statutes ("*NRS*") § 116.4116(1) provides the following:

> A judicial proceeding for breach of any obligation arising under NRS 116.4113 or 116.4114 must be commenced within 6 years after the cause of action accrues, but the parties may agree to reduce the limitation period to not less than 2 years. With respect to a unit that may be occupied for residential use, an agreement to reduce the period of limitation must be evidenced by separate instrument executed by the purchaser.

Buyer and Seller hereby agree that the time period to bring a warranty claim pursuant to NRS §§ 116.4113 or 116.4114 in relation to Buyer's acquisition of the Unit is hereby reduced to the two (2) year limit as permitted by NRS § 116.4116.

Buyer and Seller hereby agree that this document shall be an addendum to the Purchase Agreement.

### [REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Buyer's Initials
A:\8330827 v13 –
TRUMP INTERNATIONAL - CONDOMINIUM UNIT PURCHASE AGREEMENT.doc


Seller's Initials

WITNESS:

_____
(as to Seller)

**SELLER:**

TRUMP RUFFIN TOWER I, LLC, a Delaware limited
liability company

By: _____
Name: Jason D. Greenblatt
Title: Vice President
Date: July 21, 2005

WITNESSES:

_____
(As to Buyer)

_____
(As to Buyer)

_____
(As to Buyer)

_____
(As to Buyer)

**BUYER:**

X _____

Printed Name: Kuniko Ishida

Date: _____

X _____

Printed Name: ~~Yoshie Yajima~~ K.I.

Date: _____

X _____

Printed Name: _____

Date: _____

X _____

Printed Name: _____

Date: _____

# GAMING ENTERPRISE DISTRICT DISCLOSURE STATEMENT
## FOR THE TRUMP INTERNATIONAL HOTEL & TOWER – LAS VEGAS

Buyer Name(s):
Kuniko Ishida
Yoshio Yajima

Unit Number:
4319

In accordance with Nevada Revised Statutes Section 113.070, Trump Ruffin Tower I LLC, a Delaware limited liability company ("*Seller*") hereby provides to the above-named Buyer(s) ("*Buyer*") the following information regarding gaming enterprise districts located within Clark County:

    1.    A copy of the most recent gaming enterprise district map that has been made available for public inspection by Clark County is attached hereto as Exhibit "A."

    2.    The location of the gaming enterprise district that is nearest to the residence that Buyer is purchasing is the Clark County gaming district which gaming district includes the property on which the residence which the Buyer is purchasing is located.

    3.    The gaming enterprise districts are subject to change.

    4.    If Buyer would like to obtain more current information regarding gaming enterprise districts in Clark County, Buyer may contact Clark County Planning Commission at 500 S. Grand Central Parkway, P. O. Box 551744, Las Vegas, Nevada 89155-1744, (702) 455-4314.

Buyer hereby acknowledges that Seller has provided Buyer with the above information and that Buyer is aware that the property which Buyer is purchasing is located within the Clark County gaming district.

X _____     7-20-2005     9:00     a.m./p.m.
Buyer: Kuniko Ishida                              Date           Time

X _____     _____     _____ a.m./p.m.
Buyer: Yoshio Yajima                              Date           Time

X _____     _____     _____ a.m./p.m.
Buyer:                                            Date           Time

X _____     _____     _____ a.m./p.m.
Buyer:                                            Date           Time

## ADDENDUM TO GAMING ENTERPRISE DISTRICT
## DISCLOSURE STATEMENT
## FOR TRUMP INTERNATIONAL HOTEL & TOWER – LAS VEGAS

## WAIVER OF 24 HOUR DISCLOSURE PERIOD

Buyer Name(s):
Kuniko Ishida
Yoshio Yajima

Unit Number:
4219

The above-mentioned Buyer(s) ("*Buyer*") hereby acknowledges that Trump Ruffin Tower I LLC ("*Seller*") has provided Buyer with a Gaming Enterprise District Disclosure Statement. Buyer hereby waives the requirement that Seller provide such disclosure to Buyer at least twenty-four (24) hours before the time of signing a sales contract for the unit which Buyer is purchasing.

X _____  7-20-2005  9:00  a.m./p.m.
Buyer: Kuniko Ishida        Date       Time

X _____  _____  _____  a.m./p.m.
Buyer: Yoshio Yajima         Date       Time

X _____  _____  _____  a.m./p.m.
Buyer:                       Date       Time

X _____  _____  _____  a.m./p.m.
Buyer:                       Date       Time

A:\039827 v13 –
TRUMP INTERNATIONAL - CONDOMINIUM UNIT PURCHASE AGREEMENT.doc

03/24/2008  14:51  760-926-7871  TMG FINANCE  PAGE  30

ZONING DESIGNATION DISCLOSURE STATEMENT
FOR THE TRUMP INTERNATIONAL HOTEL & TOWER – LAS VEGAS

Buyer Name(s):
Kuniko Ishida
Yoshio Yajima

Unit Number:
4219

In accordance with Nevada Revised Statutes Section 113.070, Trump Ruffin Tower I LLC, a Delaware limited liability company ("*Seller*"), hereby provides to the above-named Buyer(s) ("*Buyer*") the following information concerning the zoning designations and the designations in the master plan regarding land use in relation to the above-referenced Unit located within a condominium community known as The Trump International Hotel & Tower – Las Vegas (the "*Condominium*"):

1.      That the Condominium is located within an H-1 (limited resort and apartment) zoning district.

2.      That the land use designation in the master plan for the parcels of land adjoining the Condominium is commercial tourist.

3.      That the master plan and zoning ordinances and regulations adopted pursuant to the master plan are subject to change.

4.      That the master plan is for the general, comprehensive and long term development of land in the area and the designations in the master plan regarding land use are the most probable indication of future development which may occur on the surrounding properties.

5.      That if Buyer would like to obtain more current information regarding zoning designations in Clark County, Buyer may contact Clark County Planning Commission at 500 S. Grand Central Parkway, P. O. Box 551744, Las Vegas, Nevada 89155-1744, (702) 455-4314.
         Zoning classifications describe the land uses currently permitted on a parcel of land. Designations in the master plan regarding land use describe uses that the governing city or county proposes for a parcel of land. Zoning classifications and designations in the master plan regarding the land use are established and defined by local ordinances. If the zoning classification for a parcel of land is inconsistent with the designation in the master plan regarding land use for the parcel, the possibility exists that the zoning classification may be changed to be consistent with the designation in the master plan regarding land use for the parcel. Additionally, the local ordinances that establish and define the various zoning classifications and designations in the master plan regarding land are also subject to change.

**[REMAINDER OF PAGE INTENTIONALY LEFT BANK]**

Buyer hereby acknowledges that Seller has provided Buyer with the above information

X _____     7 - 10 - 2005
Buyer: Kuniko Ishida                             Date

X _____     _____
Buyer: Yoshio Yajima                              Date

X _____     _____
Buyer:                                                     Date

X _____     _____
Buyer:                                                     Date

# INFORMATION STATEMENT PURSUANT TO NRS §116.41095

### BEFORE YOU PURCHASE PROPERTY IN A
### COMMON-INTEREST COMMUNITY,

DID YOU KNOW...

1. YOU ARE AGREEING TO RESTRICTIONS ON HOW YOU CAN USE YOUR PROPERTY?

These restrictions are contained in a document known as the Declaration of Covenants, Conditions and Restrictions (CC&Rs) that should be provided for your review before making your purchase. The CC&Rs become a part of the title to your property. They bind you and every future owner of the property whether or not you have read them or had them explained to you. The CC&Rs, together with other "governing documents" (such as association bylaws and rules and regulations), are intended to preserve the character and value of properties in the community, but may also restrict what you can do to improve or change your property and limit how you use and enjoy your property. By purchasing a property encumbered by CC&Rs, you are agreeing to limitations that could affect your lifestyle and freedom of choice. You should review the CC&Rs and other governing documents before purchasing to make sure that these limitations and controls are acceptable to you.

2. YOU WILL HAVE TO PAY OWNERS' ASSESSMENTS FOR AS LONG AS YOU OWN YOUR PROPERTY?

As an owner in a common-interest community, you are responsible for paying your share of expenses relating to the common elements, such as landscaping, shared amenities and the operation of any homeowners' association. The obligation to pay these assessments binds you and every future owner of the property. You have to pay dues whether or not you agree with the way the association is managing the property or spending the assessments. The executive board of the association may have the power to change and increase the amount of the assessment and to levy special assessments against your property to meet extraordinary expenses. In some communities, major components of the community, such as roofs and private roads, must be maintained and replaced by the association. If the association is not well managed or fails to maintain adequate reserves to repair, replace and restore common elements, you may be required to pay large, special assessments to accomplish these tasks.

3. IF YOU FAIL TO PAY OWNERS' ASSESSMENTS, YOU COULD LOSE YOUR HOME?

If you do not pay these assessments when due, the association usually has the power to collect them by selling your property in a nonjudicial foreclosure sale. If fees become delinquent, you may also be required to pay penalties and the association's costs and attorneys' fees to become current. If you dispute the obligation or its amount, your only remedy to avoid the loss of your home may be to file a lawsuit and ask a court to intervene in the dispute.

4. YOU MAY BECOME A MEMBER OF A HOMEOWNERS' ASSOCIATION THAT HAS THE POWER TO AFFECT HOW YOU USE AND ENJOY YOUR PROPERTY?

Many common-interest communities have a homeowners' association. In a new development, the association will usually be controlled by the developer until a certain number of units have been sold. After the period of developer control, the association may be controlled

A:\M339827 v13 –
TRUMP INTERNATIONAL - CONDOMINIUM UNIT PURCHASE AGREEMENT.doc

by property owners like yourself who are elected by homeowners to sit on an executive board and other boards and committees formed by the association. The association and its executive board are responsible for assessing homeowners for the cost of operating the association and the common or shared elements of the community and for the day to day operation and management of the community. Because homeowners sitting on the executive board and other boards and committees of the association may not have the experience or professional background required to understand and carry out the responsibilities of the association property, the association may hire professional managers to carry out these responsibilities.

Homeowners' associations operate on democratic principles. Some decisions require all homeowners to vote, some decisions are made by the executive board or other boards or committees established by the association or governing documents. Although the actions of the association and its executive board are governed by state laws, the CC&Rs and other documents that govern the common-interest community, decisions made by these persons will affect your use and enjoyment of your property, your lifestyle and freedom of choice, and your cost of living in the community. You may not agree with decisions made by the association or its governing bodies even though the decisions are ones which the association is authorized to make. Decisions may be made by a few persons on the executive board or governing bodies that do not necessarily reflect the view of the majority of homeowners in the community. If you do not agree with decisions made by the association, its executive board or other governing bodies, your remedy is typically to attempt to use the democratic processes of the association to seek the election of members of the executive board or other governing bodies that are more responsive to your needs. If persons controlling the association or its management are not complying with state laws or the governing documents, your remedy is typically to seek to mediate or arbitrate the dispute and, if mediation or arbitration is unsuccessful, file a lawsuit and ask a court to resolve the dispute. In addition to your personal cost in mediation or arbitration or to prosecute a lawsuit, you may be responsible for paying your share of the association's cost in defending against your claim. There is no government agency in this state that investigates or intervenes to resolve disputes in homeowner's associations.

5. YOU ARE REQUIRED TO PROVIDE PROSPECTIVE BUYERS OF YOUR PROPERTY WITH INFORMATION ABOUT LIVING IN YOUR COMMON-INTEREST COMMUNITY?

The law requires you to provide to a prospective purchaser of your property, before you enter into a purchase agreement, a copy of the community's governing documents, including the CC&Rs, association bylaws, and rules and regulations, as well as a copy of this document. You are also required to provide a copy of the association's current financial statement, operating budget and information regarding the amount of the monthly assessment for common expenses, including the amount set aside as reserves for the repair, replacement and restoration of common elements. You are also required to inform prospective purchasers of any outstanding judgments or lawsuits pending against the association of which you are aware. You are also required to provide a copy of the minutes from the most recent meeting of the homeowners' association or its executive board. For more information regarding these requirements, see Nevada Revised Statutes 116.4103 and 116.4109.

6. YOU HAVE CERTAIN RIGHTS REGARDING OWNERSHIP IN A COMMON-INTEREST COMMUNITY THAT ARE GUARANTEED YOU BY THE STATE?

Pursuant to provisions of chapter 116 of Nevada Revised Statutes, you have the right:

(a) To be notified of all meetings of the association and its executive board, except in cases of emergency.

(b) To attend and speak at all meetings of the association and its executive board, except in some cases where the executive board is authorized to meet in closed, executive session.

(c) To request a special meeting of the association upon petition of at least 10 percent of the homeowners.

(d) To inspect, examine, photocopy and audit financial and other records of the association.

(e) To be notified of all changes in the community's rules and regulations and other actions by the association or board that affect you.

7. QUESTIONS?

Although they may be voluminous, you should take the time to read and understand the documents that will control your ownership of a property in a common-interest community. You may wish to ask your real estate professional, lawyer or other person with experience to explain anything you do not understand. You may also request assistance from the ombudsman for owners in common-interest communities, Nevada Real Estate Division, at (702) 486-4033.

Buyer or prospective buyer's printed name: Kuniko Ishida

Buyer or prospective buyer's signature: X _____

Date: 7 - 20 - 2005

THIS PUBLIC OFFERING STATEMENT IS CURRENT AS OF JUNE 30, 2005. RECENT DEVELOPMENTS REGARDING (i) THE GENERAL DESCRIPTION OF THE CONDOMINIUM PROJECT, AND (ii) PENDING SUITS AGAINST THE ASSOCIATION MAY NOT BE REFLECTED IN THIS STATEMENT.

THE STATEMENTS SET FORTH IN THIS PUBLIC OFFERING STATEMENT ARE ONLY SUMMARY IN NATURE. A PROSPECTIVE PURCHASER SHOULD REFER TO THE ENTIRE SET OF DISCLOSURE MATERIALS AND THE PURCHASE AGREEMENT. ALL DISCLOSURE MATERIALS AND CONTRACTS ARE IMPORTANT DOCUMENTS AND, IF NOT UNDERSTOOD, THE PROSPECTIVE BUYER SHOULD SEEK COMPETENT ADVICE.


Buyer or prospective buyer's printed name: Kuniko Ishida

Buyer or prospective buyer's signature: X _____

Date: ___7 - 20 - 2005___

**EXHIBIT #6**

TRUMP INTERNATIONAL HOTEL & TOWER LAS VEGAS
CONDOMINIUM HOTEL RENTAL MANAGEMENT AGREEMENT

**THIS CONDOMINIUM HOTEL RENTAL MANAGEMENT AGREEMENT** (this "*Agreement*") is made this ▓▓▓ day of ▓▓▓▓▓▓▓▓▓▓, 20▓▓ by and among the Hotel Manager and the Owner as designated on the signature page of this Agreement.

## RECITALS

A.      Subject to the terms of this Agreement, Hotel Manager intends to operate the Hotel following the Opening Date. Owner currently owns or is under contract to purchase Unit No. ▓▓▓▓ (the "*Subject Unit*").

B.  ·      Owner desires to participate in the Rental Program and to engage the services of the Hotel Manager to act as the sole and exclusive rental agent to offer the Subject Unit for rental under the terms and conditions set forth in this Agreement.

C.      Hotel Manager desires to be so engaged by Owner.

## AGREEMENT

In consideration of the covenants and agreements set forth in this Agreement, the receipt and sufficiency of which are hereby acknowledged, Owner and Hotel Manager hereby acknowledge and agree, as and to the extent applicable, as follows:

### ARTICLE 1
### PRELIMINARY MATTERS AND SCHEDULES

1.1      **Recitals**. The foregoing Recitals are true and correct and are incorporated in this Agreement as if repeated at length.

1.2      **Definitions**. For purposes of this Agreement, the capitalized terms in **Schedule A** shall have the meanings given them in that Schedule. Capitalized terms used, but not defined in **Schedule A** or otherwise defined herein, shall have the meaning given such terms in the Declaration.

1.3      **The Condominium Hotel Property**. The Condominium Hotel Property contains approximately 1,282 Residential Units. The Condominium Hotel Property is and shall be subject to the following: (a) the Declaration; (b) NRS; (c) the Final Map; (d) the Property Report; and (e) the Other Agreements.

1.4      **Authority to Act**. By executing this Agreement, Owner hereby represents and warrants to Hotel Manager that (subject to **Section 1.5** below) Owner is the Owner of the Subject Unit and has the full authority to enter into this Agreement. If the Subject Unit is owned by an entity or more than one individual, the Owner shall designate, on the Designation of Owner of Record Form, an individual who shall act as Owner of Record and who shall have the authority to act on behalf of Owner (and Owner shall provide any and all required authorizations to the Owner of Record to act on its behalf) for all matters governed by or requiring Owner action under this Agreement. The Owner of Record must be the same Person as the Designated Unit Owner under the Declaration from time to time. Hotel Manager may rely on any communications or representations from the Owner of Record and the same shall be binding upon the Owner. Owner may only change the Owner of Record for a subsequent Renewal Term by delivering a new Designation of Owner of Record form at least thirty (30) days prior to the commencement of such Renewal Term.

1.5      **Condition to Effectiveness**. Notwithstanding anything in this Agreement to the contrary, if, and only if, this Agreement is executed prior to the Opening Date and Owner is not then the current owner of the Subject Unit, then this Agreement shall not become effective until such time as Owner has closed on the purchase of the Subject Unit; *provided, however* that Owner authorizes Hotel Manager to take reservations for the Subject Unit prior to such effective date.

1.6      **Rental Program Option Selection**. Owner has selected the Rental Program Option identified by Owner's initials on **Schedule B**. Owner shall have the right to change from one Rental Program Option to the other Rental Program Option only in accordance with the terms of this **Section 1.6**. Owner may change the selected Rental Program Option for the upcoming Renewal Term by providing Hotel Manager prior written notice no less than thirty (30) days before the commencement of a Renewal Term. If Owner has satisfied the notice requirements, then the change will be effective during

EXHIBIT ___|___

such Renewal Term and until such time Owner complies with this **Section 1.6** to effectuate a subsequent change.  In no event will Owner be allowed to change the applicable Rental Program Option during the course of a Term (including the Initial Term).

    1.7    **Schedules**.  The following schedules are attached hereto and incorporated in this Agreement:

Schedule A – Definitions
Schedule B – Rental Program Option
Schedule C – Example of Distribution of Net Rental Revenue for a Unit
Schedule D – Hotel Guest Services
Schedule E – Premium Dates Determination and Administration

ARTICLE 2
TERM

    2.1    **Term**. This Agreement shall be for a term equal to the Initial Term.  This Agreement shall automatically renew for the Renewal Term (and shall continue to so automatically renew at the expiration of each such Renewal Term) unless either the Hotel Manager or the Owner elects to terminate this Agreement pursuant to **Section 2.2** or as otherwise permitted under this Agreement, including Hotel Manager's right to terminate in accordance with the terms of **Section 2.4.**

    2.2    **Termination Rights**.  In addition to the termination rights granted to Hotel Manager pursuant to **Sections 2.4** and **3.8**, and in **Articles 7** and **8**, either Hotel Manager or Owner may elect to terminate this Agreement by delivering to the other party a Termination Notice not less than one hundred eighty (180) days before the commencement a Renewal Term, and, subject to the terms of this **Article 2**, this Agreement shall terminate and the Subject Unit shall be removed from the Rental Program as of the end of the then current Term.  Notwithstanding the foregoing, if the Owner exercises its termination rights under this **Section 2.2**, Owner shall be obligated to honor any Post Termination Reservations assigned to the Subject Unit following such Termination Date, *provided* such reservations were made by Hotel Manager prior to Hotel Manager's receipt of the Termination Notice.  Following receipt of the Termination Notice, Hotel Manager shall notify Owner of any Post Termination Reservation(s) and Owner shall comply with the terms of this Agreement with respect to the Post Termination Reservation(s) until after the final Post Termination Reservation is honored.  If Owner does not make the Subject Unit available for any Post Termination Reservation, then Owner shall be liable to Hotel Manager for liquidated damages as set forth in **Section 8.1(e)**.

    2.3    **Hotel Manager Right to Amend**.  Notwithstanding anything to the contrary, Hotel Manager shall have the right to unilaterally amend the terms and provisions of this Agreement through a Hotel Manager Amendment, to become effective upon the proposed effective date in such Hotel Manager Amendment, by giving Owner notice of the Hotel Manager Amendment not less than two hundred ten (210) days prior to the proposed effective date of such Hotel Manager Amendment.  In the event that Owner is not in agreement with the Hotel Manager Amendment, Owner shall have the right to cancel this Agreement by giving written notice of cancellation to Hotel Manager, which, to be effective, must be received by Hotel Manager not less than one hundred eighty (180) days prior to the proposed effective date of such Hotel Manager Amendment.  Provided Owner has given Hotel Manager written notice as required in the preceding sentence, then Owner's termination pursuant to this **Section 2.3** shall be effective on the proposed effective date for the Hotel Manager Amendment. If Owner fails to timely give notice of cancellation, this Agreement shall automatically be amended as provided in the applicable Hotel Manager Amendment and Owner shall be bound by the terms of this Agreement as amended for the balance of the Term.

    2.4    **Hotel Manager Special Termination Rights**.  Owner acknowledges that Hotel Manager requires a minimum level of participation of the Units for continuation of the Rental Program.  Accordingly, in addition to the right to terminate granted to Hotel Manager under **Section 2.2** above, Hotel Manager shall also have the right to terminate this Agreement and the Rental Program on at least ninety (90) days' notice to Owner in the event that, at any time after the 2nd anniversary of the Opening Date, fewer than eighty percent (80%) of the Units are participating in the Rental Program.  In no event shall Hotel Manager be obligated to pay Owner any liquidated damages, termination fee or any other penalty fee or additional fee as a result of such termination.

## ARTICLE 3
## RENTAL SERVICES

3.1 **Exclusive Rental; Rates; Collection.** Owner hereby retains Hotel Manager, and grants to Hotel Manager, the sole and exclusive right to rent, manage and operate the Subject Unit during the Term within the Rental Program and to do any and all things Hotel Manager deems necessary or appropriate to rent, manage and operate the Subject Unit, subject to the terms and conditions set forth herein. Owner acknowledges and agrees that the Hotel Manager intends to rent the Subject Unit to Hotel Guests on a transient basis as part of its overall operation of the Hotel. Owner hereby further grants to Hotel Manager the sole and exclusive authority to rent the Subject Unit at such rates as Hotel Manager deems appropriate from time to time. Owner agrees that all remuneration from the rental of the Subject Unit will be collected through Hotel Manager, subject to the fees and costs as specified in this Agreement and the other fees and charges to Owner's account described in this Agreement. Hotel Manager shall collect and remit to applicable governmental authorities any applicable taxes in conjunction with the renting of the Subject Unit.

3.2 **Acceptance of Reservations; Resolution of Conflicts.** Subject to the rights of Owner set forth in Article 5 below, Owner authorizes Hotel Manager, as of the date of this Agreement, to accept reservations for occupancy of the Subject Unit from Hotel Guests for any length of time, and at any time up to, but not beyond, the expiration of the Term as the same may be extended by any Renewal Term. Any such reservations shall be binding on Owner in accordance with the terms of this Agreement. If Owner does not make the Subject Unit available for such reservation, then Owner shall be liable to Hotel Manager for liquidated damages as set forth in **Section 8.1**. Both Owner and Hotel Manager shall use reasonable diligence to avoid reservation conflicts; but any conflicts that do arise in connection with reservations shall be resolved by Hotel Manager in its sole discretion. Neither Hotel Manager nor Owner shall be liable for any damages or claims otherwise resulting from such conflict or Hotel Manager's resolution of same, even if such conflict is caused by their respective negligence or that of their respective parent companies, affiliates or subsidiaries.

3.3 **Federal Taxes.**

(a) If Owner is a U.S. person (which is defined as: (i) an individual who is a citizen or resident of the United States; (ii) a partnership, corporation, company or association created or organized in the United States or under the laws of the United States; or (iii) any estate [other than a foreign estate or trust]), then Owner shall provide to Hotel Manager the tax identification information on a Form W-9. If Owner does not properly complete and provide Hotel Manager with Form W-9, then Owner agrees that the Owner's Share of Net Rental Revenue will be subject to backup withholding by Hotel Manager at the applicable rate set forth in Section 3406 of the Internal Revenue Code.

(b) If Owner is not a U.S. person (as defined above), then the Owner's Share of Net Rental Revenue will be subject to the applicable withholding rate under Section 1441 of the Internal Revenue Code unless Owner provides Hotel Manager with IRS Form W-8ECI, or other properly executed applicable form providing for a reduced rate or exemption from withholding (i) on or prior to the date of the execution and delivery of this Agreement, (ii) before the end of each third calendar year thereafter, and (iii) at any time that a change of circumstances occurs that makes any information on the form so provided incorrect, certifying that Owner is entitled to a reduced rate or exempt from withholding.

3.4 **Rental of the Subject Unit.** Hotel Manager agrees to use Reasonable Commercial Efforts, subject to the provisions of this Agreement, to:

(a) Rent the Subject Unit to Hotel Guests for and on behalf of Owner. Owner understands and agrees, however, that Hotel Manager has not guaranteed and shall not guarantee, under any circumstance, (i) the level of occupancy of the Subject Unit and/or the amount of any rental revenue, or (ii) the equal distribution of rentals among all Participating Units in the Rental Program. Further, Hotel Manager is not and shall not be liable (1) if the Subject Unit is not rented, or (2) for any loss or damage to the Subject Unit (or its contents) as a consequence of the Subject Unit being rented under this Agreement. Owner acknowledges and agrees that both the ability of the Hotel Manager to rent Units and the selection of a particular Unit within the Rental Program for rental will be subject to several factors, including, without limitation, the wishes and preferences of the Hotel Guests, usage of the Subject Unit by Owner and Owner's Guests, the remaining length of the Term of this Agreement, and the policies and procedures and promotional discounts and programs adopted from time to time by the Hotel Manager.

(b)      Arrange for the provision of certain goods, services and benefits to each Hotel Guest during such Hotel Guest's stay at the Hotel, which goods, services and benefits shall be consistent with Trump Operating and Physical Standards as implemented by the Hotel Manager in its sole and absolute discretion from time to time.

(c)      Provide, at Hotel Manager's expense, daily maid service during all periods in which the Subject Unit is rented by Hotel Guests (as distinguished from Owner Occupancy Periods).  In addition, Hotel Manager may provide, at Owner's expense, quarterly deep cleanings of the Subject Unit.  Such deep cleanings include carpet cleaning, upholstery cleaning, furniture touch-up and interior touch-up painting to maintain the Subject Unit in rentable condition.  Owner acknowledges and agrees that performance of a deep cleaning on the Subject Unit may cause the Subject Unit to be designated "Out of Order" by Hotel Manager for a period of time in accordance with **Section 6.7.**

(d)      Provide and maintain a reservations system to process all reservations from Hotel Guests for Units in the Hotel, including the Subject Unit.

(e)      Cause the Subject Unit to be maintained in accordance with the terms of this Agreement.

(f)      Collect from Hotel Guests any rental charges and any applicable taxes in connection with the rental of the Subject Unit.

(g)      Remit any applicable taxes collected by Hotel Manager to the appropriate governmental authority, including applicable transient rental taxes with respect to the rental of the Subject Unit.

(h)      Provide marketing, sales and advertising services to attract Hotel Guests and to arrange rental of the Participating Units, as determined necessary and appropriate by Hotel Manager in its sole and absolute discretion, from time to time.

(i)      Provide an accounting and distribution of Net Rental Revenue for the Subject Unit as set forth in this Agreement.

3.5      **Rental Rates.**  Owner understands and agrees that Hotel Manager may, from time to time, establish the applicable rental rates for the Subject Unit and other Participating Units, in its sole discretion.  Rates may be established or modified based on a number of factors, including, without limitation, market conditions, supply and demand, projected or current occupancy levels for the Hotel, type and location of the Unit (including view classification), seasonal demand, changes in operating costs, rates of competitive properties, promotions and discount offers, and other conditions applicable in the competitive market (all as determined by Hotel Manager).  Hotel Manager shall also have right to make changes to rates then in effect in circumstances such as, but not limited to, special Hotel events, city-wide conventions, holiday periods, extended length of stay, group discounts, corporate discounts, Hotel Manager employee discounts, customer loyalty programs, package plan discounts, discounts applied for wholesalers of hotel rooms (such as Expedia.com and similar Persons), and special events or in similar situations when Hotel Manager deems it advantageous to charge a different rate in accordance with its rate determination policies.  Owner understands, acknowledges and agrees that Hotel Manager may, in its sole discretion, engage in the practice of yield management which will likely result in varying rate structures for similar Units on the same day of occupancy.  Owner further understands, acknowledges and agrees that rental rates may vary from day to day, Unit to Unit, and from Hotel Guest to Hotel Guest, as determined by Hotel Manager in its sole discretion, and that Owner shall have no right to dispute the rental rate charged for any rental of the Subject Unit, or for any discounts or refunds issued or applied by Hotel Manager in accordance with this Agreement.

3.6      **Priority of Rental.**  Hotel Manager shall make Reasonable Commercial Efforts to equitably allocate Unit reservations and occupancy among the Participating Units based on such factors as Hotel Manager deems appropriate in Hotel Manager's sole discretion; *provided, however,* that Hotel Manager shall have the absolute right to accommodate Hotel Guest preferences and requests and to depart from internal policies and procedures concerning the allocation of reservations at any time, in its sole and absolute discretion, as Hotel Manager deems necessary to manage the Hotel and to administer the Rental Program.  Owner acknowledges that use of the Subject Unit by Owner or by an Owner's Guest during an Owner Occupancy Period will have an adverse impact on the Subject Unit's priority in allocation by Hotel Manager for reservations as the Subject Unit's Availability for rental by Hotel Guests is a factor impacting allocation of reservations.  Owner acknowledges and agrees that neither the Hotel Manager, nor any of the Hotel Manager Parties has any liability to Owner if all or any part of the reservation system becomes inoperable or ceases to function for any reason or cause, including those caused by the negligence

of the Hotel Manager or any Hotel Manager Parties, but excluding those caused by the willful misconduct of the Hotel Manager and/or the Hotel Manager Parties.

3.7   **Complimentary Use.**  Hotel Manager shall have the right to use the Subject Unit for Complimentary Rentals in connection with the promotion of the Hotel, *provided, however* that the Subject Unit shall not be used for Complimentary Rentals for more than six (6) nights during any calendar year.  Notwithstanding the foregoing, or anything in this Agreement to the contrary, in no event shall the term "Complimentary Rental" be deemed to include any reduction in the rate for the Subject Unit or any complimentary night's occupancy of the Subject Unit granted by Hotel Manager to a Hotel Guest as a result of any defect or problem with the Subject Unit or any part thereof (including, without limitation, furniture, fixtures or appliances) and Hotel Manager's election to reduce the rate for the Subject Unit or to grant a complimentary night's occupancy of the Subject Unit to a Hotel Guest as an accommodation for any defect or problem with the Subject Unit or any part thereof (including, without limitation, furniture, fixtures or appliances) shall not be counted against the six (6) Complimentary Rental nights available to the Hotel Manager for the Subject Unit.

3.8   **Condition of Unit.**  Hotel Manager reserves the right to either: (a) immediately suspend the offering of the Subject Unit for rental; or (b) to terminate this Agreement, on ten (10) days written notice; should it deem the condition of the Subject Unit to be unsatisfactory for rental, such decision to be in the sole discretion of Hotel Manager.  If this Agreement is terminated by Hotel Manager, or if Hotel Manager elects to suspend the offering of the Subject Unit for rental pursuant to this **Section 3.8**, Hotel Manager shall have the right, but not the obligation, to transfer to other accommodations any confirmed reservations for occupancy of the Subject Unit, until the Subject Unit is again in a satisfactory condition for rental and Owner shall be responsible for any applicable liquidated damages as set forth in **Section 8.1(c)**.

3.9   **Equal Opportunity Rental.**  Owner understands and agrees that Hotel Manager, in administering the Rental Program and in renting out the Subject Unit, is pledged to the letter and spirit of the U.S. policy for achievement of equal housing opportunity throughout the nation and to the Nevada Public Accommodation laws.  Accordingly, Hotel Manager encourages and supports an affirmative program in which there are no barriers to obtaining lodging, including renting of the Subject Unit, because of race, color, religion, sex, handicap, familial status or national origin.  Notwithstanding the foregoing, Hotel Manager reserves the right to refuse to rent any unit in the Rental Program, including the Subject Unit, to any Person, as determined by the Hotel Manager in its sole and absolute discretion.

3.10   **No Smoking; Pets.**  Subject to compliance with applicable laws, the Declaration and Hotel Manager's right to make exceptions to its policy in exercise of its business judgment, all Participating Units, including the Subject Unit, shall be designated as non-smoking by Hotel Manager.  Owner agrees to comply, and to cause its Guests to comply, with the foregoing "*No Smoking*" designation at all times during Owner's or Owner's Guest's use of the Subject Unit.  Owner acknowledges that Hotel Manager cannot guaranty that any Hotel Guest will comply with such designations, and Owner agrees that Hotel Manager shall not be responsible for any Hotel Guest's failure to comply with such designations.  Hotel Manager shall use Reasonable Commercial Efforts to charge any Hotel Guest failing to comply with such designations a special deep cleaning fee.  Any Owner or Owner's Guest who fails to comply with such designations shall, at Hotel Manager's option and in its sole and absolute discretion, be charged a special deep cleaning fee.  Owner acknowledges and agrees that Hotel Manager intends to operate the Hotel as a pet-friendly establishment and to accommodate Hotel Guests with pets, as determined by the Hotel Manager in its sole discretion, and unless Owner elects to have the Subject Unit be a "No Pets" designated Unit as provided below, Owner agrees to allow Hotel Guests with pets to stay in the Subject Unit.  Hotel Manager shall use Reasonable Commercial Efforts to charge any Hotel Guest who brings a pet into the Subject Unit a special deep cleaning fee; *provided, however,* that Hotel Manager may elect, in its sole discretion, not to charge such fee if Hotel Manager determines that such Hotel Guest's pet(s) did not cause any damage or require any special deep cleaning to be done within the Subject Unit.  If Owner desires the Subject Unit to be a "No Pets" Unit, then Owner shall initial in the space provided on the signature page below, and Owner acknowledges and agrees that by designating the Subject Unit a "No Pets" Unit, such designation may have a negative impact on the rental of the Subject Unit; *provided, however,* that the Hotel Manager in no way represents or warrants that the designation of the Subject Unit will have any impact, positive or negative, on the rental of the Subject Unit.  Furthermore, Owner acknowledges that Hotel Manager cannot guaranty that any Hotel Guest will comply with such designations, and Owner agrees that Hotel Manager shall not be responsible for any Hotel Guest's failure to comply with such designations.

## ARTICLE 4
## REVENUE SPLITS; FEES; ALLOCATION OF COSTS AND EXPENSES;
## REPORTS AND STATEMENTS; DISCOUNTS AND ACCOUNTING

4.1     **Revenue Split; Fees; Owner's Account.**  From the Gross Room Rental Revenue for the Subject Unit, Hotel Manager shall subtract and retain either: (a) the Service Fee or (b) the Expenses (based on the Rental Program Option selected by Owner) with the resulting difference being Net Rental Revenue.  Owner shall be entitled to Owner's Share of Net Rental Revenue, subject to such deductions and offsets as set forth in this Agreement, and Hotel Manager will retain the difference between the Net Rental Revenue and the Owner's Share of Net Rental Revenue.  All fees and charges owed by Owner under this Agreement, including, without limitation, the required Standard Package Reserve Payment and any amounts incurred but not paid by Owner during any Owner Occupancy Period, if any, shall be withheld from Owner's Share of Net Rental Revenue prior to any distribution being made to Owner under this Agreement.

4.2     **Statements/Distributions.**

(a)     Owner Statement.  On a monthly basis, Hotel Manager shall deliver to Owner, within thirty (30) days following the end of the applicable month, an Owner Statement for the Subject Unit that reflects the Gross Room Rental Revenue and any Owner's Invoiced Costs and Expenses and any other deductions or offsets that have been applied against Owner's account during the period for which such Owner Statement has been provided.  The Owner Statement will also disclose the current balance of the Standard Package Reserve and charges, if any, against the Standard Package Reserve that have been applied during the period for which such Owner Statement has been provided.  If the Owner Statement indicates that a distribution is due to Owner, the amount of such distribution will be distributed as provided in Section 4.2(b) below.  If the Owner Statement indicates that payment is due to Hotel Manager, Owner shall be obligated to remit to Hotel Manager the payment reflected in such Owner Statement within the period of time specified in such Owner Statement or accompanying notice (which period of time is currently anticipated to be thirty (30) days after the date of such Owner Statement).  If Owner fails to make any such payment as and when such payment is due and payable, Owner shall be obligated to pay to Hotel Manager any late fees, finance charges or other costs imposed from time to time by Hotel Manager and, at Hotel Manager's discretion, Hotel Manager may deduct all such amounts owed to Hotel Manager from the Standard Package Reserve.  If the Subject Unit is owned by an entity or more than one individual, then the Owner Statement, pursuant to this Section 4.2(a), shall be delivered to the Owner of Record, and Owner of Record shall be responsible for distributing the information to the other Owners.

(b)     Distribution.  If Owner is entitled to a distribution based on an Owner Statement, Owner shall receive Owner's Income reflected on that Owner Statement within ten (10) business days after the date of delivery of the applicable Owner Statement.  An example of the distribution process is set forth in Schedule C attached hereto.  Any amounts to be distributed to Owner pursuant to this Agreement will be distributed by electronic funds transfer directly to the account of Owner and Owner shall upon execution of this Agreement provide to Hotel Manager such information, authorizations and other documentation as Hotel Manager may require to allow such funds to be transferred electronically in accordance with this Section 4.2(b).  If Owner fails to provide such information, authorizations and other documentation or if Owner fails to notify immediately Hotel Manager of any account changes, or Hotel Manager is otherwise prevented from completing an electronic funds transfer, then Hotel Manager may elect to distribute Owner's funds by issuing a check.  If the Subject Unit is owned by an entity or more than one individual, then distributions by Hotel Manager, pursuant to this Section 4.2(b), shall be distributed to the account of Owner of Record, and Owner of Record shall be responsible for distributing the funds to the other Owners.  Upon distributing the funds to Owner of Record, Hotel Manager shall have satisfied its obligations under this Section 4.2(b) and is and shall be released from any further obligation with respect to such distribution.  Hotel Manager has no obligation to ensure that Owner of Record properly distributes the funds to the other Owners.

4.3     **Allocation of Costs and Expenses.**

(a)     Hotel Manager Costs and Expenses.  Except for those Ownership Costs set forth in Section 4.3(b) below, Hotel Manager shall be responsible to provide during the Term, at its cost and expense, services to Hotel Guests that are ancillary to occupancy in the Subject Unit, the scope of such services shall be determined by Hotel Manager in its sole and absolute discretion, but to include, at a minimum, those services listed on Schedule D.  In addition, the Hotel Manager shall provide minor maintenance services including (i) response to Hotel Guest service calls (such as to replace batteries and assist with electronic components in the Subject Unit); (ii) minor repairs to

mechanical, electrical, plumbing and kitchen fixtures, and (iii) minor repairs and/or adjustments to hardware for window coverings, cabinetry and doorways. Notwithstanding anything in this Agreement to the contrary, the foregoing minor maintenance shall include only maintenance and repairs within the Subject Unit that (1) can be accomplished by Hotel Manager's in-house facilities department with the tools and equipment they possess, (2) require less than fifteen (15) minutes of time to service, and (3) require less than $10.00 in parts and materials. Any required maintenance or repairs that do not meet each of these criteria shall be performed at Owner's cost and expense (which shall include reimbursement for materials and labor [including a reasonable allocation of the benefits for such laborers], plus ten percent (10%) of the cost of such maintenance) and the Hotel Manager can use the Standard Package Reserve to fund the same. The foregoing minor maintenance shall not include any replacements, repairs or maintenance resulting from misuse, theft or intentional misconduct or to the extent that any such loss is ancillary to damage to or destruction of the Subject Unit.

(b)    Owner's Costs and Expenses. Owner shall be responsible, at Owner's sole cost and expense, for all charges and expenses due and owing in connection with ownership of the Subject Unit, including, without limitation, the Ownership Costs and the payment, on a periodic basis, as charged by Hotel Manager, of any costs to replace, repair or replenish personal property included in the Standard Package for the Subject Unit. In the event that Owner fails to timely pay all Ownership Costs, Hotel Manager reserves the right, but shall not be obligated, to: (i) make payment of any such Ownership Costs on behalf of Owner, and any such payments made by Hotel Manager pursuant to this Section 4.3(b) shall be charged, at Hotel Manager's election, against Owner's account hereunder or Owner's credit card; (ii) suspend the offering of the Subject Unit for rental; and/or (iii) terminate this Agreement pursuant to the terms hereof. Notwithstanding anything herein contained to the contrary, Owner understands and agrees that the Ownership Costs are the sole obligation of Owner, and neither Hotel Manager shall have liability for the payment of same or for reimbursement of Owner for same.

(c)    Establishment of Standard Package Reserve. Upon the later to occur of: (i) the execution of this Agreement by Owner; and (ii) the Opening Date; Owner shall pay to Hotel Manager the Standard Package Reserve Base Amount as an initial contribution to the Standard Package Reserve for the Subject Unit. If Hotel Manager uses the Standard Package Reserve funds for the purposes permitted in this Agreement and the Standard Package Reserve drops below the Standard Package Reserve Base Amount, then Owner shall immediately upon notice from Hotel Manager pay to Hotel Manager for deposit into the Standard Package Reserve such amounts as may be necessary to replenish the Standard Package Reserve account to an amount equal to or greater than the Standard Package Reserve Base Amount. In addition to the foregoing, the Standard Package Reserve Payment shall be placed into the Standard Package Reserve, which amount will be deducted from Owner's Share of Net Rental Revenue as part of the calculation to determine Owner's Income in accordance with this Article 4. Except as expressly provided in this Section 4.3(c), the Standard Package Reserve shall be the property of Owner and will be held, accounted for and maintained by Hotel Manager to be used for the ongoing repair, replacement, maintenance and refurbishment of the Subject Unit and for payment of amounts owed by Owner to the Hotel Manager, as the case may be, from time to time. The Standard Package Reserve may be used by Hotel Manager for any of the following purposes: (1) the repair, maintenance and replacement of and additions to furniture, furnishings, fixtures, equipment and personal property required for the Subject Unit as and when such furniture, furnishings, fixtures, equipment and personal property are in need of repair, maintenance or replacement in accordance with the operating standards of the Hotel as determined by the Hotel Manager in its sole and absolute discretion; and (2) notwithstanding anything in this Agreement to the contrary, for the payment of any amounts owed by Owner to the Hotel Manager under this Agreement or the Declaration. The Standard Package Reserve Base Amount and the Standard Package Reserve Payment is subject to adjustment from time to time by Hotel Manager in its sole discretion. Within ninety (90) days following (A) the expiration of the Term or (B) the Termination Date, any amounts remaining in the Standard Package Reserve (less all amounts Owner then owes to Hotel Manager) for the Subject Unit shall be returned to Owner by Hotel Manager; *provided, however,* that if Owner sells the Subject Unit, then ownership of any amounts remaining in the Standard Package Reserve at the time of closing of such sale shall be transferred to the Unit Purchaser automatically, without any further action by Owner or the Unit Purchaser, and such amounts shall remain in the Standard Package Reserve pursuant to the terms of this Agreement. Hotel Manager will separately account for Owner's Standard Package Reserve but may commingle any Standard Package Reserve amounts with Hotel Manager's other funds and will not be required to pay any interest or other finance charge on such amounts. It is currently anticipated that the major components of the Standard Package will be refurbished/replaced, at a minimum, every seven (7) to ten (10) years. Notwithstanding the foregoing, a remodel of the Subject Unit and a replacement/refurbishment of the major components of the Standard Package for the Subject Unit shall be completed as and when required by Hotel Manager, from time to time, as determined by Hotel Manager in its sole discretion in accordance with Section 5.3(c);

*provided, however,* that same shall be completed in such a manner as to cause as little disruption to the owners of Units as reasonably possible, as determined by Hotel Manager in its reasonable discretion.

4.4     **Rental Accounting.** All Net Rental Revenue shall be collected by Hotel Manager and shall be deposited in the operating account for the Hotel maintained by Hotel Manager, which income may be commingled with other funds received by Hotel Manager in connection with Hotel operations. Hotel Manager shall account for all Net Rental Revenue and use reasonable care in preparation of the Owner Statements.

4.5     **No Pooling.** Owner acknowledges and agrees that no pooling of revenues or income shall occur under the Rental Program. Thus, Owner acknowledges that payment shall only be made to Owner for the actual rental and occupancy of the Subject Unit, and that Owner shall not receive any portion of monies received (a) for rentals of other Participating Units (or other Units), (b) for any deposits made and subsequently forfeited by prospective Hotel Guests, (c) on account of any Hotel Placement Items or Incidental Charges, or (d) any other revenues or income received in connection with Hotel operations.

**ARTICLE 5**
**OWNER RIGHTS AND OBLIGATIONS**

5.1     **Owner and Owner Guest Access to Hotel/Subject Unit.** Without prior notification to, approval of, and coordination with, the Hotel Manager, Owner agrees not to enter the Subject Unit, nor to permit any Owner's Guest to enter the Subject Unit, other than during an Owner Occupancy Period. Owner understands and agrees that, except only during Owner Occupancy Periods as registered guests of the Hotel in accordance with Section 5.2, Owner and Owner's Guests may not use the pool facilities or any of the parking facilities of the Hotel (including, without limitation, parking an automobile in the parking facilities except only during times when Owner is otherwise physically present at the Hotel), except that they may use any valet parking services that may from time to time be available to the general public at the Hotel and Owner shall be responsible for the cost of such services.

5.2     **Owner Occupancy; Use.**

(a)     During the Term of this Agreement, Owner (and/or such Owner's Family) and Owner's Guests shall have the right to use the Subject Unit during Owner Occupancy Periods, but such Owner Occupancy Periods shall be restricted by the terms of the applicable Rental Program Option and as provided in Section 5.2(b) with respect to Premium Dates. The occupancy of the Subject Unit by Owner's Guests shall be further restricted as set forth in Section 5.4. Requests by Owner for such use shall be made through the Rental Program Management office. Owner shall contact Hotel Manager at the Owners' reservation line at (866) 646-8163 or at such other phone number or website as directed by Hotel Manager from time to time during the Term. If the reservation is for the Owner's (and/or such Owner's Family) use of the Subject Unit, then the Owner must so indicate at the time of making the reservation; if the Owner fails to provide this information at the time of making the reservation, then such use shall be treated as use by an Owner's Guest regardless of who actually occupies the Unit and will be subject to Section 5.4. Owner shall request a reservation of the Subject Unit no earlier than the date which is one hundred eighty (180) days prior to the desired Owner Occupancy Period and no later than the date which is ninety (90) days prior to the desired Owner Occupancy Period. Provided that Owner's request for an Owner Occupancy Period satisfies the advance reservation request required above, then Hotel Manager shall confirm the Owner Occupancy Period based on Availability. In the event that Owner requests an Owner Occupancy Period less than ninety (90) days prior to the desired Owner Occupancy Period, then Hotel Manager may, in Hotel Manager's discretion, confirm the Owner Occupancy Period based only on Availability. With respect to any Owner Occupancy Period, if the Subject Unit has previously been reserved (and the reservation cannot readily be transferred by Hotel Manager to another equivalent Unit in the Hotel), then the request need not be confirmed by Hotel Manager.

(b)     To accommodate Owner Occupancy Periods during Premium Dates, Hotel Manager shall set aside the Premium Date Reservation Percentage of the total number of then Participating Units for use by owners of Participating Units during Premium Dates. Such Units will be made available to owners on a first-come, first-serve basis. Owner acknowledges and agrees that Hotel Manager shall not be required at any time to set aside more than the Premium Date Reservation Percentage of the total number of then Participating Units for use during any Premium Dates. Once a number of Participating Units equal to the Premium Date Reservation Percentage of the total number of then Participating Units has been reserved by owners, then Hotel Manager is not obligated to confirm an Owner Occupancy Period for any other Participating Unit during a Premium Date. Furthermore, except as

provided in **Schedule E**, if the Subject Unit is not reserved for an Owner Occupancy Period at least ninety (90) days in advance, then such Hotel Manager shall have the right to release the Subject Unit (and all other Units previously set aside that are not reserved) for potential reservation by Hotel Guests. Hotel Manager shall provide to the Owner of Record advance notice of the Premium Dates as set forth in **Schedule E**.

(c)     Subject to the limitations on use during Premium Dates set forth in this **Section 5.2**, and subject to the limitation on Owner's Guest usage set forth in Section 5.4, Owner (and/or such Owner's Family) and Owner's Guests shall have the right to use the Subject Unit as provided herein at no cost, except as follows:

(i)     if Owner (and/or such Owner's Family) uses the Subject Unit during an Owner Occupancy Period, then such Owner (and/or such Owner's Family) shall be responsible for paying the following: (A) the applicable Owner Use Fee (so long as Owner has paid all costs, fees and other obligations owed under the Agreement, Hotel Manager will pay the Owner Occupancy Fees, if any, owed under the Declaration accruing due to Owner's use of the Subject Unit); (B) any Incidental Charges incurred by Owner (and/or such Owner's Family); (C) if and to the extent applicable, Owner (and/or such Owner's Family) shall pay any federal, state or local occupancy taxes or other charges for each night of occupancy, as may be required by applicable laws, codes, ordinances or otherwise required by governmental authorities having jurisdiction over the Condominium Hotel Property; (D) any other Incidental Charges incurred by Owner (and/or such Owner's Family) during any prior Owner Occupancy Period that were not paid at departure; and (E) any other Incidental Charges incurred by Owner's Guests during any prior Owner Occupancy Period that were not paid prior to departure or charged to Owner on an Owner Statement. In exchange for paying the required fees listed above, Owner (and/or such Owner's Family) shall receive the Hotel services such Owner (and/or such Owner's Family) elects to receive during the applicable Owner Occupancy Period and access to and the right to receive the services available at the Hotel, subject to their being charged Incidental Charges, and any other additional fees required of Hotel Guests for such Hotel services from time to time; and

(ii)    if an Owner's Guest uses the Subject Unit, then such Owner's Guest shall be responsible for paying the following: (A) any and all fees and charges related to such occupancy as set forth in the Declaration, including, without limitation, the Transient Occupancy Fees for each night the Subject Unit is occupied by such Owner's Guest; (B) any Incidental Charges incurred by such Owner's Guest; and (C) any and all taxes and similar room occupancy charges related to such occupancy by such Owner's Guest. In exchange for paying the required fees listed above, Owner's Guests shall receive all the Hotel services and benefits generally made available to Hotel Guests, including, without limitation, access to and the right to receive the services available at the Hotel, subject to their being charged Incidental Charges, and any other additional fees required of Hotel Guests for such Hotel services from time to time.

(d)     If the Subject Unit is owned by an entity or more than one individual, then the Owner of Record shall be the contact for reserving the Owner Occupancy Period and the Owner of Record shall adhere to all procedures and policies that Hotel Manager may establish concerning reservations. Owner understands and agrees that the total nights available for Owner Occupancy Periods and for use by Owner's Guests under the applicable Rental Program Option indicates the total nights available on a per unit basis and not on a per owner basis, such that if there are multiple owners of the Subject Unit, in no event shall the aggregate total of nights the Subject Unit is used by all owners of the Subject Unit exceed the total nights available for Owner Occupancy Periods and for use by Owner's Guests under the applicable Rental Program Option.

(e)     Owner (and/or such Owner's Family) and Owner's Guests shall check in and register at the Hotel, provide a credit card to cover required charges and Incidental Charges, check out and otherwise comply with the Hotel's arrival and departure and other check-in and registration procedures.

(f)     Owner (and/or such Owner's Family) and Owner's Guests shall at all times while staying at the Hotel be subject to and comply with all rules, regulations and policies adopted from time to time by or on behalf of the Hotel, and shall comply with all terms and conditions of the Governing Documents, as well as any rules and regulations promulgated from time to time by the Hotel Manager and the Association and as more particularly required by **Section 8.4** below.

(g)     Owner (and/or such Owner's Family) and Owner's Guests shall be subject to the cancellation policy or policies in effect at the Hotel, which cancellation policy or policies may be modified from time to time by Hotel

Manager in its sole discretion, and which may include, without limitation, a charge for late cancellation. In addition to the foregoing, if Owner requests and reserves an Owner Occupancy Period and for any reason does not occupy the Subject Unit without canceling the reservation in advance, Hotel Manager, at its option, may charge to Owner an amount equal to sixty percent (60%) of the average room rate for such Owner Occupancy Period for each date such reservation was made.

(h)     Owner shall keep on file with Hotel Manager a current credit card, with such minimum level of available credit as the Hotel Manager may require from time to time, to be used for payment of all properly imposed charges, or in lieu of Hotel Manager's posting the charge against Owner's account. The determination of whether to post a charge to Owner's account or to Owner's credit card shall be made by Hotel Manager in its sole discretion (and may be made with respect to all charges to Owner, including those which, pursuant to this Agreement, are to be posted against Owner's account).

5.3     **Subject Unit**. Owner hereby acknowledges and agrees as follows for the benefit of Hotel Manager:

(a)     Owner shall, at all times during the Term, be required to select and maintain the Standard Package. Owner shall not change or alter the Standard Package or any part thereof.

(b)     Owner hereby authorizes Hotel Manager, at Owner's expense, to repair all damage to, and perform all maintenance of, the Subject Unit (including, without limitation, damage that results from the acts of a Hotel Guest, Owner or Owner's Guests, and for all normal wear and tear to the Subject Unit) and to keep the Subject Unit and any personal property located therein in good condition and repair. Pursuant to this Agreement and the Governing Documents, Owner pays 100% of such maintenance and repair costs; *provided, however,* Owner can direct Hotel Manager to use any available funds in the Standard Package Reserve to pay for all such costs or, if the funds available in the Standard Package Reserve are not sufficient to cover the entire amount, to cover such portion thereof as are available and Owner will pay the remaining balance upon demand from the Hotel Manager.

(c) .    Owner hereby authorizes Hotel Manager, at Owner's expense, to redecorate or refurbish the Subject Unit and/or replace any or all of the Standard Package in the Subject Unit in a manner and as often as Hotel Manager deems necessary, in its sole judgment, in order to maintain the quality standards as required by Hotel Manager from time to time; *provided, however,* that Hotel Manager shall provide Owner with advance written notice before commencing any redecorating or refurbishing project within the Subject Unit with an anticipated budget in excess of $5,000.00. It is currently anticipated that the major components of the Standard Package will be anticipated/replaced approximately every seven (7) to ten (10) years, but the Hotel Manager can require replacement/refurbishment at any time as provided herein. Pursuant to this Agreement and the Governing Documents, Owner pays 100% of such redecoration and refurbishment costs; *provided, however,* Owner can direct Hotel Manager to use any available funds in the Standard Package Reserve to pay for all such costs or, if the funds available in the Standard Package Reserve are not sufficient to cover the entire amount, to cover such portion thereof as are available and Owner will pay the remaining balance upon demand from the Hotel Manager.

(d)     Owner shall maintain at all times during the Term, at Owner's sole expense, with an insurance company acceptable to Hotel Manager, an HO-6 condominium package property and liability policy with such additional endorsements and/or riders as Hotel Manager may reasonably require from time to time. Such policy shall include liability coverage of not less than One Million and 00/100 Dollars ($1,000,000.00) per occurrence, and replacement cost property insurance coverage for Owner's interest in the Subject Unit and its contents (subject to usual and customary deductibles). The property policy shall be written on a so-called "all-risk" form, providing occurrence basis coverage against the perils of fire, lighting, earthquake, hurricane, water damage caused by hurricane, accidental water damage from any source, including the sanitary system, flood, explosion, riot, strike, malicious damage, vehicle/aircraft impact, collapse and burglary. Hotel Manager shall have the right to revise these insurance requirements from time to time and to approve all coverages and policies purchased by Owner. Owner shall cause each such liability insurance policy to name Hotel Manager and the Hotel Manager Parties, any lender secured by the Hotel, and any affiliates of the foregoing, and their respective partners, shareholders, trustees, members, directors, officers, employees and agents as additional insureds, and shall obtain an endorsement to such policy waiving any rights of subrogation against such parties. Owner shall provide Hotel Manager a certificate of insurance evidencing the above coverages prior to the commencement of the Term and thereafter upon any renewals or replacements of such coverage. The insurance certificate required above shall provide notice that the policy cannot be cancelled or materially changed without at least thirty (30) days prior written notice to Hotel Manager. Notwithstanding the

foregoing, if Hotel Manager offers insurance packages to units participating in the Rental Program, Owner shall obtain such coverage at Owner's expense through Hotel Manager. The amount of insurance contained in any of the aforementioned insurance coverages shall not be construed to be a limitation of the liability on the part of Owner. In addition to the foregoing, at all times during the Term, Owner shall comply with all requirements to obtain and maintain insurance for its Subject Unit and as otherwise required and set forth in the Governing Documents and/or this Agreement.

(e)      Owner shall not store any personal items in the Subject Unit unless such items are stored in the "owner's closet," if available; *provided, however,* that Owner acknowledges and agrees that Hotel Manager shall not be responsible for any loss or damage of any personal items stored in the Subject Unit in violation of this **Section 5.3(e)**. Owner agrees that the Hotel Manager may, as Hotel Manager deems necessary from time to time, expressly restrict the storage of certain types of items and/or materials, including, without limitation, any items which may be dangerous to the health or safety of Hotel Guests or which, in Hotel Manager's sole discretion, may be inappropriate to store in a hotel room.

5.4      **Guests; Rental by Owner Prohibited.**  Owner's Guests may use the Subject Unit during any Owner Occupancy Period, *provided* that Owner's Guests pays all fees and charges required hereunder, including without limitation, those fees and charges set forth in **Section 5.2(c)**, and *provided further* that Owner charges no fee, rental charge or otherwise requires other consideration, directly or indirectly, from such Owner's Guests for such occupancy; and *provided further* that in no event may the aggregate total number of nights the Subject Unit is occupied by Owner's Guests exceed the number of nights provided for Owner's Guests by the applicable Rental Program Option. All Owner's Guests must be registered and follow all applicable policies and procedures for checking-in and checking-out at the Hotel. Owner shall refer all possible rental opportunities for the Subject Unit of any kind or nature to Hotel Manager. During the term hereof, Owner covenants and agrees that it shall not, on its own or in concert with any other Person(s), lease, rent, exchange or otherwise make available the Subject Unit to any third party in return for the payment of any rent, fees or other payments (including non-monetary consideration such as an exchange of occupancy rights in other units) in connection therewith. If Owner should violate the foregoing provision, in addition to being in default hereunder, and subjecting itself to any and all remedies as provided for herein, Owner shall be required to pay to the Hotel Manager one hundred ten percent (110%) of any revenues or other value received by Owner plus any and all taxes associated with the rental.

5.5      **Risk of Loss.**  Owner assumes all risk for the loss of personal property kept in the Subject Unit, other than Hotel Placement Items. Hotel Manager shall not incur liability for the loss or damage of any such personal property. In addition, Hotel Manager shall not be liable or responsible for, or in any manner a guarantor or insurer of, the health, safety or welfare of Owner and/or any occupant or user of any portion of the Subject Unit including, without limitation, Owner and Owner's Guests, invitees, agents, servants, contractors or subcontractors or for any property of any such persons.

5.6      **Owner's Continuing Obligations.**  Except as specifically provided to the contrary in this Agreement, no obligations of Owner with respect to the Subject Unit shall be assumed by Hotel Manager. Owner shall remain responsible for the payment of all assessments, including all Association and Hotel Shared Expense maintenance charges and other sums due with respect to the Subject Unit under the Declaration or any other documents governing the Condominium Hotel, mortgage payments, income, real property, personal property or other taxes, insurance premiums and all other obligations of Owner arising in connection with ownership of the Subject Unit.

5.7      **Sale of the Subject Unit and Assignment of this Agreement.**

(a)      Showing the Subject Unit.  Owner shall inform Hotel Manager in writing at least ten (10) days prior to placing the Subject Unit up for sale. In connection with Owner's efforts to market the Subject Unit for sale, Owner agrees that the Subject Unit shall not be shown for sale when occupied by a Hotel Guest and Owner shall only be permitted to show the Subject Unit during an Owner Occupancy Period, unless otherwise agreed by Hotel Manager in advance of such showing. Further, prior to any showing to prospective purchasers, Owner shall first notify Hotel Manager and coordinate with Hotel Manager any showing of the Subject Unit. Owner shall not be permitted to conduct an "open house" for the Subject Unit.

(b)      Subject to Agreement.  **OWNER UNDERSTANDS AND AGREES THAT THIS AGREEMENT SHALL RUN WITH TITLE TO THE SUBJECT UNIT AND SHALL BIND ANY SUCCESSORS IN TITLE TO THE SUBJECT UNIT.** Any transfer of the Subject Unit by Owner shall not relieve Owner from any liability under this Agreement arising prior to the time of such transfer and any Unit

Purchaser shall be bound by this Agreement and obligated for any charges payable under this Agreement accruing prior to or subsequent to the transfer. The parties shall, within five (5) days after request by Hotel Manager, enter into a memorandum of this Agreement in a form reasonably acceptable to Hotel Manager for the purpose of giving notice in the public records of Clark County, Nevada of the existence of this Agreement, including, without limitation, the Hotel Manager's lien rights under Section 8.14 below. Without limiting the generality of the foregoing, any sale of the Subject Unit shall be subject to confirmed reservations for occupancy of the Subject Unit and the provisions of this Agreement. In connection with a sale of the Subject Unit, Owner and Unit Purchaser may enter into a written agreement (in a form approved by Hotel Manager), pursuant to which Owner would assign all of its right, title and interest in this Agreement to the Unit Purchaser and the Unit Purchaser would expressly assume all of the rights and obligations of Owner hereunder. Upon execution, Owner shall deliver to Hotel Manager a fully executed copy of such written agreement for its files. Except as otherwise provided for in Section 5.7(c) below, immediately upon the closing of the sale of the Subject Unit, the Unit Purchaser shall be deemed to be a participant in the Rental Program. If the Unit Purchaser elects not to assume this Agreement, the Unit Purchaser must honor all reservations for the Subject Unit in place at the time of the closing of the purchase and sale of the Subject Unit. Any failure to honor such reservations shall result in a liquidated damage to Hotel Manager as provided in Section 8.1 for each reservation not honored by the Unit Purchaser, which amount Hotel Manager may, in it discretion, deduct from any Owner's Share of Net Rental Revenue or offset against the Standard Package Reserve prior to distribution of the same to Owner or the Unit Purchaser, as the case may be.

(c)     Opt-Out.  Notwithstanding anything to the contrary contained in Section 5.7(b) above, the Unit Purchaser may elect to opt out of the Rental Program, provided that (i) within thirty (30) days after the closing of the purchase and sale of the Subject Unit, Unit Purchaser delivers to Hotel Manager and Hotel Manager actually receives Opt-Out Notice, (ii) the Opt-Out Notice contains the date on which the Unit Purchaser desires to "opt out" of the Rental Program, which date shall in no event be earlier than the Proposed Opt-Out Date, (iii) the Subject Unit is not rented or reserved for any period of time after the Proposed Opt-Out Date or, if the Subject Unit is rented or reserved during such period, Hotel Manager, in its judgment, is able to make alternative Units available to Hotel Guests, and (iv) no Incidental Charges or other payments due pursuant to this Agreement are outstanding. Upon timely receipt of the Opt-Out Notice, Hotel Manager will deliver to Unit Purchaser a Confirmation Letter. The terms and conditions of this Agreement shall remain in full force and effect and Unit Purchaser shall continue to be bound by the term and conditions hereof until such time as Hotel Manager delivers to Unit Purchaser the Confirmation Letter.

5.8     **Inspection of Books.**  Owner shall have the right to inspect the Hotel Manager's books with respect to the Subject Unit; *provided, however,* Owner understands and agrees that its rights to inspect Hotel Manager's books and records regarding the Subject Unit and/or Owner's account shall be limited in such manner as may be determined by the Hotel Manager, from time to time, and in no event may Owner request information to be made available on less than fifteen (15) business days prior written notice and Owner agrees that all such records may be destroyed after the lesser of (a) two (2) years after creation thereof, or (b) as otherwise determined by Hotel Manager; *provided* such destruction is consistent with Hotel Manager's general records retention policies.

### ARTICLE 6
### HOTEL MANAGER RIGHTS

6.1     **Right to Delegate.**  Without limiting the generality of the other provisions hereunder, Owner further understands and agrees that Hotel Manager may delegate, in its sole discretion, any and/or all of its rights and obligations hereunder to any Delegate and Owner hereby consents to any such delegation to Delegate. Unless Owner is otherwise notified by Hotel Manager in writing, any such Delegate shall be authorized to perform and enforce this Agreement (or such portions thereof as have been delegated) on behalf of Hotel Manager. Owner understands and agrees that in the event that any agreement between Hotel Manager, or the affiliates of Hotel Manager, and any Delegate is terminated for any reason, all use of such Delegate's trade name and trademarks or service marks shall cease and all indicia or connection between the Condominium Hotel and such Delegate, including signs or other materials bearing any of such Delegate's trademarks or service marks or trade names shall be removed from the Condominium Hotel. Additionally, Owner acknowledges and agrees that any use of any of Delegate's trade names and trademarks or service marks, without proper licensing from such Delegate, is expressly prohibited.

6.2     **Establishing Policies.**  Hotel Manager shall have the right to establish policies and procedures regarding access, control and check-in and check-out procedures, including, without limitation, establishing a mandatory card key system

and check-in process and the right to require all persons staying in the Hotel (including Owner) to present a valid picture identification and a valid credit card at check-in to pay for charges associated with the stay. Any access key may be changed periodically by Hotel Manager, in its sole discretion, to maintain access control and prevent unauthorized use of the Subject Unit.

6.3    **Resolution of Complaints; Guest Preference**. In the event of a complaint deemed substantial by Hotel Manager, in Hotel Manager's sole discretion, including, without limitation, the failure of the plumbing, heating or air conditioning systems or a major appliance within the Subject Unit, Owner agrees that Hotel Manager may handle any such complaints through a variety of methods consistent with the Hotel Manager's operating practices, including, without limitation, offering a Hotel Guest rate adjustments, credits, reimbursements and refunds. Owner further agrees that the Hotel Guest may be transferred to another unit in the Rental Program, in the Hotel or in another hotel or facility outside the Hotel if such reduction in rental rate is not acceptable to the Hotel Guest. In the event the Hotel Guest accepts the reduction in rental rate, the Net Rental Revenue after the reduction will be shared by Owner and Hotel Manager in the same proportions as the then applicable rental revenue split. Hotel Manager makes no representation that major repairs can be timely made and hereby advises Owner, and Owner understands and agrees, that failure of the type herein discussed or the accommodation of Hotel Guests' demands may periodically result in a loss of all or some portion of the rental income for the Subject Unit.

6.4    **Hotel Placement Items**. Hotel Manager shall have the right, at their sole cost and expense, to place and maintain in the Subject Unit or otherwise make available to Owner, Owner's Guests and Hotel Guests the Hotel Placement Items. In no event shall all or any portion of the revenues generated from the sale or use of Hotel Placement Items or Incidental Charges be included in Gross Room Rental Revenue hereunder. Notwithstanding the foregoing, Owner shall not place any items similar to the Hotel Placement Items, or any items which Hotel Manager, in its sole discretion, prohibits in the Subject Unit at any time during the Term.

6.5    **Charges and Costs**. Hotel Manager may, without Owner's prior consent or authorization, charge Owner's account or Owner's credit card, at Hotel Manager's election, for the cost of goods and services provided to Owner at any time or provided to the Subject Unit during any Owner Occupancy Period, or as otherwise permitted under this Agreement, including, without limitation, the costs of quarterly deep cleanings, restaurant or food services (including room service), any other Incidental Charges or any Hotel Placement Items, all at the Hotel's published rates then in existence.

6.6    **Rights of Hotel Manager for Non-Compliance of Agreement**. If Hotel Manager determines, in its good faith discretion, that any provision of this Agreement or any program implemented in accordance with this Agreement may not comply with any applicable law, including federal and state securities laws, then Hotel Manager shall have the right to revise this Agreement and the programs contemplated herein such that this Agreement and the programs contemplated herein are brought into compliance with such laws. If such a Reformation of this Agreement occurs in accordance with this **Section 6.6**, Hotel Manager and Owner shall promptly execute and deliver to the other party the form of replacement Rental Program Agreement prepared by Hotel Manager with revisions as provided in this **Section 6.6**.

6.7    **Designation of Subject Unit as "Out of Order"**. In addition to Hotel Manager's rights under **Section 3.8**, Hotel Manager may at any time designate the Subject Unit as "Out of Order" by virtue of objectionable physical conditions, Owner's failure to maintain the Standard Package as required by this Agreement and the Declaration, mechanical or electrical failures, pest infestations, or other reasonable matters (including as a result of a "deep cleaning" pursuant to **Section 3.4(c)**), and shall give prompt notice thereof to Owner. In any such case, Hotel Manager shall return the Subject Unit to the Rental Program upon its determining that the defects and deficiencies have been satisfactorily corrected. If any defects or deficiencies specified by Hotel Manager (and which are not the obligations of the Hotel Manager to correct under this Agreement) are not corrected by Owner within ten (10) days after notice to Owner, Hotel Manager may terminate this Agreement.

6.8    **Hotel Manager's Rights to Deny Check-In**. Hotel Manager shall have the right to deny check-in for any reason Hotel Manager deems necessary. Further, Hotel Manager is specifically authorized to deny the check-in of any person into a Subject Unit if Owner has not furnished Hotel Manager with the evidence of Owner's insurance required in **Article 5**.

6.9    **Rights in Addition to Other Rights Granted**. The rights granted to Hotel Manager under this **Article 6** are in addition to all other rights and privileges granted to Hotel Manager under this Agreement or the Declaration and shall not, in any event, be deemed to in any way limit any other rights, either express or implied, to which the Hotel Manager is entitled.

## ARTICLE 7
## ACKNOWLEDGEMENTS, WAIVERS AND RELEASES

7.1     Securities Law Acknowledgements.   OWNER ACKNOWLEDGES THAT OWNER'S PARTICIPATION IN THE RENTAL PROGRAM IS OPTIONAL AND VOLUNTARY, AND NOT A REQUIREMENT OF PURCHASE OR OWNERSHIP OF THE SUBJECT UNIT.  OWNER FURTHER ACKNOWLEDGES THAT THE HOTEL MANAGER PARTIES HAVE NOT: (A) MADE ANY STATEMENTS OR REPRESENTATIONS WITH RESPECT TO THE ECONOMIC OR TAX BENEFITS OF OWNERSHIP OF THE SUBJECT UNIT OR TO BE DERIVED FROM PLACING THE SUBJECT UNIT IN THE RENTAL PROGRAM; OR (B) GUARANTIED, REPRESENTED TO OR OTHERWISE DISCUSSED WITH OWNER ANY SPECIFIC LEVEL OF RENTAL INCOME, NET RENTAL REVENUE OR OTHER INCOME, OCCUPANCY LEVELS FOR THE HOTEL OR THE SUBJECT UNIT, ANTICIPATED RENTAL RATES FOR THE HOTEL OR THE SUBJECT UNIT OR ANY OTHER ECONOMIC PROJECTION FOR THE HOTEL OR THE SUBJECT UNIT.  OWNER FURTHER ACKNOWLEDGES THAT (I) NO AGREEMENT FOR PROVISION OF RENTAL SERVICES WAS ENTERED INTO PRIOR TO OWNER ENTERING INTO A BINDING, NON-CANCELABLE PURCHASE AGREEMENT FOR THE SUBJECT UNIT, (II) OWNER HAS HAD ALL OF ITS QUESTIONS ANSWERED AND HAS RECEIVED ALL REQUESTED INFORMATION REGARDING THE RENTAL PROGRAM, (III) THE SUBJECT UNIT WILL NOT BE PART OF A "RENTAL POOL" OR "RENTAL SHARING" ARRANGEMENT AND THAT OWNER WILL NOT PARTICIPATE IN THE RENTAL REVENUE OF ANY OTHER UNITS NOR WILL SUCH OTHER UNITS PARTICIPATE IN THE RENTAL REVENUE OF THE SUBJECT UNIT, AND (IV) EXCEPT AS OTHERWISE EXPRESSLY PROVIDED FOR IN THIS AGREEMENT, NO REPRESENTATION HAS BEEN MADE THAT THIS AGREEMENT WILL BE RENEWED OR EXTENDED.

Owner Initials ▨▨▨▨▨

7.2     No Liability for Operating Rental Program; No Exclusive Rental Management.  THE HOTEL MANAGER PARTIES SHALL NOT BE LIABLE TO OWNER, UNDER ANY CIRCUMSTANCES, FOR ANY CLAIMS RESULTING FROM ANY FAILURE TO RENT ANY OF THE PARTICIPATING UNITS, INCLUDING THE SUBJECT UNIT, OR FOR FAILURE TO ACHIEVE ANY SPECIFIC LEVEL OF RENTAL INCOME FOR OWNER.  IT IS UNDERSTOOD AND ACKNOWLEDGED BY OWNER THAT THE HOTEL MANAGER PARTIES ARE OR MAY IN THE FUTURE BECOME OWNERS OR OPERATORS OF OTHER HOTELS AND HOTEL/CASINO PROPERTIES AND/OR THE RENTAL MANAGERS FOR OTHER HOTEL OR RESIDENTIAL UNITS INCLUDING OTHER TOWERS ADJACENT TO THE CONDOMINIUM HOTEL; AND THAT ANY OF THE FOREGOING MIGHT BE IN RENTAL COMPETITION WITH THE HOTEL, THE PARTICIPATING UNITS AND THE SUBJECT UNIT; AND THAT THE HOTEL MANAGER PARTIES HAVE NO OBLIGATION TO ACT FOR THE EXCLUSIVE BENEFIT OF THE HOTEL OR THE SUBJECT UNIT AND THAT SUCH ACTIVITIES SHALL NOT CONSTITUTE A CONFLICT OF INTEREST BETWEEN OWNER AND HOTEL MANAGER PARTIES OR THE BREACH OF ANY DUTY OR OBLIGATION THAT MAY BE OWED FROM HOTEL MANAGER PARTIES TO OWNER.

Owner Initials ▨▨▨▨▨

7.3     **Limitation of Hotel Manager Liability.**  IN THE PERFORMANCE OF ITS OBLIGATIONS UNDER THIS AGREEMENT, THE HOTEL MANAGER PARTIES SHALL NOT BE LIABLE TO OWNER FOR ANY ACT OR OMISSION OF THE HOTEL MANAGER OR ANY OF THE HOTEL MANAGER PARTIES, EXCEPT TO THE EXTENT ANY CLAIMS ARE CAUSED SOLELY BY THE WILLFUL MISCONDUCT OF THE HOTEL MANAGER OR ONE OR MORE OF THE HOTEL MANAGER PARTIES. IN NO EVENT SHALL THE HOTEL MANAGER PARTIES BE LIABLE FOR ANY INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY OR CONSEQUENTIAL DAMAGES FOR ANY CLAIM ARISING FROM THIS AGREEMENT, EVEN IF HOTEL MANAGER HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.  IN ALL CASES, THE HOTEL MANAGER PARTIES COMBINED MAXIMUM LIABILITY UNDER THIS AGREEMENT, AND THE SOLE AND EXCLUSIVE REMEDY AGAINST ANY OF THEM FOR BREACH OF THIS AGREEMENT, SHALL BE LIMITED TO THE LESSER OF: (A) THE ACTUAL DIRECT DAMAGES INCURRED BY OWNER; OR (B) THE AMOUNT OF COMPENSATION PAID TO HOTEL MANAGER UNDER THIS AGREEMENT DURING THE PRECEDING TWELVE (12) MONTH PERIOD UNDER THIS AGREEMENT. NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, OWNER SHALL NOT MAKE ANY CLAIM AGAINST ANY OF THE HOTEL MANAGER PARTIES ON ACCOUNT OF ANY ALLEGED ERRORS OF JUDGMENT WHERE SUCH JUDGMENT IS EXERCISED IN GOOD FAITH IN CONNECTION WITH THE PROVISION OF SERVICES UNDER THE RENTAL PROGRAM OR PURSUANT TO THIS AGREEMENT.

Owner Initials ▨▨▨▨▨▨

7.4     **Indemnification by Owner.**  OWNER SHALL INDEMNIFY, PROTECT, DEFEND (WITH COUNSEL SELECTED BY HOTEL MANAGER), AND HOLD THE HOTEL MANAGER PARTIES HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS OF ANY KIND OR NATURE ARISING OUT OF ANY ACTION OR OMISSION OR COURSE OF ACTION ON THE PART OF OWNER OR ANY OF THE HOTEL MANAGER PARTIES IN PERFORMANCE OF THEIR OBLIGATIONS UNDER THIS AGREEMENT OR IN ANY WAY RELATED TO THE RENTAL, MANAGEMENT, HOTEL USE OR CONDITION OF THE SUBJECT UNIT; *PROVIDED, HOWEVER,* THAT THIS INDEMNITY SHALL NOT APPLY, AS TO ANY PARTICULAR HOTEL MANAGER PARTY, TO ANY CLAIMS RESULTING SOLELY FROM THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF SUCH HOTEL MANAGER PARTY.

Owner Initials ▨▨▨▨▨▨

7.5     **Release of Hotel Manager and Hotel Manager Parties.**  OWNER HEREBY ABSOLUTELY AND IRREVOCABLY RELEASES, REMISES, ACQUITS AND FOREVER DISCHARGES THE HOTEL MANAGER AND THE HOTEL MANAGER PARTIES, FROM ANY AND ALL CLAIMS OF EVERY KIND OR NATURE, KNOWN OR UNKNOWN, SUSPECTED OR UNSUSPECTED, ASSERTED OR UNASSERTED, FIXED OR CONTINGENT, AT LAW OR IN EQUITY, INCLUDING, WITHOUT LIMITATION, THOSE ARISING OUT OF OR RELATING IN ANY WAY TO (A) THIS AGREEMENT, (B) THE RENTAL PROGRAM, OR (C) THE PERFORMANCE OR NON-PERFORMANCE OF HOTEL MANAGER'S OBLIGATIONS PURSUANT TO THIS AGREEMENT OR IN CONNECTION WITH THE RENTAL PROGRAM.  IN SO DOING, OWNER EXPRESSLY ACKNOWLEDGES THAT IT IS KNOWINGLY AND INTENTIONALLY WAIVING AND RELINQUISHING ALL RIGHTS AND BENEFITS WHICH IT HAS OR MAY HAVE UNDER ANY LAW, RULE OR REGULATION UNDER THE LAW OF NEVADA OR OF ANY OTHER STATE OR JURISDICTION TO THE EFFECT THAT UNKNOWN OR UNSUSPECTED CLAIMS ARE NOT RELEASED BY A GENERAL RELEASE OF CLAIMS WITHOUT ANY EXPRESS WAIVER OF SUCH STATUTORY OR OTHER PROTECTION.  ACCORDINGLY, OWNER HEREBY WAIVES AND RELINQUISHES ALL SUCH RIGHTS AND BENEFITS RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT, THE RENTAL PROGRAM AND THE PERFORMANCE OR NON-PERFORMANCE OF HOTEL MANAGER'S OBLIGATIONS PURSUANT TO THIS AGREEMENT OR IN CONNECTION WITH THE RENTAL PROGRAM, AND ACKNOWLEDGES AND AGREES THAT THIS RELEASE EXPRESSLY CONTEMPLATES THE EXTINGUISHMENT OF, AND DOES EXTINGUISH, ALL UNKNOWN AND UNSUSPECTED CLAIMS.

Owner Initials ▨▨▨▨▨▨

7.6     No Liability for Personal Property of Owner.  THE HOTEL MANAGER PARTIES SHALL NOT BE LIABLE FOR ANY LOSSES OR DAMAGES SUSTAINED BY OWNER TO THE SUBJECT UNIT OR ITS CONTENTS.

Owner Initials [illegible]

7.7     Hotel Manager's Right to Terminate.  OWNER ACKNOWLEDGES THAT SOME OR ALL OF THE HOTEL MANAGER PARTIES ARE BUSINESSES AND/OR INDIVIDUALS THAT ARE OR MAY BE SUBJECT TO AND EXIST BECAUSE OF PRIVILEGED LICENSES ISSUED BY GOVERNMENTAL AUTHORITIES.  IF ANY HOTEL MANAGER PARTY IS DIRECTED TO CEASE DOING BUSINESS WITH OWNER BY ANY SUCH AUTHORITY, OR IF HOTEL MANAGER SHALL IN GOOD FAITH DETERMINE, IN HOTEL MANAGER'S REASONABLE JUDGMENT, THAT OWNER (A) IS OR MIGHT BE ENGAGED IN, OR IS ABOUT TO ENGAGE IN, ANY ACTIVITY OR ACTIVITIES, OR (B) WAS OR IS INVOLVED IN ANY RELATIONSHIP, EITHER OF WHICH COULD OR DOES JEOPARDIZE HOTEL MANAGER'S BUSINESS OR SUCH LICENSES, OR THOSE OF A PARENT COMPANY, SUBSIDIARY OR AFFILIATE, OR IF ANY SUCH LICENSE IS THREATENED TO BE, OR IS, DENIED, CURTAILED, SUSPENDED OR REVOKED, THIS AGREEMENT MAY BE IMMEDIATELY TERMINATED BY HOTEL MANAGER WITHOUT LIABILITY TO OWNER.

Owner Initials [illegible]

OWNER'S FAILURE TO INITIAL ONE OR MORE OF THE FOREGOING PROVISIONS IN THIS ARTICLE 7 SHALL NOT, IN ANY EVENT, LIMIT OR OTHERWISE INDICATE THAT OWNER HAS NOT ACKNOWLEDGED AND AGREED TO ALL OF THE FOREGOING PROVISIONS.  EACH OF THE PROVISIONS OF THIS ARTICLE 7 SHALL SURVIVE ANY EXPIRATION OR EARLIER TERMINATION OF THIS AGREEMENT.

ARTICLE 8
GENERAL PROVISIONS

8.1     Default.

(a)     Default.  If Owner defaults in performance of its obligations under this Agreement or under the terms of the Governing Documents (which default shall be deemed a default under this Agreement), Hotel Manager shall provide a Default Notice to Owner setting forth in reasonable detail (i) the nature of such default and, (ii) if such default is a Curable Default, the Cure Date.

(b)     Non-Curable Defaults.  If a default is not a Curable Default, then Hotel Manager shall immediately have the right, in Hotel Manager's sole discretion, to pursue the remedies described in Section 8.1(d) below.

(c)     Curable Defaults.  If a default is a Curable Default, and Owner fails to cure such default to the satisfaction of Hotel Manager on or before the Cure Date, then, subject to any other cure periods provided for in the Governing Documents or in this Agreement, Hotel Manager shall have the right to pursue the remedies described in Section 8.1(d) below.

(d)     Remedies.  Upon the occurrence of any event of default under this Agreement, Hotel Manager shall have the right to pursue any or all of the following remedies: (i) Hotel Manager may suspend the participation of the Owner and the Subject Unit in the Rental Program; (ii) Hotel Manager may bring a cause of action against the Owner in a court of appropriate jurisdiction for damages and/or specific performance of the terms of this Agreement; (iii) Hotel Manager may offset any amounts owed by Owner to Hotel Manager against Owner's Share of Net Rental Revenue next payable to the Owner or, if Owner's Share of Net Rental Revenue is not payable to Owner, require Owner to pay Hotel Manager any such amounts in the manner described in Article 4 above; (iv) Hotel Manager may terminate this Agreement and remove the Subject Unit from the Rental Program; *provided, however,* that if the default is a Curable Default, Owner shall have the right to cure such default as provided in this Agreement before Hotel Manager can elect to terminate this Agreement; and/or (v) Hotel Manager may elect any and all such other rights or remedies as may be available to Hotel Manager at law or equity.  The remedies under this Agreement are cumulative and election of one remedy by Hotel Manager shall not exclude Hotel Manager pursuing any other remedies hereunder or any other remedies to which the Hotel Manager may be entitled at law or in equity.

(e)   Termination; Liquidated Damages.  Any termination of this Agreement shall not relieve Owner from any liability for payments due and owing under this Agreement or the Governing Documents, which payment obligations shall survive any termination of this Agreement.  If Hotel Manager elects to terminate this Agreement in accordance with this Section 8.1, Hotel Manager shall have the right, in its sole discretion, to transfer any confirmed reservations existing in the Subject Unit to other accommodations.  Upon transferring any reservations in connection with a termination under this Section 8.1, or if Owner fails to make the Subject Unit available for any Post Termination Reservation(s), then Owner shall pay to Hotel Manager the applicable Reservation Night Cancellation Amount, all as liquidated damages and not as a penalty, the Owner and Hotel Manager agreeing and stipulating that the exact amount of damages would be extremely difficult to ascertain and that the Reservation Night Cancellation Amount constitutes a reasonable and fair approximation of such damages for each night for each Unit type.

8.2   Sale of the Hotel.  In addition to Hotel Manager's other termination rights in this Agreement, Hotel Manager may, at its option, terminate this Agreement if the Hotel Unit or the Hotel operations are sold, conveyed or otherwise transferred in connection with a bona fide sale transaction.  Owner hereby assumes all risks associated with the termination of this Agreement and the removal of the Subject Unit from the Rental Program as a result of such sale, conveyance or transfer of the Hotel Unit or the Hotel operations, including the risk of loss to Owner of potential rental income.

8.3   Access to the Subject Unit.  Owner agrees that Hotel Manager and each of its employees, agents and representatives shall have access to the Subject Unit at any time Hotel Manager deems necessary or appropriate to fulfill Hotel Manager's obligations hereunder, including, without limitation, during periods of emergency.

8.4   Rules and Regulations.  Owner and its Guests shall comply with all rules and regulations governing (a) the Rental Program, (b) the use and occupancy of the Units (including, without limitation, any use restrictions of storage of items in the Units) and (c) the use of the Shared Components, which are, from time to time, promulgated and set forth in writing by Hotel Manager or the Association pursuant to the Governing Documents.  Hotel Manager shall have the right to impose additional rules and regulation not contemplated hereby and to amend, modify or supplement such rules and regulations in order to contemporaneously administer the Rental Program and operate the Hotel in an efficient and effective manner and Owner hereby acknowledges and consents to the imposition of such new rules and regulations and to any such amendment, modification or supplement, provided the same does not have a material adverse impact on Owner or the Subject Unit.  Hotel Manager shall deliver written notice to Owner of any newly imposed rules and regulations and of any amendments, modifications or supplements to the rules and regulations described in this Section 8.4.  Owner shall be responsible for advising all Owner Guests of such rules and regulations.  The foregoing requirement shall in no event limit the obligation of the Owner and Owner's Guests to comply with any and all rules and regulations promulgated by the Association under the Governing Documents.  Failure by an Owner to comply with the rules and regulations promulgated under this Section 8.4 will constitute a default pursuant to Section 8.1 above.

8.5   Assignment.  Hotel Manager may assign all of its right, title and interest in this Agreement to any Person and the Owner hereby irrevocably gives its consent to any such assignment.  Except as otherwise provided in Section 5.7 above, Owner may not assign any of its right, title or interest in this Agreement without the prior written consent of Hotel Manager and any such assignment without Hotel Manager's consent shall be a default under this Agreement and shall be void and of no force or effect.  If Hotel Manager consents to any assignment by Owner, the assignee must, as a pre-condition of such assignment, execute an assumption agreement in favor of Hotel Manager in respect of Owner's obligations (and Hotel Manager's rights) under this Agreement.  Owner acknowledges and agrees that pursuant to the terms of Section 5.7, this Agreement and the obligations hereunder shall run with the Subject Unit unless Hotel Manager expressly agrees to the contrary in writing.

8.6   Hotel Manager's Authority.  In addition to the terms and conditions expressed in this Agreement, Owner hereby authorizes Hotel Manager to perform all other acts and do all other things deemed necessary or desirable, in the sole and absolute discretion of Hotel Manager, to carry out the terms of this Agreement.

8.7   Successors and Assigns.  This Agreement shall be binding on the heirs, personal representatives, successors and assigns of the parties hereto and shall inure to the benefit of the heirs, personal representatives, successors and permitted assigns of the parties hereto.

8.8   Entire Agreement.  This Agreement constitutes the entire agreement between the parties with respect to the subject matter contemplated herein and supersedes all oral statements and prior writings with respect to the subject matter

contemplated herein, including, without limitation, any promotional items or reference materials regarding the Rental Program such as "Frequently Asked Questions" circulars or similar Rental Program overview statements and any previously executed rental management agreements among the parties. This Agreement creates no other relationship between Owner and Hotel Manager other than an agency relationship pursuant to the terms of and for purposes of this Agreement.

8.9     **Modification and Changes.** Except as otherwise expressly provided for in this Agreement, this Agreement cannot be changed or modified except by another agreement in writing signed by all the parties or by their respective duly authorized agents.

8.10     **Waivers.** Failure by a party to insist upon the strict performance of any provision of this Agreement, or to exercise any right or remedy consequent upon the breach thereof, shall not constitute a waiver of any such breach or any subsequent breach of such provision. No provision of this Agreement and no breach thereof shall be waived, altered or modified except by written instrument. No waiver of any breach shall affect or alter this Agreement, but each and every provision of this Agreement shall continue in full force and effect with respect to any other breach then existing or subsequent breach thereof.

8.11     **Applicable Law.** This Agreement shall be construed, interpreted and applied in accordance with, and shall be governed by, the laws of the State of Nevada, without regard to conflict of law principles.

8.12     **Notices.** Except as may otherwise be provided in this Agreement, all notices, demands, statements, requests, consents, approvals and other communications required or permitted to be given hereunder, or which are to be given with respect to this Agreement, shall be in writing, duly executed by an authorized officer or agent of the party so giving such Notice, and either personally delivered to any duly authorized representative of the party receiving such Notice or sent by facsimile transmission, registered or certified mail, or by courier service, return receipt requested, addressed:

If to Hotel Manager, to:

> Trump International Hotel & Tower Las Vegas
> 2000 Fashion Show Drive
> Las Vegas, NV 89109
> Attention: Director of Residential Services
> Facsimile No.: (702) 476-7455

With a copy to:

> Snell & Wilmer
> 3883 Howard Hughes Parkway, Suite 1100
> Las Vegas, Nevada 89169
> Attention: W. Brian Hulse, Esq.
> Facsimile No.: (702) 784-5252

If to Owner:

> **Notices shall be sent to the Owner of Record at the address and/or facsimile number set forth in the Designation of Owner of Record Form executed by Owner.**

Except as otherwise expressly provided for herein, all Notices shall be effective for all purposes upon personal delivery thereof or, if sent by facsimile transmission, shall be effective on the date of transmission duly shown on the confirmation slip, or, if sent by mail or air freight or courier service, shall be effective on the date of delivery duly shown on the return receipt, or upon attempted delivery if delivery is refused or the return receipt is not signed or if delivery is impossible because of failure to provide a reasonable means for accomplishing delivery. Any party may at any time change the addresses for Notices to such party by providing a Notice in the manner set forth in this **Section 8.12.**

8.13     **Revocable License.** "Trump International Hotel & Tower" is a trademark owned by Donald J. Trump. Hotel Manager has been granted a revocable license to use such trademark. Owner acknowledges and agrees that Donald J. Trump may, at his sole option, revoke said license including, but not limited to, if the Condominium Hotel is not being maintained in a manner comparable to Trump International Hotel & Tower – New York or, if Trump International Hotel &

Tower – New York is not owned or controlled by Donald J. Trump or one of his affiliates, other five star super-luxury condominium hotels as designated by a rating guide recognized in the industry for rating super-luxury or ultra-luxury hotels.

8.14    **Lien Rights of Hotel Manager.** In the event that the Owner fails to comply with any of the payment obligations set forth in this Agreement (including, without limitation, the payment obligations set forth in Articles 2, 4 and 8), and fails to promptly pay to Hotel Manager any such amounts as and when such amounts are due and payable in accordance with this Agreement, Hotel Manager shall have a lien on the interest of Owner in the Subject Unit, as well as any other Unit owned by Owner, in the amount of any sums due from Owner; *provided, however,* that such lien shall be subordinate to the lien of a prior recorded first mortgage on the interest of such Owner. Except as hereinafter provided, the lien provided for in this Section 8.14 shall not be affected by any transfer of title to the Subject Unit or any other Unit to which such lien is attached. A lien granted under this Section 8.14 shall be foreclosed in the same manner that an Association or a Hotel Unit Owner lien is foreclosed under the Declaration. Owner hereby expressly grants to Hotel Manager and/or its designees, successors or assigns the right to record a memorandum of this Agreement against the Subject Unit in the records of Clark County to provide notice of this lien right.

8.15    **Counterparts.** This Agreement may be executed simultaneously in multiple counterparts, each of which counterparts (whether facsimile or original) shall be deemed an original. In proving this Agreement, it shall not be necessary to produce or account for more than one of the counterparts.

8.16    **Interpretation.** In this Agreement, save and except as otherwise expressly provided herein: (a) all words and personal pronouns relating thereto shall be read and construed as the number and gender of the party or parties requires and the verb shall be read and construed as agreeing with the required word and pronoun; (b) the division of this Agreement into Articles and Sections and the use of headings is for convenience of reference only and shall not modify or affect the interpretation or construction of this Agreement or any of its provisions; (c) when calculating the period of time within which or following which any act is to be done or step taken pursuant to this Agreement, the date which is the reference day in calculating such period shall be excluded. If the last day of such period is not a business day, the period in question shall end on the next business day; (d) unless otherwise expressly stated, all references to Article and Section numbers refer to Articles and Sections of this Agreement, and all references to Schedules refer to the Schedules attached hereto which are made a part hereof; (e) the words "herein" "hereof" "hereunder" "hereinafter" and "hereto" and words of similar import refer to this Agreement as a whole and not to any particular Article or Section hereof; and (f) wherever the term *"Hotel Manager"* is used herein, where the context so requires, such term shall be deemed to include any Delegate or any other Hotel Manager Parties whenever Hotel Manager determines such to be necessary in Hotel Manager's sole discretion.

8.17    **Applicability.** If any term or provision of this Agreement or the application of it to any person, entity or circumstance shall to any extent be invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to persons or circumstances other than those as to which it is invalid or unenforceable shall not be affected thereby, and each term and provision of this Agreement shall be valid and shall be enforced to the extent permitted by law.

8.18    **Guest Lists Proprietary to Hotel Manager.** Any records pertaining to Hotel Guest lists, including, without limitation, names, addresses, Hotel Guest charge statements, folio accounts, Hotel Guest reservations, and reservation agreements with respect to past, present or future rental of any Participating Units or otherwise pertaining to Hotel Guests, constitutes proprietary information of Hotel Manager and shall not be made available or disclosed to Owner except on an as needed basis (as determined by Hotel Manager in its reasonable discretion) with respect to a particular Hotel Guest where disclosure of the particular Hotel Guest information is necessary to protect the interests of Owner, such as for a dispute between the particular Hotel Guest and Owner. If for any reason such Hotel Guest lists or any portion thereof is obtained by or disclosed to Owner, Owner agrees to maintain the confidentiality of such Hotel Guest list and not to disclose all or any portion of such Hotel Guest list to any Person, unless compelled by a final court order which is not subject to appeal.

8.19    **No Partnership/Joint Venture.** Nothing in this Agreement shall constitute or be construed to be or create a partnership or joint venture between the Owner and Hotel Manager.

8.20    **Dollar Amounts.** Unless otherwise stated herein, wherever specific dollars amounts payable by Owner to Hotel Manager are stated in this Agreement, such amounts may be increased annually in the sole discretion of Hotel Manager by application of a nationally recognized consumer price index chosen by Hotel Manager. In the event no such consumer price index is available, Hotel Manager shall choose a reasonable alternative to compute such increases.

8.21    **Patriot Act; Non-interference with Licenses.**  Owner represents and warrants that Owner is not a person or entity with whom United States persons and/or entities are forbidden from doing business or who may jeopardize any licenses or permits (including any liquor or other operating licenses) issued to the Hotel, the Hotel Manager, any Hotel Manager Parties or any affiliate thereof.

8.22    **Attorneys' Fees.**  In any action, litigation or proceeding arising out of or concerning a default of this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party its costs and reasonable attorneys' fees, through the appellate level.

**ARTICLE 9**
**ARBITRATION**

9.1    **General.**  All disputes arising under this Agreement shall be decided by mediation and/or arbitration in accordance with this **ARTICLE 9** and the proceedings shall be conducted in Las Vegas, Nevada.

9.2    **Mediation.**  Prior to, and as a condition precedent to the commencement of any arbitration under this Agreement, the claim, dispute or other matters in question shall be submitted to mediation in accordance with the provisions of this Section 9.2.  The parties agree that any and all disputes, claims or controversies arising out of, or relating to, this Agreement shall be submitted to JAMS, or its successor, for mediation, and if the matter is not resolved through mediation, then it shall be submitted to JAMS, or its successor, for final and binding arbitration pursuant to the arbitration clause set forth below.  Either party to this Agreement may commence mediation by providing to JAMS and the other party hereto a written request for mediation, setting forth the subject of the dispute and the relief requested.  The parties will cooperate with JAMS and with one another in selecting a mediator from JAMS panel of neutrals, and in scheduling the mediation proceedings.  The parties covenant that they will participate in the mediation in good faith, and that they will share equally in its costs.  All offers, promises, conduct and statements, whether oral or written, made in the course of the mediation by any of the parties, their agents, employees, experts and attorneys, and by the mediator or any JAMS employees, are confidential, privileged and inadmissible for any purpose, including impeachment, in any arbitration or other proceeding involving the parties, provided that evidence that is otherwise admissible or discoverable shall not be rendered inadmissible or non-discoverable as a result of its use in the mediation.  Either party may initiate arbitration with respect to the matters submitted to mediation by filing a written demand for arbitration at any time following the initial mediation session or forty five (45) days after the date of filing the written request for mediation, whichever occurs first; *provided, however*, that the party that is the plaintiff under any claim, dispute or other matter cannot elect to initiate arbitration as provided herein if such party has not made itself available for and/or participated in good faith in the initial mediation session.  The mediation may continue after the commencement of arbitration if the parties so desire.  Unless otherwise agreed by the parties, the mediator shall be disqualified from serving as arbitrator in the matter.  The provisions of this Section 9.2 may be enforced by any court of competent jurisdiction.  The parties acknowledge and agree that each party shall be responsible for its own costs, fees and expenses, including attorneys' fees, to be paid by such party in connection with any mediation or arbitration conducted pursuant to this Article 9.

9.3    **Arbitration; Selection of Arbitrator(s).**  Any and all disputes, claims or controversies arising out of, or relating to, this Agreement, or the breach, termination, enforcement, interpretation or validity thereof, including determination of the scope or applicability of this agreement to arbitrate, which has not been resolved by the mediation process set forth in this *Section 9.3*, shall be settled by binding arbitration in accordance with the Comprehensive Arbitration Rules and Procedures then in effect of JAMS, and judgment upon the award rendered in such arbitration may be entered in any court having jurisdiction thereof.  The arbitration proceedings shall be conducted in Clark County, Nevada.  Hotel Manager on the one hand and the Owner on the other hand shall select an arbitrator from a list provided by the JAMS that is mutually satisfactory to them.  If Hotel Manager and the Owner are unable to agree on an arbitrator, Hotel Manager and the Owner shall each choose an arbitrator from a list provided by JAMS.  The two arbitrators so selected shall then select a third arbitrator mutually satisfactory to them from the list provided by JAMS.  The single arbitrator so selected by the aforesaid procedure shall hear the dispute and decide it.  The award of the arbitrator shall be binding and final on all parties.  Any and all legal, accounting and other costs and expenses incurred by each party shall be borne by the party who incurred them.  Notwithstanding anything in this Agreement or the JAMS Comprehensive Arbitration Rules and Procedures to the contrary, the arbitrator(s) of this Agreement shall decide all disputes, claims, controversies or other matters in question in accordance with Nevada law.  This requirement is not merely directory, but constitutes a limitation upon the powers of the arbitrator(s).  The arbitrator(s) shall not be the ultimate judges of whether their decision as to any question in dispute is or is not in accordance with Nevada law.  Instead, any such decisions shall be subject to review by the courts in accordance with Section 10(d) of the United States Arbitration Act (9 U.S.C. §10(d)) (the *"Arbitration Act"*).

9.4     **Arbitration Awards.**  Notwithstanding anything to the contrary, in all arbitration proceedings under this Agreement, the award of the arbitrator: (a) shall indicate the arbitrator's decision with respect to each of the individual claims presented by each party; and (b) shall contain a detailed statement of the reasons supporting each such decision of the arbitrator.

9.5     **Governing Law; Venue.**  This Agreement shall be governed by and construed under and pursuant to the laws of the State of Nevada applicable to contracts made and to be performed entirely within such State without regard to Nevada's conflicts of laws principals.  Any and all litigation or filing of an action (if any) concerning any dispute arising under or in connection with this Agreement, including, without limitation, any action for a review of any decisions hereunder pursuant to the Arbitration Act under **Section 9.3**, shall be filed and maintained only in a state or federal court located in Clark County, Nevada and by signing this Agreement, the parties consent to venue within and the jurisdiction of the State of Nevada.

9.6     **Priorities and Inconsistencies.**  If there are conflicts or inconsistencies between this Agreement and the Declaration, then the terms and provisions of this Agreement shall prevail with the respect to the rights and obligations between the Owner and the Hotel Manager.

9.7     **Class Actions Prohibited.**   IN ANY ARBITRATION CONDUCTED UNDER THIS AGREEMENT, NO CLASS ACTION SHALL BE PERMITTED, NOTWITHSTANDING OTHERWISE APPLICABLE LAW.  AN ARBITRATOR ACTING UNDER THIS AGREEMENT IS NOT EMPOWERED BY THIS AGREEMENT TO CONDUCT A CLASS ARBITRATION.  ONLY CLAIMS OF HOTEL MANAGER AND THE OWNER SHALL BE DETERMINED IN ANY ARBITRATION UNDER THIS AGREEMENT. THE ARBITRATOR SHALL NOT ALLOW EITHER HOTEL MANAGER OR OWNER TO SERVE IN ANY REPRESENTATIVE CAPACITY FOR OTHERS OR AS A PRIVATE ATTORNEY GENERAL.

9.8     **Waiver of Right to Jury Trial and Right to Class Action.**  Hotel Manager and Owner acknowledge and agree that by entering into this Agreement and by agreeing to the terms of this **Article 9**:

(a)     HOTEL MANAGER AND OWNER HEREBY WAIVE THEIR RIGHTS TO TRIAL BY JURY OF ANY DISPUTE ARISING OUT OF OR RELATING TO THIS AGREEMENT ALLEGED AGAINST EACH OTHER OR ANY HOTEL MANAGER PARTIES; AND

(b)     HOTEL MANAGER AND OWNER HEREBY WAIVE ANY RIGHTS TO PROCEED BY WAY OF A CLASS ACTION, TO SERVE IN ANY REPRESENTATIVE CAPACITY FOR OTHERS, AND TO ACT AS A PRIVATE ATTORNEY GENERAL IN ANY CLAIM OR CONTROVERSY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE BREACH, TERMINATION, ENFORCEMENT, INTERPRETATION OR VALIDITY THEREOF.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF the parties have executed this Agreement as of the date first above written.

HOTEL MANAGER:                           OWNER:

Trump Ruffin Tower I LLC, a Delaware
limited liability company

By: _____                  By: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
Name: _____                Print Name: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
Its: _____                 Title (if any): ▓▓▓▓▓▓▓▓▓▓▓▓▓▓


                                         By: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
                                         Print Name: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
                                         Title (if any): ▓▓▓▓▓▓▓▓▓▓▓▓▓▓


                                         By: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
                                         Print Name: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
                                         Title (if any): ▓▓▓▓▓▓▓▓▓▓▓▓▓▓


                                         By: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
                                         Print Name: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
                                         Title (if any): ▓▓▓▓▓▓▓▓▓▓▓▓▓▓


                                         By: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
                                         Print Name: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
                                         Title (if any): ▓▓▓▓▓▓▓▓▓▓▓▓▓▓


                           By Initialing Below Owner Hereby
                     Elects to Have the Subject Unit Be a "No Pets" Unit
                           (as governed by Section 3.10)


                                   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
                                         Owner's Initials

## SCHEDULE A
## DEFINITIONS

"*Arbitration Act*" shall have the meaning set forth in **Section 9.3** of this Agreement.

"*Agreement*" shall mean this Trump International Hotel & Tower – Las Vegas Condominium Hotel Rental Management Agreement.

"*Association*" shall have the meaning given such term in the Declaration.

"*Availability*" shall mean the availability of a Unit as determined in Hotel Manager's sole discretion based on Hotel Manager's internal policies and procedures including the use of actual occupancy and/or forecasted occupancy of the Hotel to determine whether a Unit is available for use by an Owner on any given night.

"*Claim*" or "*Claims*" shall mean any claims, demands, damages, judgments, costs, losses, penalties, fines, liens, suits, actions, expenses and liabilities, including, without limitation, reasonable attorneys' fees and costs and expenses incident thereto.

"*Commencement Date*" shall mean the date on which this Agreement is executed by Hotel Manager.

"*Complimentary Rental*" shall mean use of the Subject Unit for which Hotel Manager receives no Gross Room Rental Revenue. Notwithstanding the foregoing, or anything in this Agreement to the contrary, in no event shall the term "Complimentary Rental" be deemed to include any reduction in the rate for the Subject Unit or any use of the Subject Unit by a Hotel Guest for which Hotel Manager receives no Gross Room Rental Revenue, which reduction or use results from any defect or problem with the Subject Unit or any part thereof (including, without limitation, furniture, fixtures or appliances).

"*Condominium Hotel Property*" shall mean, collectively, the Hotel Unit, the Residential Units and Common Elements (each as defined in the Declaration).

"*Condominium Hotel*" shall mean the Trump International Hotel & Tower – Las Vegas.

"*Confirmation Letter*" shall mean a letter from Hotel Manager to a Unit Purchaser confirming (i) that all of the requirements of **Section 5.7(c)** have been met, and (ii) provided that all of such conditions have been met, the effective date on which the Subject Unit will be removed from the Rental Program.

"*Curable Default*" shall mean: (i) failure to pay an amount required by this Agreement or the Governing Documents as and when required; or (ii) failure to maintain the Standard Package in the Subject Unit; or (iii) any other default Hotel Manager elects, in its sole discretion, to allow Owner to cure and for which the Hotel Manager provides written notice of such right to cure in the Default Notice.

"*Cure Date*" shall mean the date within which Owner shall have to cure a Curable Default.

"*Declaration*" shall mean that certain Declaration of Covenants, Conditions and Restrictions and Reservation of Easements for Trump International Hotel & Tower – Las Vegas, as recorded in the official records of the Clark County Recorder's office.

"*Default Notice*" shall mean a written notice of default in accordance with **Section 8.1** of the Agreement.

"*Delegate*" shall mean any third party, including any separate delegate or Hotel operator, to whom Hotel Manager chooses to delegate all or any portion of its rights and obligations under this Agreement.

"*Departure Cleaning Fee*" shall mean the amount charged by Hotel Manager at the conclusion of an Owner Occupancy Period for which Owner did not elect to receive all of the Hotel services and benefits generally made available to Hotel Guests.

"*Designation of Owner of Record Form*" shall mean the form designating the Owner of Record and required to be provided to the Hotel Manager by Owner pursuant to the terms of **Section 1.4** of this Agreement if the Subject Unit is owned by an entity or more than one individual.

6420442.15

"*Expenses*" shall mean an amount equal to the sum of (i) up to twenty percent (20%) of the Gross Room Rental Revenue before any other deductions or distributions, which amount represents a portion of Hotel Manager's costs and fees of administering this Rental Program, including credit card fees, reservation fees, travel agent fees and marketing costs; (ii) an amount equal to the Transient Occupancy Fee applicable to the Subject Unit type in accordance with the Declaration; and (iii) the Franchise Fee.

"*Expiration Date*" shall mean the following: (i) if Owner selects Option 1 or Option 2 as indicated on **Schedule B**, then Expiration Date shall mean the later of: (a) December 31, 2009, if this Agreement is executed prior to December 31, 2008; and (b) December 31 of the year following the year in which this Agreement is executed after December 31, 2008; or (ii) if Owner selects Option 3 as indicated on **Schedule B**, then Expiration Date shall mean the later of: (a) twelve (12) months from the Opening Date; (b) twelve (12) months from the Commencement Date if such date occurs after the Opening Date; and (c) twelve (12) months from the date on which Owner acquires title to the Subject Unit by recording of a deed in the office of the Clark County Recorder.

"*Final Map*" shall mean the final map of the Condominium Hotel recorded in Clark County for the Condominium Hotel Property.

"*Franchise Fee*" shall have the meaning given such term in the Declaration.

"*Governing Documents*" shall mean, collectively or individually, as the context requires, the Declaration, the applicable provisions of the NRS, the Final Map, the Property Report and the Other Agreements.

"*Gross Room Rental Revenue*" shall mean all room revenues actually received by Hotel Manager from Hotel Guests for the rental of the Subject Unit, less and except: (i) any value added, sales, use, occupancy, bed, resort, tourism and/or other taxes assessed in conjunction with the renting of the Subject Unit; and (ii) any Incidental Charges.

"*Hotel*" shall mean the hotel to be operated by the Hotel Manager and commonly known as Trump International Hotel & Tower Las Vegas, or such other name as Hotel Manager elects from time to time in its sole discretion.

"*Hotel Guest(s)*" shall mean any member of the general public that is a guest(s) or potential guest(s) of the Hotel, other than Owner and Owner's Guests.

"*Hotel Manager*" shall mean Trump Ruffin Tower I LLC, a Delaware limited liability company or its Delegate if Hotel Manager exercises its right to delegate under **Section 6.1**.

"*Hotel Manager Amendment*" shall mean an amendment to this Agreement by Hotel Manager pursuant to the terms of **Section 2.3** of the Agreement.

"*Hotel Manager Parties*" shall mean Hotel Manager, any Delegate of Hotel Manager, and their respective parent companies, affiliates, subsidiaries, and each of their respective directors, members, managers, shareholders, officers, partners, employees, consultants, agents or representatives.

"*Hotel Placement Items*" shall mean marketing and promotional materials relating to products or services of the Hotel, its Delegate or their affiliates or the hotel brand, or of any other Person designated as a hotel brand partner, from time to time.

"*Hotel Unit*" shall have the meaning given such term in the Declaration.

"*Hotel Unit Owner*" shall have the meaning given such term in the Declaration.

"*Incidental Charges*" shall mean revenue generated from any source other than Gross Room Rental Revenue and any other fees or charges to a Hotel Guest occupying the Subject Unit, including, without limitation, mini-bar purchases, pay-per-view television services, food and beverage purchases, fitness center fees and charges, telephone charges, gift shop purchases, internet access charges, business center charges, show tickets or other activities, amenities or other sales or service products provided by Hotel Manager or its designees, charges for use of meeting space (if any), charges for use of cabanas (if any), dry cleaning services, valet parking services, and other fees and charges related to other services offered by the Hotel.

"*Initial Term*" shall mean a term to commence on the later of: (i) the Opening Date; (ii) the date on which Owner acquires title to the Subject Unit by recording of a deed in the office of the Clark County Recorder; or (iii) the Commencement Date, and to terminate at 12:00 noon on the Expiration Date.

"*Institutional First Mortgages*" shall mean a bank, savings and loan association, insurance company, real estate or mortgage investment trust, pension fund, an agency of the United States Government, mortgage banker, the Federal National Mortgage Association, the Federal Home Loan Mortgage Corporation or any other lender generally recognized as an institutional lender, holding a first mortgage on the Subject Unit.

"*Internal Revenue Code*" shall mean the U.S. Internal Revenue Code and any rules or regulations promulgated thereunder.

"*JAMS*" shall mean Judicial Arbitration and Mediation Services.

"*Net Rental Revenue*" shall mean the Gross Room Rental Revenue from the rental of the Subject Unit, less and except either: (i) the Service Fee or (ii) the Expenses, deducted in accordance with the Rental Program Option elected by Owner on **Schedule B.**

"*Notices*" shall mean all notices, demands, statements, requests, consents, approvals and other communications required or permitted to be given under this Agreement, or which are to be given with respect to this Agreement, all as delivered in accordance with **Section 8.12** of this Agreement.

"*NRS*" shall mean the laws of the State of Nevada set forth in Nevada Revised Statutes.

"*Opening Date*" shall mean the date designated in writing by Hotel Manager to Owner (but which is generally intended to be the date that the Hotel first opens to Hotel Guests). Hotel Manager anticipates that the Opening Date will be March 31, 2008; *provided, however,* the foregoing information is provided as a courtesy only to Owner and is not binding on Hotel Manager nor does it create any obligation whatsoever on Hotel Manager.

"*Opt-Out Notice*" shall mean a written notice delivered by a Unit Purchaser to Hotel Manager in accordance with the terms of **Section 5.7(c)**, electing to opt out of the Rental Program.

"*Other Agreements*" shall mean such other declarations, easements and other agreements with respect to the Condominium Hotel Property as may be recorded from time to time in the records of the Clark County Recorder's office.

"*Owner*" shall mean, jointly and severally, each of the parties set forth on the signature page of this Agreement except that for purposes of **Section 5.2**, if the Subject Unit is owned by an entity or more than one individual, then Owner shall mean the Owner of Record.

"*Owner Occupancy Period*" shall mean those times of occupancy for which Owner has requested, and the Hotel Manager and/or its Delegate has confirmed Owner's occupancy of the Subject Unit, which occupancy shall commence upon check-in at the front desk of the Hotel and shall terminate at the designated time for check-out for such occupancy period.

"*Owner of Record*" shall mean the individual who shall act as the primary contact for the Subject Unit, if the Subject Unit is owned by an entity or more than one individual, as designated in accordance with **Section 1.4**.

"*Owner Statement*" shall mean the statement of Owner's account for the period specified in such statement, which shall set forth the total Gross Room Rental Revenue and Owners Invoiced Costs and Expenses and any other offsets or deductions applied against Owner's account for the applicable period.

"*Owner's Family*" shall mean the spouse and children by blood or adoption of Owner.

"*Owner's Guest*" shall mean any Person including, but not limited to, any Person who is an Owner of the Subject Unit, but who is not the Owner of Record and such Person's spouse and children by blood or adoption.

"*Owner's Income*" shall mean an amount equal to the excess, if any, by which the amount of Owner's Share of Net Rental Revenue for the Subject Unit for the period covered by the applicable Owner Statement Period exceeds the amount of the Owner's Invoiced Costs and Expenses for the Subject Unit during the same period, net of applicable withholding, if any.

"*Owner's Invoiced Costs and Expenses*" shall mean Ownership Costs payable to Hotel Manager, Standard Package Reserve Payment(s), any amounts owing by Owner in respect of its or Owner's Guests' use of the Subject Unit, including, without limitation, Incidental Charges; any costs or expenses incurred by Hotel Manager, or owed by Owner to Hotel Manager, for which Owner is responsible in accordance with this Agreement or the Declaration (including any late fees, interest or other

charges applicable thereto); and any other amounts payable by Owner to Hotel Manager allocable to the Subject Unit for the period to which the Owner Statement applies.

"*Owner's Share of Net Rental Revenue*" shall mean the applicable percentage of the Net Rental Revenue to which Owner shall be entitled based on the Rental Program Option selected by Owner as specified on **Schedule B**, subject to such deductions and offsets as are set forth in this Agreement.

"*Ownership Costs*" shall mean (i) mortgage and/or other financing costs; (ii) real and personal property taxes allocable to the Subject Unit or the rental thereof; (iii) all insurance premiums and deductibles allocable to or otherwise applicable to the Subject Unit as contemplated in or required by the Governing Documents or this Agreement; (iv) regular and special assessments and charges levied against the Subject Unit pursuant to the Governing Documents, including, without limitation, Owner's Residential Unit Allocated Interest of all Hotel Shared Expenses and related charges and assessments levied against the Subject Unit pursuant to the terms of the Governing Documents; (v) any fees to be paid by Owner's Guests or any other Person resulting from their occupancy of the Subject Unit, including, but not limited to, Transient Occupancy Fees (except that when any Hotel Guest uses the Subject Unit, Hotel Manager will pay the Transient Occupancy Fees and the Franchise Fee imposed under the Declaration), if the same are not paid by Owner's Guests or such Person prior to departure; (vi) all local and long distance telephone charges from the Subject Unit (except as otherwise allocated hereunder); and (vii) all utility costs allocable either directly or indirectly to the Subject Unit, as applicable.

"*Owner Use Fee*" shall mean: (i) if Owner elects, at the time such Owner registers for an Owner Occupancy Period, to receive all of the Hotel services and benefits generally made available to Hotel Guests as identified on **Schedule D**, an amount equal to the Transient Occupancy Fee applicable to the Subject Unit type in accordance with the Declaration for each night of such Owner Occupancy Period; or (ii) if Owner declines, at the time such Owner registers for an Owner Occupancy Period, to receive such Hotel services and benefits for each night of such Owner Occupancy Period, an amount equal to the Departure Cleaning Fee.

"*Participating Units*" shall mean the Units enrolled in the Rental Program from time to time.

"*Person*" shall mean any individual, partnership, limited liability company, corporation, governmental authority, trust, trustee, unincorporated organization and the heirs, executors, administrators or other legal representatives of any individual.

"*Post Termination Reservation(s)*" shall mean those dates following the Termination Date that Owner shall be required to make the Subject Unit available for an existing reservation.

"*Premium Dates*" shall mean those nights in any calendar year for which Hotel Manager has determined that the Hotel may experience significantly higher occupancy rates. In addition to such other nights as Hotel Manager identifies in its sole discretion in accordance with **Schedule E**, Premium Dates are anticipated to include, without limitation, those nights from December 30 through January 1st and the night of the National Football League Super Bowl and two nights before and two nights after the National Football League Super Bowl. The number of Premium Dates shall not exceed fifteen (15) days in any calendar year.

"*Premium Date Reservation Percentage*" shall mean the percentage of the total number of then Participating Units that Hotel Manager elects from time to time to set aside during Premium Dates for use by owners of Participating Units. The initial Premium Date Reservation Percentage under **Schedule E** is five percent (5%). In no event shall the Premium Date Reservation Percentage be less than two percent (2%) during the term of this Agreement.

"*Property Report*" shall mean the Property Report for the Condominium Hotel relating to the Condominium Hotel Property.

"*Proposed Opt-Out Date*" shall mean the date which is sixty (60) days after receipt by Hotel Manager of an Opt-Out Notice.

"*Reasonable Commercial Efforts*" and similar words and phrases as used in this Agreement shall mean such efforts as Hotel Manager reasonably deems necessary and appropriate, but shall not in any event require the expenditure of funds by Hotel Manager or any of its affiliates, except as expressly set forth herein.

"*Reformation*" shall mean, in accordance with the terms of Section 6.6, a revision by Hotel Manager of this Agreement and/or the programs contemplated herein such that this Agreement and/or the programs contemplated herein are brought into compliance with applicable laws (including, federal and state securities laws).

"*Renewal Term*" shall mean a renewal of this Agreement for a term of one (1) year.

"*Rental Program*" shall mean the program under which the Hotel Manager or its designee will make Reasonable Commercial Efforts to rent Units for Residential Unit Owners at the Condominium Hotel who have executed a form of this Agreement.

"*Rental Program Option*" shall mean each of the rental program options identified and described on **Schedule B.**

"*Reservation Night Cancellation Amount*" shall mean, for each night of any reservation for which the Subject Unit is not available, the following: (i) if Hotel Manager finds a replacement room in the Hotel, the average rack rate for rooms of comparable quality to the Subject Unit on the day upon which the Subject Unit is not available plus ten percent (10%) or (ii) if Hotel Manager is unable to find a replacement room within the Hotel and must place the guest at another hotel property of similar quality as the Hotel, the cost of the replacement room plus ten percent (10%).

"*Service Fee*" shall mean an amount equal to ten percent (10%) of the Gross Room Rental Revenue before any other deductions or distributions, which amount represents a portion of Hotel Manager's costs and fees of administering this Rental Program, including credit card fees, reservation fees, travel agent fees and marketing costs.

"*Standard Package*" shall mean that "Standard Package" (as defined in Section 9.19 of the Declaration) which includes, without limitation, the standard decorations, wall coverings and other interior design appointments, furniture, fixtures, equipment, improvements, kitchen utensils, glasses, dishes, flatware, bed linens, bath towels, robes, hangers, clocks, radios, hairdryer(s), iron, ironing board, toaster, coffeemaker, telephones, bathroom scale and other personal property delivered to Owner in connection with the conveyance of the Subject Unit, as the same may be modified by Hotel Manager from time to time in Hotel Manager's sole and absolute discretion. A current list of the items constituting the Standard Package for the Subject Unit can be obtained from Hotel Manager upon request.

"*Standard Package Reserve*" shall mean a reserve account for the Subject Unit into which the Standard Package Reserve Payments shall be deposited.

"*Standard Package Reserve Base Amount*" shall mean that amount which the Hotel Manager sets, from time to time, as the base amount that must be maintained in the Standard Package Reserve at all times with respect to the Subject Unit. The initial Standard Package Reserve Base Amount shall be an amount equal to One Thousand and 00/100 Dollars ($1,000.00).

"*Standard Package Reserve Payment*" shall mean the following: (i) during the calendar year of 2008, an amount equal to two percent (2.0%) of the Gross Room Rental Revenue to be deducted from Owner's Share of Net Rental Revenue and to be placed into the Standard Package Reserve; and (ii) after the calendar year of 2008, an amount equal to three percent (3.0%) of the Gross Room Rental Revenue to be deducted from Owner's Share of Net Rental Revenue and to be placed into the Standard Package Reserve.

"*Subject Unit*" shall mean the unit identified in **Recital A** of this Agreement.

"*Term*" shall mean the Initial Term, as may be extended by any Renewal Term.

"*Termination Date*" shall mean: (i) the end of the then current Term during which a terminating party delivers a Termination Notice in accordance with terms of **Section 2.2** of the Agreement; or (ii) the date Hotel Manager elects to terminate this Agreement as provided in **Section 2.4.**

"*Termination Notice*" shall mean the prior written notice of a party's election to terminate this Agreement delivered in accordance with the terms of **Section 2.2** of the Agreement.

"*Transient Occupancy Fee*" shall have the meaning given such term in the Declaration.

"*Trump Operating and Physical Standards*" shall mean those operating and physical facilities standards and requirements for the operation of the Hotel as established and required by the Donald Trump, the Trump Organization or any of their respective assigns or designees from time to time.

"*Unit*" or "*Units*" shall mean, individually or collectively, as the context requires, the Residential Units within the Condominium Hotel Property.

*"Unit Purchaser"* shall mean a third party who purchases the Subject Unit from Owner during the Term.

## SCHEDULE B
### RENTAL PROGRAM OPTION SCHEDULE

| Options | Option 1 | Option 2 | Option 3 |
|---|---|---|---|
| Owner Share of Net Rental Revenue | 50% | 55% | 80% |
| Number of nights per calendar year Subject Unit may be used for Owner Occupancy Periods | Unlimited | Unlimited | Unlimited |
| Nights per calendar year available for Owner's Guests | 30 | 30 | 30 |

**BY INITIALING IN THE SPACE PROVIDED, OWNER ELECTS THE FOLLOWING RENTAL PROGRAM OPTION:**

| Option 1 | Option 2 | Option 3 |
|---|---|---|
| _____ | _____ | _____ |

6420442.15

## SCHEDULE C
## EXAMPLES OF DISTRIBUTION OF RENTAL INCOME FOR UNIT

*THE FOLLOWING EXAMPLES ARE INTENDED SOLELY TO GIVE A GENERAL DESCRIPTION OF HOW GROSS ROOM RENTAL REVENUE FOR A PARTICULAR UNIT RENTED TO A HOTEL GUEST MIGHT BE DISTRIBUTED AND IS NOT INTENDED TO BE, NOR SHOULD OWNER RELY UPON SUCH EXAMPLE AS A DEFINITIVE STATEMENT OR REPRESENTATION OF GROSS ROOM RENTAL REVENUE, NET RENTAL REVENUE OR DISTRIBUTIONS FOR THE SUBJECT UNIT. HOTEL MANAGER HAS NOT MADE ANY REPRESENTATIONS OR WARRANTIES NOR DOES HOTEL MANAGER MAKE ANY REPRESENTATIONS OR WARRANTIES CONCERNING GROSS ROOM RENTAL REVENUE OR NET RENTAL REVENUE AMOUNTS NOR HAS HOTEL MANAGER GIVEN OWNER ANY EXPECTATIONS REGARDING THE SAME.*

### EXAMPLE OF A UNIT IN OPTION 1

By way of example only, if Owner elects Option 1 and the Subject Unit is rented to a Hotel Guest for $300.00 for one night of occupancy, such funds would be distributed as follows: (A) $30.00 would be distributed to the Hotel Manager for the Service Fee; (B) the remaining $270.00 would be divided in accordance with the applicable Owner's Share of Net Rental Revenue, which in this case would result in a distribution of $135.00 to the Hotel Manager (50% of Net Rental Revenue) and an allocation of $135.00 to the Owner (50% of Net Rental Revenue), which would be subject to applicable withholding, if any. Assuming no withholding is applicable, the Owner's $135.00 would be adjusted by subtracting $6.00 (the 2% Standard Package Reserve Payment applicable during the calendar year of 2008 -- after the calendar year of 2008 the Standard Package Reserve Payment is 3% and the amount to be subtracted would be $9.00) to be held in the Standard Package Reserve for the Subject Unit, with a total of $129.00 being credited to Owner.

|  | Hotel Manager | Owner |
|---|---|---|
| Service Fee | $ 30.00 | N/A |
| Share of Net Rental Revenue | $ 135.00 | $ 135.00 |
| Less Current Transient Occupancy Fee (Studio) | -$ 49.76 | N/A |
| Less Current Franchise Fee | -$ 10.00 | N/A |
| Less Standard Package Reserve Payment (2008) | N/A | -$6.00 |
| Net Share (assuming no withholding) | $105.24 | $129.00 |

### EXAMPLE OF A UNIT IN OPTION 2

By way of example only, if Owner elects Option 2 and the Subject Unit is rented to a Hotel Guest for $300.00 for one night of occupancy, such funds would be distributed as follows: (A) $30.00 would be distributed to the Hotel Manager for the Service Fee; (B) the remaining $270.00 would be divided in accordance with the applicable Owner's Share of Net Rental Revenue, which in this case would result in a distribution of $121.50 to the Hotel Manager (45% of Net Rental Revenue) and an allocation of $148.50 to the Owner (55% of Net Rental Revenue), which would be subject to applicable withholding, if any. Assuming no withholding is applicable, the Owner's $148.50 would be adjusted by subtracting $6.00 (the 2% Standard Package Reserve Payment applicable during the calendar year of 2008 -- after the calendar year of 2008 the Standard Package Reserve Payment is 3% and the amount to be subtracted would be $9.00) to be held in the Standard Package Reserve for the Subject Unit, with a total of $142.50 being credited to Owner.

|  | Hotel Manager | Owner |
|---|---|---|
| Service Fee | $ 30.00 | N/A |
| Share of Net Rental Revenue | $ 121.50 | $ 148.50 |
| Less Current Transient Occupancy Fee (Studio) | -$ 49.76 | N/A |
| Less Current Franchise Fee | -$ 10.00 | N/A |
| Less Standard Package Reserve Payment (2008) | N/A | -$ 6.00 |
| Net Share (assuming no withholding) | $ 91.74 | $ 142.50 |

6420442.15

## EXAMPLE OF A UNIT IN OPTION 3

By way of example only, if Owner elects Option 3 and the Subject Unit is a Studio unit and is rented to a Hotel Guest for $300.00 for one night of occupancy, such funds would be distributed as follows: (A) $47.24 would be distributed to the Hotel Manager for the Expenses (based on 15.75% to pay a portion of Hotel Manager's costs and fees of administering this Rental Program); (B) $49.76 would be paid to the Hotel Unit Owner to pay the Transient Occupancy Fee (the current amount applicable to a Studio Unit) in accordance with the Declaration; (C) $10.00 would be paid to the Hotel Unit Owner to pay the Franchise Fee (the current amount) in accordance with the Declaration; and (D) the remaining $193.00 would be divided in accordance with the applicable Owner's Share of Net Rental Revenue, which in this case would result in a distribution of $38.60 to the Hotel Manager (20% of Net Rental Revenue) and an allocation of $154.40 to the Owner (80% of Net Rental Revenue), which would be subject to applicable withholding, if any.  Assuming no withholding is applicable, the Owner's $154.00 would be adjusted by subtracting $6.00 (the 2% Standard Package Reserve Payment applicable during the calendar year of 2008 – after the calendar year of 2008 the Standard Package Reserve Payment is 3% and the amount to be subtracted would be $9.00) to be held in the Standard Package Reserve for the Subject Unit, with a total of $148.40 being credited to Owner.

|  | | Hotel Manager | Owner |
|---|---|---|---|
| Expenses are deducted from Gross Room Rental (including payment of current Transient Occupancy Fee and current Franchise Fee) | -$ 107.00 | N/A | N/A |
| Net Rental Revenue | $ 193.00 | N/A | N/A |
| Share of Net Rental Revenue | | $ 38.60 | $ 154.40 |
| Less Transient Occupancy Fee (Studio) | | N/A | N/A |
| Less Franchise Fee | | N/A | N/A |
| Less Standard Package Reserve Payment (2008) | | N/A | -$ 6.00 |
| Net Share (assuming no withholding) | | $ 38.60 | $ 148.40 |

**SCHEDULE D**

**HOTEL GUEST SERVICES**

Hotel Guest Registration Services

> Check-In.
> Check-Out.
> Settlement of Folio.

Daily Housekeeping Service and Check-Out Cleaning Service

> Empty trash.
> Change linen and make beds (*Sofa Bed made in daily service only*).
> Replenish all terry towels and amenities (*Replenish in daily service when less than half full*).
> Wipe and/or dust hard surfaces.
> Vacuum and mop floors.
> Bathroom Cleaning.
> Kitchen Cleaning.
> Straighten/organize guest personal items/shoes.
> Turndown Service.
> Disinfect Whirlpool (*Check Out Service Only*).

The above list is merely illustrative of the type of services to be provided to Hotel guests. Hotel Manager may provide services in addition to the foregoing.

## SCHEDULE E
## PREMIUM DATES DETERMINATION AND ADMINISTRATION

Hotel Manager shall have the right, in its sole discretion, to identify, amend, modify and/or adjust Premium Dates and/or the Premium Date Reservation Percentage in accordance with this Schedule E, which shall be applicable and binding upon Owner and Hotel Manager for all purposes under this Agreement upon the date designated by Hotel Manager (but in no event earlier than thirty (30) days following the date Hotel Manager provides notice to the Owner of Record of such amendment, modification and/or adjustment). Hotel Manager shall give the Owner of Record at least thirty (30) days advance notice of any change in Premium Dates or of any amendment, modification and/or adjustment of the Premium Date Reservation Percentage; *provided, however*, that if the Owner of Record has previously reserved the Subject Unit prior to the date on which Hotel Manager amends, modifies or adjusts the Premium Dates and the date of such reservation falls within a newly designated Premium Date, then the Owner shall be allowed to occupy the Subject Unit during such Premium Date (but only for the length of the specific reservation made by the Owner of Record); *provided further* that Owner acknowledges and agrees that any owner who so reserves a Participating Unit prior to an amendment, modification and/or adjustment of the Premium Dates may be included by Hotel Manager in any determination of whether the number of Participating Units that have been reserved for a Premium Date meet or exceed the Premium Date Reservation Percentage. Subject to the Hotel Manager's rights to amend, modify and/or adjust the same, the initial Premium Date Reservation Percentage shall be equal to five percent (5%); *provided, however*, that Hotel Manager shall not modify the Premium Date Reservation Percentage such that it is lower than two percent (2%) during the term of this Agreement. The total number of Premium Dates in any calendar year shall not exceed fifteen (15) days.

6420442.15